13-1345, -1383

## UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

HOMELAND HOUSEWARES, LLC,
*Plaintiff/Counterclaim Defendant-Cross Appellant*,

and

HASTIE2MARKET, LLC, C-SQUARED TV, INC., INFOMERCIAL CONSULTING CORPORATION, BRENTWOOD CORPORATE SERVICES, INC., BABY BULLET, LLC, CAPITAL BRANDS, LLC, and DOES 1-10,
*Counterclaim Defendants*,

v.

SORENSEN RESEARCH AND DEVELOPMENT TRUST,
*Defendant/Counterclaimant-Appellant*.

———————————————

On Appeals from the United States District Court for the Central District of California in Case No. 11-CV-3720, Judge George H. Wu

## RESPONSIVE AND OPENING BRIEF OF PLAINTIFF/CROSS-APPELLANT HOMELAND HOUSEWARES, LLC

R. Joseph Trojan
Dylan C. Dang
TROJAN LAW OFFICES
9250 Wilshire Blvd., Suite 325
Beverly Hills, CA 90212
(310) 777-8399
Email: Trojan@trojanlawoffices.com
Attorneys for Cross Appellant,
HOMELAND HOUSEWARES, LLC

September 16, 2013

# CERTIFICATE OF INTEREST

Counsel for the appellee, R. Joseph Trojan, certifies the following:

1.    The full name of every party or amicus represented by me is:

Homeland Housewares, LLC

2.    The name of the real party in interest represented by me is:

None

3.    All parent corporations and any publicly held companies that

own 10 percent or more of the stock of the party or amicus

curiae represented by me are:

None

4.    The names of all law firms and the partners or associates that

appeared for the party or amicus now represented by me in the

trial court or agency or are expected to appear in this court are:

R. Joseph Trojan, Dylan C. Dang, Trojan Law Offices

# Table of Contents

STATEMENT OF RELATED CASES ..........................................................1

STATEMENT OF JURISDICTION ..............................................................2

PRELIMINARY STATEMENT .....................................................................2

COUNTER-STATEMENT OF ISSUES PRESENTED FOR
REVIEW .....................................................................................................4

COUNTER-STATEMENT OF THE CASE.....................................................4

STATEMENT OF THE FACTS......................................................................5

    A. Basic Explanation of the Technology ....................................................5

    B. The '460 Patent .....................................................................................7

    C. Known Methods of Preventing Gaseous Voids in the
       Prior Art ...............................................................................................9

    D. The Alleged Infringement ...................................................................11

    E. District Court Proceedings ..................................................................16

        1. Litigation Facts ...........................................................................16

        2. The District Court's Claim Construction Ruling...........................17

        3. The District Court Granted Homeland Summary
           Judgment of Noninfringement ......................................................18

        4. Court Denied Homeland's Motion for Summary
           Judgment of Invalidity .................................................................18

SUMMARY OF ARGUMENT .....................................................................19

    A. Summary of Claim Construction Argument .........................................19

    B. Summary of Noninfringement Argument..............................................22

    C. Summary of Invalidity Argument........................................................26

        1. Summary of Indefiniteness Argument...........................................26

     2. Summary of Obviousness Argument ............................................28

STANDARD OF REVIEW .........................................................................30

ARGUMENT .............................................................................................30

I.  ARGUMENTS IN RESPONSE TO SORENSEN'S
    APPEAL......................................................................................30

  A. The District Court Did Not Err in Construing "Threshold
     Rate"......................................................................................30

     1. Sorensen's Proposed Construction of "Threshold
       Rate" Would Render the Claims Indefinite ...................31

     2. The "Threshold Rate" Has to Be Empirically
       Determined for the Claims to Be Definite .....................34

     3. Determination of the "Threshold Rate" Must Be at the
       Time the Mold Is Made in Order to Prevent Gaseous
       Voids..........................................................................38

     4. Sorensen's Reliance on Mr. Osswald's Opinion Is
       Improper as His Testimony Was Not Before the
       District Court ................................................................40

  B. The District Court Did Not Err in Granting Summary
     Judgment of Noninfringement .............................................41

     1. Homeland's Products Do Not Have "Flow Chambers"................43

       a. The Dye Tests ..........................................................44

         i)  Sorensen Failed to Present Evidence to
           Challenge the Dye Tests ....................................46

         ii) Dye Tests Were Properly Admitted.....................48

       b. The Short Shots.........................................................49

         i)  Plastic Does Not Flow from the Ribs ..................50

         ii) The Short Shots Have Proper Foundation ...........52

2.  Homeland's Products Do Not Have "Exit Positions,"
    "Entrance Positions," or "Inscribed-Sphere
    Dimensions"....................................................................52

3.  Homeland's Products Do Not Have a Thin-Wall
    Cavity Section that Increases in the General Direction
    of Flow ............................................................................53

    a.  Homeland's Engineering Drawings and Caliper
        Measurements ...........................................................54

    b.  Sorensen's Three Drawings .......................................55

4.  Homeland's Products Do Not Have a "Threshold
    Rate" ...............................................................................57

5.  Sorensen Never Tested Homeland's Products.............59

C.  The District Court Did Not Err in Denying Sorensen's
    Motion to "Revise" the Summary Judgment of
    Noninfringement ....................................................................60

II. ARGUMENTS IN SUPPORT OF HOMELAND'S CROSS-
    APPEAL.......................................................................................61

A.  Indefiniteness: The District Court Erred in Denying
    Homeland Summary Judgment of Invalidity Under 35
    U.S.C. § 112, ¶2 ......................................................................62

    1.  Law on Indefiniteness ...................................................62

    2.  The Claims Are Indefinite Because Sorensen Admits
        "Threshold Rate" Has No Meaning ...............................63

    3.  The Circular Logic of the '460 Patent ..........................64

    4.  The Claims Are Indefinite Because There Is No Way
        to Know Whether Voids Are Prevented Due to
        "Threshold Rate" or to Other Factors ...........................65

B.  Obviousness: The District Court Erred in Denying
    Homeland Summary Judgment of Invalidity Under 35
    U.S.C. § 103 ............................................................................67

1. The Question of Obviousness Rests Solely on the
   "Threshold Rate" Limitation..........................................................68

2. The *Graham* Factors .....................................................................69

   a. First *Graham* Factor: The Scope and Content of
      the Prior Art ...........................................................................70

   b. Second *Graham* Factor: The Claimed Invention Is
      an Inherent Characteristic of the Prior Art ...............................72

   c. Empirical Testing Is Obvious ...................................................74

C. Request for Sanctions Against Sorensen for Frivolous
   Appeal ...............................................................................................76

CONCLUSION ...........................................................................................76

# Table of Authorities

## *Cases*

*Abbs v. Principi,*
    237 F.3d 1342 (Fed. Cir. 2001)................................................................78

*Application of Tennant,*
    386 F.2d 472 (Cust. & Pat. App. 1967) ...................................................73

*Athletic Alternatives, Inc. v. Prince Mfg., Inc.,*
    73 F.3d 1573, 1581 (Fed. Cir. 1996)........................................................39

*E-Pass Technologies, Inc. v. 3Com Corp.,*
    559 F.3d 1374 (Fed. Cir. 2009)................................................................79

*Eon-Net LP v. Flagstar Bancorp,*
    653 F.3d 1314 (Fed. Cir. 2011)..................................................................3

*Graham v. John Deere Co.,*
    383 U.S. 1 (1966)....................................................................................68

*Halliburton Energy Services, Inc. v. M-I LLC,*
    514 F.3d 1244 (Fed. Cir. 2008)..........................................................31, 61

*In re Huai-Hung Kao,*
     639 F.3d 1057 (Fed. Cir. 2011) ..............................................................73

*In re Kubin,*
    561 F.3d 1351 (Fed. Cir. 2009) ...............................................................73

*Kirshner v. Uniden Corp. of Am.,*
    842 F.2d 1074 (9th Cir. 1988)................................................................40

*KSR International Co. v. Teleflex Inc.,*
    550 U.S. 398, 127 S.Ct. 1727 (2007) ......................................................68

*SmithKline Beecham Corp. v. Apotex Corp.,*
    403 F.3d 1331 (Fed. Cir. 2005)................................................................31

*Tate Access Floors, Inc. v. Interface Architectural,*
    279 F.3d 1357 (Fed. Cir. 2002)................................................................30

*United Carbon Co. v. Binney Co.*,
  317 U.S. 228 (1942) ...................................................................................61

*United States v. Walker*,
  601 F.2d 1051 (9th Cir. 1979) ...............................................................40

*Young v. Lumenis, Inc.*,
  492 F.3d 1336 (Fed. Cir. 2007) ........................................................29, 31

## *Codes, Rules, Statutes*

28 U.S.C. § 1291 ................................................................................................2

28 U.S.C. § 1295(a)(1) .......................................................................................2

28 U.S.C. § 1338(a) ............................................................................................2

35 U.S.C. § 103 .........................................................................4, 66, 71, 73

35 U.S.C. § 103(a) ....................................................................19, 28, 59, 74

35 U.S.C. § 112 ...........................................4, 19, 26, 31, 60-61, 65

35 U.S.C. § 285 ................................................................................................4

Chisum on Patents,
  Donald S. Chisum, Vol. 3 § 8.03 (2010) ................................................61

## STATEMENT OF RELATED CASES

This is an appeal by Defendant/Appellant Sorensen Research & Development Trust (hereinafter "Sorensen") from the district court's August 23, 2012 Order granting Homeland Housewares, LLC's Renewed Motion for Summary Judgment of Noninfringement of U.S. Patent No. 6,599,460 and denying Sorensen's Motion for Reconsideration of Markman Ruling Re Claim Construction of "Threshold Rate." A0018-20; A0021-36.[1]

Plaintiff/Cross-Appellant Homeland Housewares, LLC (hereinafter "Homeland") cross-appeals the district court's March 1, 2013 Order denying Homeland's Motion for Summary Judgment of Invalidity and granting Sorensen's Cross-Motion for Summary Judgment of Validity of U.S. Patent No. 6,599,460. A0037-53.

Sorensen has separately appealed from the district court's June 23, 2013 Order Granting in Part and Denying in Part Homeland's Motion for Attorney Fees. DE #249. Sorensen's appeal of the attorney fees award has been docketed as Appeal No. 2013-1537. The present appeal will likely affect or be affected by the result in Appeal No. 2013-1537.

---

[1] Citations are to the Joint Appendix **(A)**. Citations to any portion of the trial court record not included in the Joint Appendix are to the docket entry **(DE)** number of the clerk's docket sheet. Where applicable, citations are made to internal page or column and line numbers (page:line).

## STATEMENT OF JURISDICTION

The district court had subject matter jurisdiction over this patent infringement action pursuant to 28 U.S.C. § 1338(a). It entered final judgment on May 28, 2013. A0001-02. Sorensen filed a notice of appeal. DE #200. Homeland timely filed a notice of cross-appeal. DE #215. This Court has jurisdiction over this appeal pursuant to 28 U.S.C. §§ 1291 and 1295(a)(1).

## PRELIMINARY STATEMENT

Sorensen is a well-known Non-Practicing Entity—ranked, in fact, as the sixth-most litigious NPE in the country[2]—that has brought a slew[3] of frivolous patent cases. This is one of them.

In the present case, Sorensen accused Homeland of infringing U.S. Patent No. 6,599,460 ("the '460 patent"), entitled "Prevention of Void-Based-Irregularity Formation in Thin-Wall, Injection-Molded Plastic Product." A0065-73. Living up to its reputation as one of the most litigious NPEs in the country, Sorensen sent out dozens of boilerplate cease-and-desist letters in the last two years on this very patent, making indiscriminate threats of litigation in order to coerce extortive licensing fees. DE #163

---

[2] As reported in "The 271 Patent Blog." A2363-69.
[3] At last checked, Sorensen has been a named party in some 73 cases involving patents that it does not practice. A2367-69.

(Exh. 2); DE #203 (¶¶18-18(dd)); DE #203-18; *Eon-Net LP v. Flagstar Bancorp*, 653 F.3d 1314, 1326-1327 (Fed. Cir. 2011) (noting "indicia of extortion" because it was part of Eon–Net's history of filing nearly identical patent infringement complaints against a plethora of diverse defendants, where Eon–Net followed each filing with a demand for a quick settlement at a price far lower than the cost to defend the litigation). In this case, Sorensen demanded that Homeland pay a "standard" licensing fee of $300,000 or else it would "make Homeland the subject of Sorensen R&D's next lawsuit for infringement of the '460 patent." A0157.

As Sorensen is in the business of making money by making baseless infringement claims, it never had any actual motivation to litigate this case on the merits. This is most plainly evident by the fact that Sorensen never presented *any* admissible evidence to support its claim of infringement against Homeland. A0033. The district court noted again and again Sorensen's failure to produce admissible evidence, remarking at the end of the case, "Sorensen's repeated unreasonable litigation conduct unjustifiably burdened the Court, Homeland, and even itself, because developing the evidence would have been simpler, less costly, and potentially more effective than its paper litigation strategy." A7439.

Though lacking evidence, Sorensen aggressively litigated this case for more than two years so that it could continue to coerce others in the industry to submit to the patent. To push this case along, Sorensen resorted to making arguments that were so frivolous the **district court ultimately granted Homeland attorney fees under 35 U.S.C. § 285 in an amount of a quarter-of-a-million dollars.** A7431-45.

Despite being sanctioned, Sorensen remains stubbornly undeterred, raising on this appeal the same frivolous arguments for which it has already been sanctioned.

## COUNTER-STATEMENT OF ISSUES PRESENTED FOR REVIEW

As to Homeland's cross-appeal, the issues presented for review are:

1. Whether the district court erred in finding that the claims of the '460 patent are not indefinite under 35 U.S.C. § 112, ¶ 2.

2. Whether the district court erred in finding the '460 patent is not invalid under 35 U.S.C. § 103.

## COUNTER-STATEMENT OF THE CASE

In response to Sorensen's allegations that certain Homeland products infringe the '460 patent, Homeland filed a complaint seeking a declaratory judgment of noninfringement, invalidity, and unenforceability. DE #1. Sorensen asserted a counterclaim of infringement. DE #14.

The district court granted summary judgment of noninfringement to Homeland.  A0021-36.  Sorensen sought reconsideration of the summary judgment, which was denied.  A0054-64.

The district court denied Homeland's motion for summary judgment of invalidity, and granted instead summary judgment in favor of Sorensen, but expressly held that it did so *without* finding that the patent is valid. A0037-53.

The district court ultimately granted attorney fees to Homeland based on Sorensen's misconduct throughout the case, awarding fees in the amount of $253,777.37.  A7431-45.

## STATEMENT OF THE FACTS

### A.    Basic Explanation of the Technology

Injection molding is a manufacturing process typically used to make plastic products.  In general, the process involves injecting molten plastic material under high pressure into a mold where it cools and hardens to the configuration of the mold cavity.  A2271-82.  When the plastic is injected into the mold, the hot plastic (~300-500° F) will immediately begin to solidify on encountering the cool mold (~90-120° F).  A2274-76 (¶10).

As a result of solidification, the fill path will narrow until the flow of the plastic stops due to the cooling of the material.  A2275 (¶11).  How

quickly solidification occurs depend on the wall thickness of the part. Therefore, how far the plastic can flow will depend on the part's wall thickness. This is called the flow length to wall thickness (L/t) ratio.[4] For a mold part that is very thin, solidification will happen very quickly, so the flow length will be very short.[5] A2275 (¶12). The thinner the part, the shorter the flow length. *Id*.

Thus, a basic problem in manufacturing a very thin part is that often the plastic will completely solidify before the mold can be completely filled. A2275-76 (¶13). To extend the flow length in order to completely fill the mold, the conventional practice is to artificially thicken the part by using a "flow leader." *Id*. A flow leader is a channel that is thicker (*i.e.* having a larger flow area) than the thin wall part. *Id*. Because the flow leader is thicker than the thin wall part, the molten plastic will flow farther through the flow leader before the fill path stops from the cooling of the material. *Id*. In this way, a flow leader can be used to extend the flow path so that a thin mold can be completely filled. *Id*.

//

---

[4] The general rule of thumb in molding is that the plastic cannot practically flow in length more than 150-200X the thickness of a "standard" section, which is about 3 mm. A2275 (¶11).

[5] For a "thin" part, the rule of thumb is that the plastic cannot practically flow in length more than 50-75X the thickness of a "thin" section, "thin" being generally understood to mean less than 1 mm. A2275 (¶12).

B.     The '460 Patent

The '460 patent is directed to a method of injection molding for "thin wall" plastic products.  A0065-73.  'Thin' is a relative term but academic papers in the art consistently define "thin wall" as being 1 mm or less.[6] A2494; A2520, A2527-28.   In accordance with the common practice of using flow leaders to extend the flow path for thin molds discussed above, the patent teaches the use of "flow chambers" (*i.e.* flow leaders).  As the '460 patent explains, "[s]ome thin-wall portions of some plastic products are injection molded by using a mold cavity that includes flow chambers for directing injected fluid plastic material into thin-wall cavity sections located between the flow chambers to thereby form the thin-wall portions of the product."  A0069 (1:13-17).

The '460 patent goes on to teach that "[f]or some products, it is desired to increase the thickness of the thin-cavity section"; however, "when such thickness is so increased, void-based irregularities sometimes occur in a

---

[6] *Study of Thin-Wall Injection Molding* by Guojun Xu, M.E. (2004) ("Thin-wall injection molding (TWIM) is conventionally defined as molding parts that have a nominal wall thickness of **1 mm or less**…"); *ANTEC 2000: Plastics, The Magical Solution* ("Thin-wall injection molding, in which parts typically have a thickness of **1 mm or less**…"); *Scaling Approach for Thin Wall Injection Moulding by Dimensional Analysis* by Farhad Gharagheizi and Mahmood Torabi Angaji ("Thin-wall injection moulding (TWIM) is conventionally defined as moulding parts that have a nominal wall thickness of **1 mm or less**…").  A2494; A2520; A2527-28.

thin-wall portion...between [the] opposed flow chambers…."  A0069 (1:18-28).

The patent teaches that such void irregularities can be prevented by increasing the thickness of the thin wall section:

> We have discovered that the formation of such void-based irregularities in the thin-wall portion of the product can be prevented…by dimensioning the mold cavity so that said thickness increases in said direction at less than a threshold rate. When said thickness increases in said direction at a rate that equals or exceeds the threshold rate, such void-based irregularities usually occur. The threshold rate for a zone is determined empirically for each product…

A0069 (1:51-62).

In summary, the thickness of the thin wall is increased by using "flow chambers" (*i.e.* flow leaders) to direct the flow of the plastic material into the thin wall section.  A0069.  The key is that as the fluid plastic travels down the flow chambers to fill the thin wall section, the thickness of the thin wall section "*increase[s]…at less than a threshold rate* to thereby prevent…any gaseous void…."  A0072 (7:30-36 (emphasis added)).

The "increase being at less than a *threshold rate*" is the critical limitation of the '460 patent as it is the only basis on which the claimed invention was patentably distinguished over the prior art.  A2371-82; A4394-96.

**C.    Known Methods of Preventing Gaseous Voids in the Prior Art**

As a preliminary matter, it is important to understand that the term "threshold rate" as used in the '460 patent is very different from its ordinary usage in the art.  Homeland's expert, Mr. Bill Tobin, explained:

> One of ordinary skill in the art would understand the "threshold rate" as referring to **a minimum flow rate for filling the mold, not the rate at which the thickness of the thin wall section is increased**….The concept of a "threshold rate"—as meaning a minimum flow rate at which the mold part can be filled before the molten plastic becomes too thick to flow or solidifies—is well known in the casting industry, dating all the way back to the ancient Egyptians who cast bronze swords in sand molds.

A2271-82 (¶23 (emphasis added)).

Mr. Tobin went on to explain that "[t]he 'threshold rate' cannot be understood as referring to the rate at which the thickness of the thin wall section is increased in order to prevent gaseous voids…because the increase in thickness of the thin wall section has little to do with the formation or prevention of voids."  A2280 (¶24).  Mr. Tobin further opined:

> …There is no "threshold rate" of thickness that prevents the formation of voids.  A void can form because the injected plastic shrinks upon cooling, as material is pulled away from the hot center section towards the cold mold walls, leaving a void in the center.  In order to prevent voids, the injection is pressurized to force a sufficient volume of plastic into the mold to offset the

9

> shrinkage. **Thus, voids are prevented by adjusting the pressure of the injection, not changing the thickness of the wall.** Therefore, the term "threshold rate" as it is used in '460 patent is unclear.

A2280-81 (¶24 (emphasis added)).

At the end of the case, Sorensen itself finally admitted that the adjustment of injection pressure and speed can prevent gaseous voids:

> SRDT [*i.e.* Sorensen] never believed, nor asserted, that "increasing the thickness at less than a threshold rate" solely controls "whether gaseous voids will form in thin-wall injection molding," neither in Doc. #164, p. 18-22, nor elsewhere. The '460 patent is directed to preventing gaseous voids from forming in a thin-wall section of a plastic product by increasing the thickness of the thin-wall section at less than a threshold rate; it is not directed to preventing gaseous voids from forming in the thin-wall section by varying injection speed and injection pressure.

A6571-72 (n. 4 (underlining in original)). The district court remarked that "Sorensen now admits that it knew that its solution to the formation of gaseous voids in such injection molding - adjusting the rate of thickness increase until no gaseous voids are formed - was not the only solution to the problem." A7438.

This admission, as the district court observed, completely undercuts Sorensen's entire case:

> Sorensen's argument that the change in injection pressure and speed matter here undercuts Sorenson's entire theory of the '460 patent.…[B]y arguing that injection speed

10

and pressure materially affect the behavior of the plastic formation, Sorensen endorses the theory put forth by Homeland's expert, Dr. Tobin, who stated that it is fact those parameters, not the rate of increase in thickness of the thin wall portion, that control void formation.

A0062 (n. 4).

### D.    The Alleged Infringement

Homeland makes and sells wildly popular food blender systems called the Magic Bullet and the Baby Bullet.  These food blender systems come with an assortment of plastic cups and mugs, for example, as shown:




On March 18, 2011, Sorensen sent a cease-and-desist letter accusing certain of Homeland's plastic cups and mugs of infringing the '460 patent.[7] A0132-40.  In support of the letter, Sorensen attached some drawings:





A0139-140.

In response to the letter, Homeland pointed out at least four reasons why the accused products did not infringe the patent—*three of these reasons would later prove dispositive on summary judgment* and are thus relevant to the issues raised in this appeal.  A0142-152; A0161-63; A0021-36.

---

[7] The cease-and-desist letter to Homeland was among dozens of boilerplate cease-and-desist letters that Sorensen began sending out in 2011-12 on the same '460 patent.  DE #203 (¶¶18-18(dd)); DE #203-18.

First, Homeland pointed out at that its products are not "thin wall" products. A0161. As noted above, "thin wall" is commonly understood to be 1 mm or less. A2494; A2520, A2527-28. The '460 patent itself teaches a "thin-wall cavity section 20 [that] has a uniform thickness of 0.15 mm." A0070 (4:17-18). By contrast, Homeland's products are approximately 2.5 to 3.2 mm thick in the relevant zones. A0151-52. This is more than two to three times thicker than the standard definition of "thin" in the art and upwards of 20 times thicker than what is taught in the '460 patent. A0151-52; A0161.

Because Homeland's products are so much thicker than the standard thin wall product, they do not experience "gaseous voids" that affect thin wall products as described in the '460 patent. A0142-43; A02318-19. In fact, Homeland confirmed with its manufacturer that gaseous voids have never been a problem in the injection molding of Homeland's products. A02318 (¶14). Since gaseous voids are not a problem in making the products, there would be no reason to employ the injection molding process claimed in the '460 patent to prevent a problem that does not exist in the first place. A0142-43.

Second, as Homeland further explained to Sorensen, the products do not have "flow chambers." A0143; A02318 (¶16). Because Homeland's

13

products are thick, not thin, it would be unnecessary to use flow chambers to extend the flow path to fill the mold.[8]  The ribs in Homeland's products that Sorensen contended to be flow chambers do not function to direct the flow of plastic in the molding process.  Rather, the ribs only function to create turbulence to facilitate the blending of foodstuff when the blender cups are used by end consumers.  A2318 (¶ 16).

As Homeland further pointed out, it is easy to see that the ribs do not function as flow chambers because they are not connected to the gate (*i.e.* the point of injection).  A0143; A0148-149.  In order for the ribs to function as flow chambers to channel the flow of the fluid plastic, the molten plastic would have be fed directly from the gate into the flow chambers, otherwise the plastic would flow randomly into the so-called thin wall section between

---

[8] This can be confirmed by examining the dimensions of the accused products.  As discussed, *supra,* molten plastic usually cannot flow in length more than 150-200X the thickness of the standard wall stock.  Applying this rule of thumb to the accused products, the Homeland cups have a minimum wall stock of about 2.5 mm.  Therefore, the maximum flow length would be roughly 375 to 500 mm.  Yet the longest Homeland cup is only about 140 mm in length, which means that the mold is completely filled long before the flow length runs out.  A6064-65.  This is why the ribs in the Homeland's products are not "flow chambers" because there is no need to use flow chambers as claimed in the patent.

the ribs.[9]  A2217 (¶17).  Homeland produced photographs of the mold parts to show that the gate is not connected to the ribs.  A0145-48.

Third, Homeland pointed out that its products do not have walls that increase in thickness.  A0144; A0151-52; A0161-62.   Homeland produced engineering drawings that show the products' walls are substantially uniform in thickness (and any variance being within the normal manufacturing tolerance).  A0149-52.  Indeed, even according to Sorensen's own drawings, the difference in wall thickness of 0.070 mm is less than the normal manufacturing tolerance of $\pm$ 0.1 mm set forth in Homeland's engineering drawings.  A0162; A2278 (¶19); A2311-13.

Lastly, Homeland pointed out that its products do not have walls that increase in thickness "at less than the threshold rate."  A0144; A0162.  To this day, Sorensen has never identified what the "threshold rate" is for Homeland's products.

In response to Homeland's engineering drawings, the photographs of Homeland's mold, and Homeland's common-sense explanation of why the products do not infringe the '460 patent, Sorensen responded on April 15,

---

[9] The '460 patent teaches that "[t]he pair of opposing flow chambers 21 extend from a feeding flow chamber 22 that is coupled to a gate 23 defined by the mold."  A0070 (3:53-55).

2011 by threatening to "make Homeland the subject of Sorensen R&D's next lawsuit for infringement of the '460 patent." A0157.

### E.    District Court Proceedings

#### 1.    Litigation Facts

Homeland filed suit against Sorensen on April 29, 2011, seeking a declaratory judgment of noninfringement, invalidity, and unenforceability. DE #1. On June 2, 2011, Sorensen asserted a counterclaim of infringement. DE #14.

Sorensen served infringement contentions on August 26, 2011, which referred only to three drawings: D-7060, D-7105 and D-7106. A2399-2423. Besides these three drawings, **Sorensen admitted it had no other documents to support its infringement contentions.** A2449-54; A6092-A6108 (at A6104:17-18; A6105:24 – A6106:5); A6109-23.

Having received nothing from Sorensen in discovery, Homeland took it upon itself to produce further evidence of noninfringement (in addition to the photographs and engineering drawings already produced prior to the start of the litigation). A0145-52. To confirm what was shown in the engineering drawings (*i.e.,* that the walls do not increase in thickness), Homeland cut a sampling of its products, measured them with an electronic caliper, photographed the measurements, produced the photographs and

made the cut samples available for Sorensen's inspection. A2316 (¶10); A2235-36.

To show that Homeland's products do not have "flow chambers," Homeland produced a series of short shots and dye tests to demonstrate that the flow of injected plastic is not directed by the ribs. A2316 (¶¶9, 13-14); A2327-34; A2339-43. First, Homeland ran short shots by making partial fillings of the mold to show the flow of the fluid plastic at different stages of the injection molding process (akin to taking snap shots of the injection process). A2327-34.

In addition to the short shots, Homeland also conducted dye tests. Homeland put color dye in the mold, and then ran another series of shots to visually track the flow of the dye as the mold is filled. A2316 (¶¶13-14); A2339-43. The dye tests showed that the plastic does not flow through the ribs and into the so-called thin wall section as claimed in the patent. *Id*.

When Sorensen ignored all of this empirical data proving noninfringement, Homeland moved for summary judgment of noninfringement on March 21, 2012. DE #76. The motion was subsequently taken off calendar at Sorensen's behest. DE #95.

## 2.    The District Court's Claim Construction Ruling

On July 5, 2012, the district court issued its Markman ruling on the

claims of the '460 patent.    A0103-17.    Sorensen filed a motion for reconsideration of the Markman ruling, which the Court denied.  DE #114 & #140.

### 3.    The District Court Granted Homeland Summary Judgment of Noninfringement

After the Markman ruling, Homeland filed a renewed motion for summary judgment of noninfringement on July 26, 2012.  DE #118.  The district court granted Homeland summary judgment of noninfringement on August 23, 2012.  A0021-36.  Sorensen later moved to "revise" the summary judgment of noninfringement, which was denied.  A0054-A64.

### 4.    The District Court Denied Homeland's Motion for Summary Judgment of Invalidity

On September 17, 2013, Sorensen moved to dismiss Homeland's remaining claims of invalidity and enforceability, which the district court denied.  A3230-39.

On December 14, 2012, Homeland moved for summary judgment of invalidity of the '460 patent under 35 U.S.C. § 103(a) as obvious and under 35 U.S.C. § 112, ¶ 2 as indefinite.  DE #158.  Sorensen filed a cross-motion for summary judgment that the patent is valid.  DE #167.  The district court denied Homeland's motion for summary judgment of invalidity, and granted

instead summary judgment in favor of Sorensen on the ground that Homeland had not produced sufficient evidence to proceed with its invalidity counterclaims.  A0037-53.

## SUMMARY OF ARGUMENT

### A.    Summary of Claim Construction Argument

The district court correctly construed "threshold rate" to mean "the rate of increase in the thickness of the thin wall section [to be] empirically determined by conducting test strips at the time the mold is made in order to prevent gaseous voids."  A0015-17.  This is not only correct, it is the only logical construction that could possibly render the claims definite.

The key claim made by the '460 patent is that gaseous voids can be *prevented* by increasing the thin wall section "at less than a threshold rate." A0072 (7:33).  In order to prevent gaseous voids relative to the threshold rate instead of relative to some other parameters (*e.g.* injection pressure or speed), the threshold rate has to be known.  There is no mathematical formula taught by the '460 patent to determine threshold rate.  This means that the threshold rate has to be *empirically determined at the time the mold is made* in order to know how much the thickness of the thin wall section can be increased without exceeding that threshold rate.

19

The fundamental problem with Sorensen's appeal of the district court's construction of threshold rate is that Sorensen itself is unable to offer a workable definition of that crucial term. Instead, Sorensen insists that it is unnecessary to determine the threshold rate at all:

> The '460 patent does not disclose a method for determining a threshold rate; the '460 patent discloses the inventors' discovery of the existence of a threshold rate and teaches how to use that concept to prevent void formation.

*See* Sorensen's Opening Brief ("SOB") at 21; A0668 (lines 11-13). As discussed below, the mere discovery of the existence of a rate under which gaseous voids do not form, a rate that will vary depending on the parameters and characteristics of a particular mold, is not invention; it is merely an observation. Incredibly, Sorensen itself analogized the threshold rate to the boiling point of water. A0026; A0688-89. If inventing is to be something more than making an observation, the threshold rate must be determinable so that one would know what it is and how to use it to prevent gaseous voids.

Furthermore, if the threshold rate were not empirically determined at the time the mold is made, then it would mean that it can only be determined after the product is already molded. This would require the practitioner to work *backwards,* first by making a product through trial and error that does not exhibit voids, and then conduct testing to determine the rate for that

product.  But if the threshold rate is only determined after the product is already made, it cannot be said that the patent teaches a way of *preventing* gaseous voids.

The district court wrestled with this problem in the Markman Order, remarking on the circular logic of determining the threshold rate only after the product is already made:

> Homeland neatly sums up the difficulty in construing this term when it argues: "The logic of the claim is circular: gaseous voids are prevented by increasing the thickness of the thin wall at less than a threshold rate, but the threshold rate itself can only be determined by repeated testing until gaseous voids are prevented." …This is, in essence, a definiteness argument, since a person of ordinary skill in the art would not know what the threshold rate is until that person conducted testing on the particular product to see at what rate of increase gaseous voids are prevented; once that testing is complete, however, the person need not have referred to a "threshold rate" at all, but has instead, in some sense, discovered for herself that rate.

A0016-17.  This paradox—that gaseous voids are prevented by increasing the thickness of the thin wall at less than a threshold rate, but the threshold rate itself is unknown until after the product is made—lies at the heart of the problem of what the term means.  This is why the district court construed threshold rate to mean that it must be empirically determined at the time the mold is made.

Regardless of how threshold rate is construed, the issue is moot if this Court affirms the district court's ruling that there is no infringement on the basis of any of the other claim limitations.

### B.  Summary of Noninfringement Argument

The district court correctly granted summary judgment of noninfringement to Homeland on three grounds:

1)  The district court held that there was no genuine dispute that Homeland's products do not have "flow chambers."[10] A0028-31.  This finding was based on the short shots and dye tests, which showed that the ribs in Homeland's products do not direct the injected plastic into the alleged "thin wall" sections.  A2314-19; A2327-34; A2339-43.

2)  The district court held that there was no genuine dispute that Homeland's products do not have a "thin-wall cavity section [that] increases in the general direction of flow" (hereinafter "the thickness-of-wall" limitation).  A2332-34.  This finding was based on Homeland's engineering drawings and actual measurements of the products, which showed that the walls of the products have uniform thicknesses.  A2314-19; A6057-74; A2335-36.

---

[10] And by logical extension, the district court also found there was no genuine dispute that the accused products lacked "exit positions," "entrance positions," and "inscribed spheres."  A0032.

3)    The district court held that there was no genuine dispute that the accused products are not made pursuant to a "threshold rate" as claimed in the '460 patent.  A0034.  This finding was based on the declaration of Joe Meyer, who averred that Homeland has never determined the "threshold rate" of the accused products in order to prevent gaseous voids because gaseous voids have never been a problem in the accused products.  A2318 (at ¶15).

Against the weight of this evidence, what did Sorensen produce? Quite literally, nothing.  Three *unsubstantiated drawings* are all Sorensen has ever produced to support its claim of infringement.  As the district court noted below:

> All in all, again, Sorensen has failed to present even a scintilla of evidence to counter the weighty evidence put forward by Homeland.…
>
> ***
>
> [A]fter more than a year of opportunities to take discovery and run tests, Sorensen has presented no evidence whatsoever showing that the Accused Products do in fact contain all the claim limitations, and has not even suggested what type of evidence it might present in that regard.

A0033; A0036.  Later, in rejecting Sorensen's motion to "revise" the summary judgment of noninfringement, the district court again emphasized

that it "has repeatedly noted Sorensen's failure to produce any such evidence." A0064.

Specifically, on the issue of whether the ribs in Homeland's products function as flow chambers, Sorensen only contests the quality of the short shots and dye tests, arguing mainly that the evidence lack proper foundation. These same arguments were repeatedly rejected by the district court, which noted it "has repeatedly addressed the issue of evidence relating to short shot and dye tests submitted by Mr. Meyer. In granting summary judgment of non-infringement, the Court thoroughly outlined Sorensen's lack of diligence in discovery and Sorensen's failure to assert specific facts that would aid in its cause for additional discovery…." A0052; A0062; A0030-31.

The reason that Sorensen keeps making the same tired arguments about the short shots and dye tests is that it has no evidence of its own to show that the ribs in Homeland's products function as flow chambers. As the district court noted, "Sorensen does not deny that it has conducted no testing whatsoever that could show how the Accused Products do in fact utilize flow chambers." A0030.

On whether the walls of Homeland's products increase in thickness, Sorensen was unable to produce evidence that it had actually measured

Homeland's products to determine if the walls increase in thickness. Homeland presented original engineering drawings and actual measurements of the accused products taken with an electronic caliper. A2314-19; A6057-74; A2335-36. What did Sorensen present? In its Opening Brief, Sorensen states that, "[it] offered, by way of Mr. Sorensen's Declaration, *three drawings* depicting Sorensen's measurements of the three Accused Products." *See* SOB at 48 (emphasis added). The district court commented on the inadequacy of the drawings, noting that "Sorensen has only presented the **three drawings found in the Contentions, as the sum total of documents evidencing testing they did to support the infringement claim…."** A0030 (emphasis added). As the three unauthenticated drawings did not raise a trialable issue, the district court concluded, "Sorensen has put forward *no* admissible evidence indicating that the walls are *not* of uniform thickness…." A0033 (emphasis in original).

Lastly, on the most critical limitation of the '460 patent—whether gaseous voids are prevented in Homeland's products by increasing the thickness of the wall section "at less than a threshold rate"—Sorensen argues only that the district court's construction of "threshold rate" is wrong. *See* SOB 55. But no matter how threshold rate is defined, the bottom line is that Sorensen has never offered evidence to show that Homeland's products have

walls that increase in thickness at less than a threshold rate. A2346 (¶11); A2445-49. Indeed, Sorensen has never even identified the so-called threshold rate of Homeland's products.

Therefore, Sorensen cannot establish any material issues that would justify reversal of the district court's summary judgment of noninfringement.

### C.    Summary of Invalidity Argument

The district court erred in denying Homeland's motion for summary judgment of invalidity. A0053. It erred, moreover, in granting summary judgment in favor of Sorensen on the ground that Homeland had not produced sufficient evidence to proceed with its invalidity counterclaims. *Id*.

### 1.    Summary of Indefiniteness Argument

The district court held that the claims are not indefinite under 35 U.S.C. § 112, ¶ 2 based on its construction of "threshold rate" as requiring empirical testing. As discussed above, Sorensen has argued on this appeal that the court erred in granting summary judgment of noninfringement based on the construction of threshold rate. *See* SOB at 55.

If Sorensen insists that the district court's construction of threshold rate is wrong for infringement, then it cannot argue that the district court got it right in holding the claims are not indefinite under the same claim

construction.  On the other hand, if Sorensen maintains that the district court did not err in holding the claims are definite, then it cannot argue, as it does in challenging the summary judgment of noninfringement, that the district court erred in construing threshold rate as requiring empirical determination. The patent is either not infringed or indefinite.  Sorensen cannot take diametrically opposite positions regarding infringement and validity. Sorensen has to pick its poison.

If the district court's construction of threshold rate is overturned on any grounds, then the claims of '460 patent would be indefinite because the term "threshold rate" is so ambiguous that one of skill in the art would not be able to determine the metes and bounds of the patent.  Sorensen admitted below that it was known in the prior art that gaseous voids could be prevented by controlling variables such as injection pressure or speed. A7437-38.   Thus, in order to know the metes and bounds that separate the '460 patent from the prior art, it would be necessary to demarcate the method of preventing gaseous voids claimed in the patent (*i.e.* by keeping the thickness of the thin wall at less than the threshold rate) from other methods of preventing gaseous voids that were already known in the prior art (*i.e.* by controlling injection pressure and speed).

When practicing the claimed invention, one of skill in the art would

need to know whether gaseous voids are prevented due to the thickness of the thin wall being less than the threshold rate or whether it is due to some other variables such as injection pressure and speed.  The claims of the '460 patent are indefinite because there is simply no way to know whether gaseous voids are prevented due to the threshold rate since that rate will vary depending on changes in injection pressure and speed.

Moreover, the claims are indefinite because there is no way to calculate the rate that delineates the threshold at which voids are prevented. A0026; A0062 (n. 4).  The essential problem of the '460 patent is that it claims that gaseous voids are prevented by increasing the thickness of the thin wall at less than a threshold rate, but the threshold rate itself is unknown and undeterminable.  Therefore, the claims are indefinite because one of ordinary skill in the art would not know when she is crossing over the boundaries of the '460 patent because they are defined by an unknowable term.

### 2.    Summary of Obviousness Argument

The '460 patent is also invalid under 35 U. S. C. § 103(a).  Sorensen admitted below that people of ordinary skill in the art would have known how to prevent the formation of gaseous voids in thin wall injection molding by controlling injection pressure and speed.  A6571-72 (n. 4); A7438.  The

pressure and speed at which the fluid plastic flows through the cavity depends on the wall thickness. Since changing the wall thickness of the mold cavity will change the pressure and speed of the plastic flow, the threshold rate, being a function of the wall thickness, will necessarily change due to changes in the pressure and speed when the wall cavity is changed. A2280-81 (¶¶23-24). There is no teaching in the '460 patent of how the threshold rate can be controlled independently of pressure and speed. Thus, the '460 patent's claim that gaseous voids are prevented by increasing the thickness of thin wall at less than a threshold rate is really just a claim that gaseous voids are prevented due to some threshold pressure and speed.

The '460 patent is also obvious over U.S. Patent No. 4,117,950 to Allen and U.S. Patent No. 5,839,603 to Smith. A2383-92; A2393-98. It is obvious because one of ordinary skill in the art would have known from reading these prior art patents how to increase the thickness of the thin wall section in the direction of flow and prevent the formation of gaseous voids in thin wall injection molding. The '460 patent does not teach a new way of preventing gaseous voids that cannot be accomplished by Allen and Smith. Rather, all it teaches is that gaseous voids do not occur below some abstract "threshold rate." As noted, this is an observation, not an invention.

Indeed, Sorensen has repeatedly argued that it is not even necessary to determine the "threshold rate" in order to make a product without gaseous voids. A2160 ("The claims of the '460 patent do not require the 'threshold rate' to be determined…" (underlining in original)). If it is not necessary to determine the "threshold rate" to prevent gaseous voids, then the limitation is meaningless, and there is nothing left of substance to distinguish the '460 patent over the prior art.

## STANDARD OF REVIEW

The district court's grant of summary judgment is reviewed *de novo*. *Young v. Lumenis, Inc.,* 492 F.3d 1336, 1345 (Fed. Cir. 2007).

## ARGUMENT

## I.    ARGUMENTS IN RESPONSE TO SORENSEN'S APPEAL

### A.    The District Court Did Not Err in Construing "Threshold Rate"

At the heart of the '460 patent is its claim that gaseous voids can be prevented by increasing the thickness of the thin wall section "at less than a threshold rate." A0072 (7:29-36). What is the "threshold rate"?[11] This has been the overriding question in the case.

---

[11] Sorensen stated below that the term "is not defined, it is not used in any special sense in this patent." A0688. As noted, Homeland's expert, Bill Tobin, explained that, "One of ordinary skill in the art would understand the

The district court construed "threshold rate" to mean "the rate of increase in the thickness of the thin wall section [to be] empirically determined by conducting test strips at the time the mold is made in order to prevent gaseous voids." A0015-17. (Sorensen moved for reconsideration of the court's construction of threshold rate, which was denied. A0024-26.) This construction is necessary if the claims are to be definite. *Tate Access Floors, Inc. v. Interface Architectural,* 279 F.3d 1357, 1369 (Fed. Cir. 2002). Sorensen's construction, by contrast, would render the claims indefinite.

### 1.    Sorensen's Proposed Construction of "Threshold Rate" Would Render the Claims Indefinite

For the '460 patent's claims to be definite, "threshold rate" must be construed in a way as to "particularly point[] out and distinctly claim[] the subject matter which the applicant regards as his invention." 35 USC § 112, ¶2. The primary purpose of the definiteness requirement is to provide clear warning to the world of the scope of the patent. *See Halliburton Energy Services, Inc. v. M-I LLC,* 514 F.3d 1244, 1249 (Fed. Cir. 2008) ("Because claims delineate the patentee's right to exclude, the patent statute requires that the scope of the claims be sufficiently definite to inform the public of

---

'threshold rate' as referring to a minimum flow rate for filling the mold, not the rate at which the thickness of the thin wall section is increased." A2280 (¶ 23).

31

the bounds of the protected invention, i.e., what subject matter is covered by the exclusive rights of the patent."); *Young v. Lumenis, supra,* 492 F.3d at 1346 ("The purpose of the definiteness requirement is to ensure that the claims delineate the scope of the invention using language that adequately notifies the public of the patentee's right to exclude." (internal quotations and citations omitted)); *SmithKline Beecham Corp. v. Apotex Corp.,* 403 F.3d 1331, 1340 (Fed. Cir. 2005) ("To satisfy this requirement, the claim, read in light of the specification, must apprise those skilled in the art of the scope of the claim.").  In keeping with the purpose of § 112, ¶ 2, "threshold rate" must be defined as to provide clear warning of the scope of the '460 patent.

Sorensen's proposed construction of threshold rate—to mean "the increase in the thickness of the thin-wall cavity section within a zone below which void-based irregularity formation between the adjoining flow chambers is prevented"—would render the claims indefinite.  *See* SOB at 16 (citing A0015).  Sorensen's construction is merely a circular rewording of the claim:

| Claim 1 of '460 Patent | Sorensen's Claim Construction |
|---|---|
| "…the thickness of the at least one thin-wall cavity section increases in the general direction of flow within | "the increase in the thickness of the thin-wall cavity section within a zone below which void-based irregularity |

| | |
|---|---|
| the flow chambers adjoining said zone, with said increase being at less than a threshold rate to thereby prevent injected fluid plastic material so directed into the at least one zone from at any time surrounding any gaseous void within the at least one zone." | formation between the adjoining flow chambers is prevented." |

Under Sorensen's construction, the '460 patent is reduced to this perplexing paradox: gaseous voids are prevented by increasing the thickness of the thin wall at less than a "threshold rate," but the "threshold rate" is just "the increase in the thickness of the thin-wall cavity section … below which void-based irregularity formation … is prevented."  By this circular logic, **any injection-molded product having a wall of increasing thickness that does not exhibit gaseous voids would, by definition, be under the "threshold rate."**  Conversely, the only way to show that an increase is *not* "less than the threshold rate" would be to show that it has gaseous voids.

Hence, the district court found that "Sorensen's proposed construction would have made its claims cover any use of any existing or future method that merely happened to not produce gaseous voids in a given product run." A0045.  In effect, Sorensen's construction would grossly expand the scope of the patent by reading that term out of the claims.

Moreover, Sorensen's construction would also grossly expand the scope of the patent because it would cover products in which gaseous voids are prevented by other methods, such as controlling the injection pressure and speed. As the district court pointed out, "[Sorensen's] proposed construction of 'threshold rate,' which would have captured processes for molding products with increasing thickness that address the gaseous void problem by adjusting injection speed and pressure without adjusting the rate of increase in the thickness of the mold, was not only incorrect, but unreasonably broad." A7438.[12]

Such an unreasonably broad reading of threshold rate renders the claims indefinite because it hopelessly blurs the bounds between the claimed invention and the prior art.

## 2. The "Threshold Rate" Has to Be Empirically Determined for the Claims to Be Definite

To more definitely delineate the scope of the invention, and thereby enable people of ordinary skill in the art to ascertain its metes and bounds so

---

[12] It is precisely because Sorensen adopted such an unreasonably broad reading of its patent that it indiscriminately threatened suits against dozens and dozens of businesses without ever attempting to determine the threshold rate of the varied accused products. If Sorensen's construction of threshold rate were adopted, it would give Sorensen—already the sixth most litigious NPE in the country (A2363-69)—unfettered license to sue because no one would be able to avoid infringement by showing that their products are not "less than the threshold rate."

as to avoid infringement of the '460 patent, the "threshold rate" has to be determinable.  This means that it has to be empirically determined at the time the mold is made.

Sorensen argues that the district court's construction is wrong because the rate need not be determined, "whether by empirical means or otherwise":

> The '460 patent does not disclose a method for determining a threshold rate; the '460 patent discloses the inventors' discovery of the existence of a threshold rate and teaches how to use that concept to prevent void formation.

*See* SOB at 21-22.  The inventors' observation that gaseous voids do not appear below a certain rate is just that, an observation—it is not an invention.  It is merely an observation of a phenomenon that is not patentable.  In order for the claimed injection molding method to be patentable, the threshold rate must be determined so that the method can be used to prevent gaseous voids, otherwise the limitation would be meaningless.

Indeed, if the threshold rate is not determined, how is one to know that any absence of gaseous voids is due to the claimed method, instead of due to some other known methods, such as the adjustment of injection pressure and speed?  As the district court remarked below,

> So, Sorensen acknowledges that the problem addressed by the '460 patent – gaseous void formation – can be

> addressed by modifying injection speed and pressure, in addition to the solution claimed in the '460 patent of modifying the rate of thickness increase in a thin wall section. That fact further highlights the necessity of the Court's construction of "threshold rate" to require empirical testing to determine that rate, consistent with the text of the '460 patent and the inventor's testimony.

A7437.

Further, the district court noted that Sorensen itself acknowledges there is no fixed threshold rate, "analogiz[ing] [it] to the boiling point of water, saying that just as the boiling point of water will vary based on altitude (actually based on barometric pressure), the threshold rate below which gaseous voids will not form will vary based on the particular product and mold cavity." A0026. Since the threshold rate will change depending on certain parameters, it is necessary to empirically determine what the rate is on a case-by-case basis.

Hence, the district court noted in its Markman ruling that common-sense logic dictates that the threshold rate has to be determined by empirical testing in order for the claimed injection method to be practiced:

> Given the language of the specification, and Sorensen's admission that the "value" of the "threshold rate" for a given item would vary based on "mold cavity geometries and the type and amount of plastic used," it is hard to see how they can plausibly argue that the "threshold rate" of the Accused Products should not be construed so as to involve an empirical test to see what the rate is….

A0016.  Without determining the threshold rate, it would be impossible to know how much to increase the thickness of the mold so as not to exceed the threshold rate in order to prevent gaseous voids.  Below and now on appeal, Sorensen has never been able to explain how gaseous voids can be prevented if the threshold rate is not empirically determined.  The district court's construction is the only way to make sense of the patent's claims because it enables the threshold rate to be determined.

Sorensen argues that requiring empirical testing violates the prohibition against importing limitations into the claims.  In construing threshold rate to be determined by empirical testing, however, the court did not import an unnecessary step that is extraneous to the claimed method.  Since the only way to practice the claimed method is to determine the threshold rate by empirical testing, the court interpreted threshold rate in the only way that makes it possible to practice the claimed invention.  As the court noted in denying Sorensen's motion for reconsideration of the Markman ruling:

> [A]gain, there is no other way for the term to be constructed, because without the use of empirical testing to determine the threshold rate, in Homeland's words, "it is impossible to determine whether this claim limitation is met by [any] accused product." Docket No. 128 at 8. Sorensen has simply never responded adequately to this Court's finding that any construction of "threshold rate" that lacks a component of empirical testing would be

entirely circular.

A0026.

### 3.    Determination of the "Threshold Rate" Must Be at the Time the Mold Is Made in Order to Prevent Gaseous Voids

Further, under the district court's construction, the threshold rate is empirically determined "at the time the mold is made" in order to prevent gaseous voids. A0015-17.  Sorensen argues "there is no temporal limitation in the claims that requires that a step of empirical determination and/or conducting test strips be accomplished at 'the time the mold is made.'"  *See* SOB at 23.

The only purpose of keeping the wall thickness below the "threshold rate" is to *prevent* gaseous voids.  The claim is for a method of making thin wall sections without voids.  To *prevent* the formation of gaseous voids, the threshold rate would have to be determined "at the time the mold is made" so as to know not to exceed that rate or else gaseous voids would form.  If the threshold rate were only determined after a part is molded, then there would be no point to determining the rate.

The '460 patent teaches that the threshold rate is determined at the time the mold is made by trial and error:

The dimensions of the mold cavity is selected in accordance with such test-strip determinations. Partial test products are molded with different quantities of fluid plastic material being injected into the mold cavity to determine whether the respective rates of increase of the thickness are such that void-based irregularity are consistently prevented. When it is observed that void-based irregularity formation is not consistently prevented, the rate of increase in the thickness is reduced in the zone or zones in which void-based irregularity formation is not consistently prevented; and further test strips and partial test products are injection molded for further observation.

A0071 (5:3-36). The threshold rate is determined at the time the mold is made by adjusting the mold parts to increase the wall thickness until gaseous voids are no longer observed. This trial and error process of reconfiguring the mold until "void-based irregularity are consistently prevented" cannot be done after the part is already made. This is why the threshold rate has to be determined at the time the mold is made.

Claims are not traps for the unwary. *See Athletic Alternatives, Inc. v. Prince Mfg., Inc.,* 73 F.3d 1573, 1581 (Fed. Cir. 1996) ("the primary purpose of the [definiteness] requirement is to guard against unreasonable advantages to the patentee and disadvantages to others arising from uncertainty as to their [respective] rights" (internal quotations and citations omitted)). This requirement serves the purpose of allowing others to respect the patent by avoiding infringement. Interpreting the claim so that it has an

unknown term makes it impossible to avoid infringement. The only way to make "threshold rate" knowable is to interpret it to require empirical determination as the district court has done.

> **4.      Sorensen's Reliance on Mr. Osswald's Opinion Is Improper as His Testimony Was Not Before the District Court**

In arguing that the district erred in construing "threshold rate," Sorensen attempts to rely on the testimony of an expert, Mr. Tim Osswald, that it only hired long after the district court had construed the claims and granted summary judgment of noninfringement to Homeland. Throughout its Opening Brief, Sorensen cites again and again to Mr. Osswald's expert report. *See* SOB at 26, 31-32. This is improper as Mr. Osswald's report was not before the district court at the time it construed the claims or decided the question of infringement. A0052; *see also, Kirshner v. Uniden Corp. of Am.,* 842 F.2d 1074, 1077 (9th Cir. 1988) ("Papers submitted to the district court *after* the ruling that is challenged on appeal should be stricken from the record on appeal." (emphasis in original)); *United States v. Walker,* 601 F.2d 1051, 1055 (9th Cir. 1979) ("We are here concerned only with the record before the trial judge *when his decision was made.*" (emphasis added)).

In the proceedings below, the district court harshly admonished Sorensen for improperly trying to pack the record for appeal with Mr. Osswald's report:

> ….Nothing required Sorensen to include irrelevant portions of its expert's report in its submissions concerning the motions under consideration.
>
> Sorensen asks the Court to only disregard, rather than strike, the paragraphs at issue...**In doing so, Sorensen's purpose in attempting to include those paragraphs becomes transparent. Having failed to timely submit the infringement evidence in question in connection with the infringement summary judgment motion, Sorensen now wants that evidence in the record for purposes of appeal, even though the Court was not given an opportunity to consider it in the infringement context. That tactic is improper.**
>
> …**Sorensen's <u>repeated</u> effort to improperly pack the record for appeal with evidence that it did not present when the Court was actually deciding the issues to which the evidence is relevant does not help Sorensen's case on the merits, whatever it may be.**

A0052 (emphasis added; internal citations omitted).  Therefore, this Court should give no consideration to Sorensen's arguments based on the improper testimony of an expert hired after the fact.

## B.    The District Court Did Not Err in Granting Summary Judgment of Noninfringement

The district court correctly granted summary judgment of noninfringement based on the finding that at least three major claim

elements are absent in Homeland's accused products: (1) the "flow chambers" (and, relatedly, "exit positions," "entrance positions," and "inscribed-sphere dimensions"); (2) the "the thickness of the at least one thin-wall cavity section increases in the general direction of flow"; and (3) "said increase being at less than a threshold rate to thereby prevent…gaseous void." A0018-20; A0021-36.

The bulk of Sorensen's appeal is directed to challenging the district court's finding that the ribs in Homeland's products are not flow chambers. It argues that the dye tests were improperly admitted through lay testimony and that the short shots lacked proper foundation. These arguments, however frivolous, only pertain to the question of whether Homeland's products have flow chambers. Sorensen does not challenge the other evidence as to the other claim limitations. It cannot challenge the engineering drawings or the measurements of Homeland's products that show the walls are of uniform thickness. It cannot challenge the sworn declaration of Mr. Meyers averring that Homeland's products have never suffered from gaseous voids and, thus, Homeland has never determined the threshold rate to prevent gaseous voids. Each of these grounds would be enough to sustain the summary judgment.

Regardless of Homeland's evidence, Sorensen has *zero* evidence—literally nothing—of its own to raise a genuine issue as to infringement. Therefore, Sorensen's appeal must fail.

### 1.    Homeland's Products Do Not Have "Flow Chambers"

Homeland's products, approximately 2.5 to 3.2 mm thick in the relevant zones (A6057-74), are two to three times thicker than the standard definition of "thin" (*i.e.* 1 mm) in the art. Because Homeland's products are thick, not thin, there would be no need to use flow chambers for two reasons.

First, there would be no reason to use flow chambers because the problem of gaseous voids described in the '460 patent occurs in thin wall products. A2318. Sorensen has never been able to show that such gaseous voids occur in products as thick as Homeland's. Homeland submitted the declaration of Mr. Meyers, who averred that "[t]he problem of 'gaseous voids' that is described in the patent has never been a problem in making the accused products." A2318 (¶15). As the district court noted, "Sorensen has presented no evidence to counter Mr. Meyer's testimony that gaseous voids have never been a problem in manufacturing the Accused Products." A0028. Since gaseous voids were never a problem, it was never necessary to use flow chambers to prevent a problem that did not exist.

Second, there would be no reason to use flow chambers to extend the flow path because the products are more than thick enough for the mold to be completely filled.[13] Given the dimensions of Homeland's products, Sorensen has never been able to explain why it would be necessary for Homeland's products to have flow chambers to extend the fill path.

In short, the ribs in Homeland's products are not "flow chambers" to direct the flow of the plastic in the molding process. Rather, the only function of the ribs is to create turbulence to facilitate the blending of foodstuff when the products are used by end consumers. A2318 (¶ 16).

### a.    The Dye Tests

To demonstrate that the ribs are not "flow chambers," Homeland conducted simple dye injection tests to visually track the flow of the plastic as the mold is filled. A2316-18 (¶¶13-14); A2339-43. Homeland put color dye on the gate and ran a short shot as shown below:

//

//

---

[13] This can be confirmed by examining the dimensions of the accused products. As discussed above, molten plastic usually cannot flow in length more than 150-200X the thickness of the standard wall. Applying this rule of thumb to the accused products, the Homeland cups have a minimum wall thickenss of about 2.5 mm. Therefore, the maximum flow length would be roughly 375 to 500 mm. Yet, the longest Homeland cup is only about 140 mm in length, which means that the mold is completely filled long before the flow length runs out. A6064-65.



A2340.  It is easy to see that the ribs do not function as "flow chambers" because when the plastic is injected into the gate, the plastic does not flow into the ribs to be directed into the wall sections, but rather the plastic flows directly into the wall sections.  A2277-78 (¶18).

It is also easy to see that the ribs do not function as flow chambers because the plastic does not flow *from* the ribs *into* the wall sections. Homeland put color dye on different parts of the ribs of the mold and ran a series of shots, one of which is shown below:

//

//

//

//



A2341.   If the plastic were flowing from the ribs into the walls, then the liquid dye in the ribs would appear in the wall sections in the final product. *Id*.  However, the dye from the ribs never shows up in the wall sections at all.  *Id*.  The photograph shows that the dye travels out of the rib only at the other end of the cup (indicated by arrow), but not into the wall sections.  *Id*. This clearly shows that the plastic does not flow *from* the ribs *into* the wall section as claimed in the patent.  A2277-78 (¶18).  Therefore, the ribs do not function as flow chambers for directing the fluid plastic into the wall section as claimed in the patent.

i)      **Sorensen Failed to Present Evidence to Challenge the Dye Tests**

Sorensen failed to present *any* evidence to challenge the dye tests.  As the district court pointed out:

> As to the dye test, Sorensen merely states conclusorily that dye and plastic do 'not flow at the same rate or direction' and thus concludes that the dye test is not an accurate indicator of the flow of plastic. Crucially, Sorensen backs up this assertion [with] only a declaration from inventor Jens Ole Sorensen….in fact it has offered only the word of Jens Ole Sorensen without any further substantiation.

A0030-31.  The court went on to note, "Jens Ole Sorensen, incredibly, even testified at his deposition that no testing has ever been performed to determine whether the plastic flowed 'from the ribs' or 'from the gate down between the ribs.'"   A0031 (fn. 6).

If Sorensen disputes the quality of Homeland's dye tests, it could have ran its own dye tests.  Yet it did not.  The district court observed, "Sorensen never ran its own tests showing the dye (or anything) doing anything different, despite having had access to the physical samples used to create the photographs here." A0030.

Accordingly, the court found, "Sorensen has offered less than a scintilla of evidence that dye would flow in a different direction than would plastic," and, therefore, it rightly concluded that "the result of the dye test, that the ribs do not direct the flow of plastic, is not a matter of genuine dispute."  A0031.

//

//

### ii)     Dye Tests Were Properly Admitted

"Perhaps realizing that its infringement claim could not withstand summary judgment with merely this flimsy dispute as to the facts," the district court bluntly remarked below, "Sorensen then offers evidentiary objections to the dye test." A0030.   On appeal, Sorensen repeats the argument that the dye tests "were improperly admitted through lay testimony" and should have been "scrutinized under the expert opinion rules of evidence, including the *Daubert* assessment of whether a test is reliable and valid." *See* SOB at 37-38.

The dye tests were not improperly admitted.  They were conducted under the direction of Mr. Meyer,[14] who supervised production and quality control of the manufacturing of the accused products.  A2315 (¶1); A5310-12 (¶¶5-7).  Hence, as the district court rightly noted, it had "no reason to decline to make common sense deductions from those photographs." A0030.

//

---

[14] Specifically, the short shots were and dye tests were conducted by Chen Min, the Engineering Manager of Sinolink International Trading Company Limited ("Sinolink").  A5313-15.  Sinolink makes the accused products for Homeland.  *Id*.  Chen Min conducted the short shots and dye tests under the direction of Joe Meyer, formerly the Managing Director of Capital Bay Ltd. (HK), which supervises production and quality control of the Chinese factories (including, Sinolink) that make Homeland's products.  A5310-12; A5313-15.

b.    **The Short Shots**

At Sorensen's request, Homeland ran short shots as shown:



A2334.

The short shots show that the plastic does not flow via the ribs to form the wall section as required by the patent because there would be gaps in the wall sections where the plastic had not yet joined together if the plastic were flowing from the ribs to fill in the wall sections.  A2327-34.  The short shots show the plastic flowing downward from the gate creating a wave front.  *Id*. The wave front does not flow from the sides of each rib toward the adjacent rib as would be expected if the ribs were flow chambers filling in the wall sections.  *Id*.

### i)    Plastic Does Not Flow from the Ribs

Sorensen points to one image of one short shot labeled HH000018-4 (A2331) and argues that it shows "the plastic in the short shots flows from the rib-forming portions of the mold cavity into the thin-wall cavity section that lies in between." *See* SOB at 45 (citing A2756).



There are two problems with this argument.

First, the HH000018-4 image does not show what Sorensen says it shows.  The flow front in the image does not indicate that the plastic is flowing from the ribs.  A2331; A2756.  If the plastic were flowing from the ribs, then the flow front would look more like what is shown in Figs. 3 and 4A of the '460 patent:





The flow front that is identified by Sorensen in image HH000018-4 looks nothing like what is shown in the '460 patent. Rather, the flow front is almost perpendicular to the ribs.

Second, Sorensen only points to one flow front in one short shot. There are six short shots, each with a multitude of flow fronts. A2327-34. If the ribs functioned as flow chambers, the flow fronts across all of these short shots would have to consistently show that the plastic flows from the ribs. But Sorensen is unable to explain how the flow fronts in all six short shots support its argument. The district court was correct in noting that "Sorensen does explain how this inverted circular line indicates that the ribs

direct the flow of plastic, nor does Sorensen attempt to explain away the fact that all of the other short shot samples do not feature this inverted circular line." A0031.

### ii)    The Short Shots Have Proper Foundation

Sorensen contends that the short shots lack proper foundation "[g]iven…the absence of certain foundational facts." *See* SOB at 43. What "certain foundational facts" are absent, Sorensen does not explain.

Sorensen's tired argument that the short shots lack foundation were flatly rejected time and again by the district court:

> Proceeding to…the short shot test, Sorensen raises similar arguments as those discussed above in an attempt to form a smoke screen around the fact that it has conducted zero experiments of its own that contradict the results of the simple tests put forward by Homeland….Thus, again, lacking any evidence to support its infringement claims and lacking any comprehensible argument or evidence contradicting Homeland's evidence of non-infringement, Sorensen resorts to evidentiary objections to the short shot tests.

A0031.

### 2.    Homeland's Products Do Not Have "Exit Positions," "Entrance Positions," or "Inscribed-Sphere Dimensions"

Claim 1 of the '460 patent recites, in relevant part, "wherein within the at least one zone inscribed-sphere dimensions at each entrance position

are smaller than inscribed-sphere dimensions at the corresponding exit position of the adjoining flow chamber…" A0072.  Sorensen has never offered any evidence to demonstrate that Homeland's products have "exit positions," "entrance positions," and "inscribed-sphere dimensions" as recited in the '460 patent's claims.

The district court adopted Sorensen's constructions of these terms. A0003-17.  In particular, the district court construed "inscribed-sphere dimension" as follows:

> An "inscribed-sphere dimension" at an entrance position is the diameter of the largest sphere that will fit into the mold cavity at the entrance position.  An "inscribed-sphere dimension" at an exit position is the diameter of the largest sphere that will fit into the mold cavity at the exit position.

A0014.  Sorensen has never offered any evidence to show that the "inscribed-sphere dimensions at each entrance position are smaller than inscribed-sphere dimensions at the corresponding exit position of the adjoining flow chamber…" as required by the claims.  A0031-32.

### 3.    Homeland's Products Do Not Have a Thin-Wall Cavity Section that Increases in the General Direction of Flow

As an independent ground for the finding of noninfringement, the district court found that the accused products do not meet the thickness-of-

wall limitation based on Homeland's engineering drawings and its measurements of the accused products. A0032-34. The evidence in favor of Homeland is so strong on this point that the district court concluded, "**it was clear and convincing misconduct to make Homeland litigate infringement given the state of Sorensen's evidence of the accused products' dimensions.**" A7439 (emphasis added).

a.    **Homeland's Engineering Drawings and Caliper Measurements**

The engineering drawings show that the walls of Homeland's products are of substantially uniform thicknesses, and any variance is within the standard tolerance (±0.1 mm) set forth in the drawings, which is consistent with the standards set by The Society of the Plastics Industry (as set forth in *Standards and Practices of Molders, Guidelines for Custom Molders*). A2314-19; A6057-74; A2278 (¶19); A2311-13.

Moreover, Homeland verified the wall dimensions in the engineering drawings by measuring samples of actual products. A2316 (¶10); A2335-36. It did this by cutting the samples, measuring them with an electronic caliper, and photographing the measurements. *Id*. The measurements taken were perfectly consistent with the dimensions in the engineering drawings (*i.e.* within the range of manufacturing tolerance specified in the drawings)

and showed that the walls are uniform. *Id*. Sorensen has never introduced evidence to controvert the engineering drawings nor the measurements of the accused products.

### b.    Sorensen's Three Drawings

Against the weight of Homeland's evidence, what evidence did Sorensen offer to show that the walls of Homeland's products increase in thickness as claimed in the patent? Sorensen states in its Opening Brief:

> Sorensen offered, by way of Mr. Sorensen's Declaration, three drawings depicting Sorensen's measurements of the three Accused Products. These are the same drawings that the court notes are attached to Sorensen's Infringement Contentions…. Each of the drawings reflects an increase in wall thickness…

*See* SOB at 48-49. These drawings have never been properly authenticated by any evidence to demonstrate that what is shown in the drawings is what Sorensen claims it is. FRE 901. Sorensen has never offered into evidence the Homeland products that are purportedly depicted in the drawings. Nor has it produced any documents to substantiate the dimensions shown in the drawings.

In fact, Sorensen could not substantiate the dimensions shown in the drawings because Mr. Brown, who purported analyzed the products and prepared the drawings for Sorensen, admitted that he did not record the measurements:

Q.    And at how many different points did you determine the thickness along the flow chamber?

A.    I don't remember.

Q.    If you wanted to find out, is there any particular documents that you would look at?

**A.    No.  It's not recorded.**

* * * * *

Q.    You had said earlier that you had taken measurements of the Magic Bullet; correct?

A.    I did.

Q.    But you have no record of those measurements; is that correct?

**A.    That's correct.**

A6116 (lines 2-11); A6117 (lines 8-17) (emphasis added).

Accordingly, the district court found:

As for these drawings, Jens Ole Sorensen and Paul Philip Brown (who collected the data Sorensen used to make the drawings) testified that they did not record any measurements other than those displayed on the drawings themselves; there are no logs of which product the drawings depict, when the measurements were made, or how many measurements were taken….All in all, again, Sorensen has failed to present even a scintilla of evidence to counter the weighty evidence put forward by Homeland, this time in regards to the question of whether the walls of the Accused Products are of uniform thickness.

> …Sorensen has put forward *no* admissible evidence indicating that the walls are *not* of uniform thickness, and given that Homeland has put forth authenticated photographic evidence of the Accused Products as well as the engineering specifications for the Accused Products, all indicating that the walls are of uniform thickness, the Court would find that there is no genuine dispute as to this issue.

A0033 (emphasis in original; footnote omitted).  Sorensen's failure to present any evidence to show that the walls of Homeland's products increase in thickness alone warrants affirming the summary judgment of noninfringement.

### 4.   Homeland's Products Do Not Have a "Threshold Rate"

Since Homeland's products do not increase in thickness, it follows that the walls do not increase in thickness at "less than a threshold rate." The district court found that the accused products do not meet the threshold rate limitation based on Joe Meyer's declaration stating:

> The problem of "gaseous voids" that is described in the patent has never been a problem in making the accused products. Because "gaseous voids" have never been a problem in the accused products, the accused products were not designed to have "thin wall" sections that increase in thickness at less than a "threshold rate" as claimed in the '460 patent.…

A2318 (¶15).

Notably, Sorensen devotes only one paragraph in its entire 60-page appeal brief to the critical question of how the threshold rate limitation is met in Homeland's products, arguing that "because *an increase in thickness of the thin-wall cavity section is an implicit aspect of this term,* the genuine dispute regarding whether the walls do, in fact, increase in thickness further precludes summary judgment on grounds relating to the term 'threshold rate.'" *See* SOB at 55 (emphasis added). This single sentence sums up how nonsensical this case is. Having no evidence whatsoever of the so-called "threshold rate" in Homeland's products, Sorensen argues that if there is genuine dispute as to whether the walls increase in thickness at all, it somehow relieves Sorensen of the burden to show there is a genuine dispute regarding the actual "threshold rate."

Again, by Sorensen's logic, any increase in thickness of the thin wall section would be under the threshold rate because the increase is "an implicit aspect" of that term. This does not make sense. According to this logic, if Homeland's products increase in thickness, it must necessarily mean that the increase is less than the threshold rate. As discussed above, this would effectively read that limitation right out of the claims. The district court put it succinctly thus:

> Sorensen should have known that it needed to develop
> evidence that Homeland employed the '460 patent's

> method of avoiding gaseous voids, not some other method (if any). Instead, Sorensen asserted infringement based only on its belief that there was an increase in thickness in one small portion of Homeland's product, essentially attempting to expand the scope of the patent to include any non-defective injection molded product with ribs in which the thickness of the plastic increased.

A7438. Even assuming arguendo that Homeland's products have walls that increase in thickness, Sorensen still failed to show that that any such increase is less than the magical threshold rate.

### 5.    Sorensen Never Tested Homeland's Products

In the face of all the evidence provided by Homeland, Sorensen failed to produce any evidence to support its infringement claim.  Sorensen's failure to test Homeland's products was particularly inexplicable because there were any number of tests that Sorensen could have easily ran in its own lab to see if the products met the claim limitations.

For instance, Sorensen could have build test molds of the products to perform the kind of empirical testing described in the '460 patent.  Mr. Brown testified:

| | |
|---|---|
| Brown: | Our normal procedure is to build a test mold to establish the thicknesses that are required for a particular case. |
| Trojan: | Did you ever build test molds to test the Magic Bullet product? |
| Brown: | No. |

> Trojan:       Did you ever build test molds to test the Baby Bullet product?
>
> Brown:        No.

A6118 (lines 14-23). Though it was normal procedure for Sorensen to make test molds, it did not make any for Homeland's products.

Sorensen also could have ran computer simulations to determine the plastic flow pattern in the accused products. Bill Tobin, Homeland's expert, testified that "[t]here are now, today, computer simulation programs that will even mold the part for you inside the computer. That was available back in 1978." A6495 (lines 21-23) A6496-98. Yet Sorensen never ran any computer simulations to test Homeland's products.

Therefore, the district court's finding that Sorensen did not present evidence to establish that there is a genuine issue of material fact as to the question of infringement was correct.

## C. The District Court Did Not Err in Denying Sorensen's Motion to "Revise" the Summary Judgment of Noninfringement

Sorensen contends that the district court erroneously denied its motion to "revise" the summary judgment of noninfringement, quite brazenly arguing throughout its Opening Brief that there was "newly-discovered" evidence that Mr. Meyer's declaration supporting the short shots and dye

tests was false.  *See* SOB at 2, 12, 56.  As the district court noted below with much exasperation, "[t]he [c]ourt has repeatedly addressed the issue of evidence relating to short shot and dye tests submitted by Mr. Meyer." A0052.  And it repeatedly found the evidence to be sound and compelling.

Sorensen's allegation that Mr. Meyer's declaration is somehow false is undermined by the simple fact that it refused to depose him.  DE #152.  If Sorensen had any doubts about the foundation of his testimony, then the thing to do would have been to take his deposition.  Instead, when the court gave Sorensen the opportunity to depose Mr. Meyer, Sorensen hurriedly informed the court that it had no intention of deposing him.  As the district court noted in denying Sorensen's motion to revise the summary judgment, "Sorensen *repeatedly* declined to depose Meyer." A0061 (emphasis in original).  The repeated refusal to depose Mr. Meyer demonstrates that Sorensen was once again not interested in <u>evidence</u>.  It prefers innuendo to facts.  Therefore, the district court was correct to deny Sorensen's motion to "revise" the summary judgment of noninfringement.

## II.    ARGUMENTS IN SUPPORT OF HOMELAND'S CROSS-APPEAL

The district court denied Homeland's motion for summary judgment that the '460 patent is invalid under 35 U.S.C. § 103(a) as obvious and under

35 U.S.C. § 112, ¶2 as indefinite.  A0037-53.  Homeland cross-appeals the district court's Order denying its summary judgment motion of invalidity and granting Sorensen's cross-motion for summary judgment of validity. DE #215.

## A.    Indefiniteness: The District Court Erred in Denying Homeland Summary Judgment of Invalidity Under 35 U.S.C. § 112, ¶2

The district court held that the claims of the '460 patent are not indefinite under 35 U.S.C. § 112, ¶2 in light of its construction of "threshold rate" as requiring empirical testing.  A0037-53.  As discussed above, Homeland does not challenge the district court's construction of that term; however, if this Court should reverse the district court's construction of "threshold rate," then Homeland appeals the holding that the claims are definite on the following grounds.

### 1.    Law on Indefiniteness

Under § 112, claims must be sufficiently definite.  *See* 35 U.S.C. § 112, ¶ 2.[15]  There are two basic purposes underlying the definiteness requirement.  *See, generally,* Donald S. Chisum, Chisum on Patents, Vol. 3 § 8.03 (2010).  The first is to provide clear warning to others as to what

---

[15] Prior to the Leahy-Smith America Invents Act, U.S.C. § 112, ¶2 provided: "The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention."

constitutes infringement of the patent. *See Halliburton Energy Services, Inc. v. M-I LLC,* 514 F.3d 1244, 1249 (Fed. Cir. 2008) ("Because claims delineate the patentee's right to exclude, the patent statute requires that the scope of the claims be sufficiently definite to inform the public of the bounds of the protected invention, i.e., what subject matter is covered by the exclusive rights of the patent."). The second purpose of the definiteness requirement is to provide a clear measure of the invention for the determination of patentability. *See United Carbon Co. v. Binney Co.,* 317 U.S. 228, 236 (1942) ("Moreover, the claims must be reasonably clear-cut to enable courts to determine whether novelty and invention are genuine."). The claims of the '460 patent fail in both respects.

### 2. The Claims Are Indefinite Because Sorensen Admits "Threshold Rate" Has No Meaning

The claims of the '460 patent are indefinite because the critical term "threshold rate" is hopelessly ambiguous, having no real meaning. In deposition, Jens Ole Sorensen, one of the named inventors, stated that the term "is not defined, it is not used in any special sense in this patent." A6107-08. Paul Brown, the other inventor, could not say what "threshold rate" means. A6122 (lines 9-23). When Homeland asked Sorensen in discovery to explain the meaning of "threshold rate," Sorensen refused to

answer. A3377-79. Sorensen repeatedly argued below that the term should be given no special meaning. A0687-89. And on this appeal, Sorensen explains "threshold rate" in a way that just reads back on the claim language itself.

If "threshold rate" is "not used in any special sense in this patent" as Jens Ole Sorensen testified, then the claims do not provide a clear measure of the invention for the determination of either infringement or patentability.

### 3.    The Circular Logic of the '460 Patent

The '460 patent's claims are indefinite for the simple reason that one of skill in the art would not know how to prevent gaseous voids using the "threshold rate," as Mr. Tobin opined in his report. A2281-82. According to the patent, gaseous voids are prevented by increasing the thickness of the thin-wall section at less than the "threshold rate," but since there is no fixed "threshold rate," it is impossible to know how much to increase the thickness of the thin-wall section in order to prevent gaseous voids. A0026.

This is why the '460 patent requires the practitioner to work *backwards* to determine the threshold rate: first the practitioner must make a product, through trial and error, that does not exhibit voids, and *then* conduct testing to determine what that "threshold rate" is for that product. A0070-71. There is no way of calculating the "threshold rate" to prevent gaseous

voids if the rate can only be determined after the product is already made.

The district court wrestled with the problem of determining the "threshold rate" only after the product is already made, remarking "[t]his is, in essence, a definiteness argument, since a person of ordinary skill in the art would not know what the threshold rate is until that person conducted testing on the particular product to see at what rate of increase gaseous voids are prevented; once that testing is complete, however, the person need not have referred to a 'threshold rate' at all, but has instead, in some sense, discovered for herself that rate." A0016-17. That gaseous voids are prevented by increasing the thickness of the thin wall at less than a threshold rate, but the threshold rate is unknown and undeterminable until after the product is made, is so illogical as to render the claims indefinite.

**4.    The Claims Are Indefinite Because There Is No Way to Know Whether Voids Are Prevented Due to "Threshold Rate" or to Other Factors**

In an attempt to resolve the circular logic of the '460 patent's claims, the district court construed "threshold rate" as being determinable by empirical testing. AA0016. Based on its construction, the district court later held that the claims are definite because empirical testing makes the "threshold rate" knowable:

> The claim as properly construed by the Court to include empirical testing does not suffer from this defect… Circularity is no longer an issue in the case due to the Court's claim construction….
>
> Indeed, the Court was able to understand the bounds of the claim in determining that Homeland did not infringe because Homeland did not practice the trial-and-error method that Mr. Sorensen describes.

A0045.

If this Court overturns the district court's ruling that the "threshold rate" must be determinable by empirical testing, then claims are indefinite because it would be impossible to know whether gaseous voids are prevented due to the thickness being kept below the threshold rate or whether it is due to other some other factors, such as injection pressure and speed. It is undisputed that gaseous voids can be prevented by regulating the injection pressure and/or speed. A7438. The '460 patent claims only that gaseous voids can be prevented by keeping the increase in thickness of the thin-wall section at less than the "threshold rate." But since there is no fixed threshold rate, and the threshold rate will change depending on injection pressure and speed, there is no way to know whether gaseous voids are prevented due to the thickness being kept below the threshold rate or whether it is due to the injection pressure and speed. A2281-82; A0026.

For instance, if a practitioner makes a product having a thin wall

section that increases in thickness without exhibiting gaseous voids, the practitioner would not know whether his product is infringing or not, because the absence of gaseous voids could be due to the thickness increasing at less than the threshold rate as claimed or because the injection pressure or speed is preventing voids. Without a clear way to distinguish the '460 patent's method of preventing gaseous voids from the prior art's methods of preventing gaseous voids, it is impossible to know the metes and bounds of the patent. Therefore, the claims violate § 112, ¶2.

**B.    Obviousness: The District Court Erred in Denying Homeland Summary Judgment of Invalidity Under 35 U.S.C. § 103**

The district court granted summary judgment to Sorensen that the '460 patent is not invalid under 35 U.S.C. § 103. In doing so, however, the court made it clear that it "grant[s] the substance of Sorensen's motion for summary judgment that the '460 patent is not invalid under 35 U.S.C. § 103, but clarif[ies] that it is merely granting summary judgment of Homeland's failure to present sufficient evidence to try its invalidity case, rather than holding the patent 'valid'." A0051-52. Homeland appeals the denial of summary judgment to it and the grant of summary judgment to Sorensen.

//

### 1.    The Question of Obviousness Rests Solely on the "Threshold Rate" Limitation

As discussed above, Sorensen argues on this appeal that "the '460 patent discloses the inventors' discovery of the existence of a threshold rate...." *See* SOB at 21. The essential question as to validity is whether the claim that gaseous voids are prevented when the thickness of the thin wall section is increased at less than a "threshold rate" would have been obvious to people of ordinary skill in the art at the time of the invention. The question of obviousness rests solely on the threshold rate limitation, as it is the only basis on which the claimed invention is alleged to be patentable over the prior art. A4395.

During prosecution, the then-pending claims were rejected as being obvious in view of U.S. Patent No. 5,839,603 to Smith (hereinafter "Smith") and U.S. Patent No. 4,117,950 to Allen (hereinafter "Allen"). A3343-54; A3355-60; A3361-70. In response, the applicants specifically relied upon the threshold rate limitation to overcome the prior art:

> ....the cited references do not suggest that within a zone of a thin-wall cavity section between opposing flow chambers in which the thickness of the thin-wall cavity section increases in the general direction of flow within the flow chambers, such increase should be less than a threshold rate to thereby prevent the fluid plastic material injected into the zone from the flow chambers from at

> any time surrounding any gaseous void within the zone,
> as recited in Claims 1 and 18.

A3351 (underlining in original).

In the Notice of Allowability, the '460 patent was granted on the basis of the threshold rate limitation: "The prior art does not teach or suggest the thickness of the thin wall section increasing in the direction of flow at less than a threshold rate to prevent injected plastic into the zone from at any time surrounding any gaseous void within the zone." A4395.

Homeland contends that the '460 patent is obvious in view of solutions to the gaseous voids problem that was already known at the time of the invention, and specifically, over Allen and Smith.

### 2.    The *Graham* Factors

Under *Graham v. John Deere Co.,* 383 U.S. 1, 17-18 (1966), the framework for determining obviousness is based on three principal factual inquiries: first, determine the scope and content of the prior art; second, ascertain the differences between the claimed invention and the prior art; and, third, resolve the level of ordinary skill in the pertinent art.[16] *See also,*

---

[16] Here, there is also no genuine issue of material fact as to the level of ordinary skill in the art. A0050.

*KSR International Co. v. Teleflex Inc.*, 550 U.S. 398, 406, 127 S.Ct. 1727, 1729-30 (2007).[17]

### a.    First *Graham* Factor: The Scope and Content of the Prior Art

There are no genuine issues of material fact as to the scope and content of the prior art.

The '460 patent acknowledges that the problem of gaseous voids in thin wall injection molding was well known in the art at the time of the invention.   A0069 (1:13-29).   The common solution to this problem, as Sorensen acknowledged below, was to control injection pressure and speed. A6571 (n. 4); A7438.  Homeland presented the uncontroverted testimony of Bill Tobin, who explained that gaseous voids could be prevented by controlling injection pressure and speed, a solution that had long been known in the art.  A2280-81 (¶¶23-24).

Aside from the common knowledge of controlling injection pressure and speed, the prior art also disclosed another solution to the problem of preventing gaseous voids in thin wall injection molding.  Specifically, Allen

---

[17] In addition, objective evidence of nonobviousness (*e.g.* commercial success) are secondary considerations, though such secondary considerations are not relevant in this case as Sorensen does not practice the patent.

taught the use of ribs (*i.e.* flow chambers) to direct the flow of injected

plastics to form "thin walled" sections:

> In accordance with this invention…A plurality of radially
> extending ribs project from the center of the central panel
> to the rim…As the chamber is filled with plastic, the pie-
> shaped, thin-walled panel sections between ribbed
> portions are formed from plastic flowing outwardly from
> the channeled portions…

A3358 (1:50 – 2:23). Allen went on to teach that "the ribs are placed close

enough together that the thin panel sections between ribs are completely

formed before the closure rim is formed **so that there are no voids in the**

**plastic.**" *Id.* (2:53-56 (emphasis added)).

Relying on Allen, Smith taught that the thickness of the thin-wall

section can be increased in the direction of flow:

> The thinnest section of the tapered section 26 is closest to
> the center gate allowing this thin area to fill first when
> the melt temperature of the plastic is the hottest. As the
> flow front advances, the cooler temperature of the
> injected plastic during molding requires a thicker section
> to allow for complete filling.…**As the thickness in the**
> **tapered section 26 increases,** the flow front of the
> plastic will move uniformly to the outside rim structure
> 12 of the closure 10.

A3369 (3:35-50 (emphasis added)). Thus, at the time of the invention, one

of ordinary skill in the art would have known how to make a thin wall

product having an increasing thickness without voids based on the combined

teachings of Allen and Smith.

### b. Second *Graham* Factor: The Claimed Invention Is an Inherent Characteristic of the Prior Art

The only difference between the '460 patent and the prior art is the

claimed "threshold rate," which the district court neatly summed up thus:

> [W]hat is purportedly new about the '460 Patent is that the increase in the thickness of the thin walls, which must increase in the direction of the flow of the fluid plastic, must be at a certain rate, the "threshold rate," if gaseous voids are to be prevented….In other words, in order for gaseous voids to be prevented in plastic injection molding technique, the Allen patent's key teaching was that the walls must be thin, the Smith patent's key teaching was that the thin sections should increase in thickness in the direction of the plastic, and the '460 Patent's key teaching is that such increase must not occur at more than a threshold rate.

A0016.

The '460 patent is obvious over Allen and Smith. One of ordinary

skill in the art would have known from reading Allen that gaseous voids can

be prevented by positioning the ribs close enough such that no voids will

form in the thin panel section. A3358 (2:53-56). One of ordinary skill in the

art would also have known from reading Smith that the thickness of the thin-

wall section can be increased in the direction of flow. A3369 (3:46-48).

Thus, the combination of Allen and Smith would have been enough to teach

a person of ordinary skill how to make a thin wall product of increasing thickness without gaseous voids. Since, according to Sorensen, any increase in a thin wall section that does not exhibit gaseous voids would necessarily be under the threshold rate, the combined teachings of Allen and Smith would have resulted in a product that is under the threshold rate.

The threshold rate is merely an inherent characteristic of the method taught by Smith for making thin wall sections. *Application of Tennant,* 386 F.2d 472, 475 (Cust. & Pat. App. 1967) (finding "relative size of the perforations in the adhesive and backing may reasonably be said to be inherent in, or obvious from, the Scholl patent"); *In re Huai-Hung Kao,* 639 F.3d 1057, 1070 (Fed. Cir. 2011) (finding obviousness where "claimed 'food effect' is an inherent property of oxymorphone itself"); *In re Kubin,* 561 F.3d 1351, 1357 -1358 (Fed. Cir. 2009). That gaseous voids do not appear below some threshold rate is an inherent characteristic of Smith because the threshold rate is a function of injection pressure and speed. A2280-81 (¶¶23-24).

Reconfiguring the wall thickness to prevent gaseous voids as claimed in the '460 patent is just a way of changing the pressure and speed at which the injected plastic flows through the mold cavity to prevent gaseous voids. The observation that gaseous voids do not appear when the increase in the

thickness of the thin wall is less than a threshold rate is obvious because it is merely an observation that gaseous voids do not appear below certain pressure and speed. Therefore, '460 patent is invalid because one cannot claim an inherent characteristic of the prior art.

### c.    Empirical Testing Is Obvious

The district court granted summary judgment to Sorensen on the ground that Homeland did not demonstrate that the claimed invention was obvious in light of its construction of "threshold rate" as requiring empirical testing. A0038-53. Under that construction, the narrow question is whether it would have been obvious to a person having ordinary skill in the art to prevent gaseous voids by empirically determining the rate of increase in the thickness of the thin wall section. The court found that "Homeland ha[d] not offered evidence that empirically determining a 'threshold rate' that prevents the formation of gaseous voids in thin wall plastic molding, for instance, with test strips, is found in the prior art." A0049.

The district court's ruling that the '460 patent is not obvious because Homeland did not offer evidence "that empirical testing to determine the threshold rate was known anywhere else in the prior art" (A0051) is off the mark because how the threshold rate is empirically determined has nothing to do with whether the claimed method of preventing gaseous voids is

obvious under § 103. Sorensen has never contended that empirical testing, whether by test strips or other means, to determine the rate of wall thickness is in any way new or nonobvious.

According to Sorensen, the thickness of the thin wall can be kept below the threshold rate without ever having to actually determine the threshold rate at all. That the increase in thickness of the thin wall is less than the threshold rate can be simply verified by the absence of gaseous voids. This is why Sorensen argued, again and again, that the threshold rate need not be determined to practice the invention: "[t]he claims of the '460 patent do not require the 'threshold rate' to be determined…" A2160 (underlining in original). Since Sorensen contends it is not necessary to empirically determine the threshold rate to practice the invention, the district court erred in holding that the invention is not obvious based on its construction that threshold rate requires empirical determination.

The empirical determination of the threshold rate, by test strips or other means, is not what distinguishes the claimed invention from the prior art. Rather, what distinguishes the invention from the prior art, according to Sorensen, is the claim that increasing the thickness of the thin wall section at less than threshold rate would prevent gaseous voids. Since Allen and Smith teach how to increase the thickness of a thin wall section to prevent gaseous

voids, the '460 patent is obvious under 35 U.S. C. § 103(a).  No additional evidence was needed.

## C.    Request for Sanctions Against Sorensen for Frivolous Appeal

Sorensen's appeal is frivolous.  It asks this Court to reverse the district court's summary judgment on the basis of meritless arguments that are unsupported by a shred of evidence.  These arguments are so frivolous that the district court sanctioned Sorensen below.  Likewise, this Court should award costs and attorney fees.  *Abbs v. Principi,* 237 F.3d 1342, 1351 (Fed.Cir.2001) ("The purpose of awarding costs pursuant to Fed. R.App. P. 38 is to deter frivolous appeals and thus preserve the appellate calendar for cases worthy of consideration."); *E-Pass Technologies, Inc. v. 3Com Corp.,* 559 F.3d 1374, 1380 (Fed. Cir. 2009) (holding attorney who wrote and signed the appellate brief to be equally responsible as the party since a conclusion of frivolity rests not only on the filing of the appeal "but also on the frivolous nature of the advocacy in support of it").

## CONCLUSION

For all the above reasons, Homeland respectfully requests that the district court's August 23, 2012 Order granting Homeland Housewares, LLC's Renewed Motion for Summary Judgment of Noninfringement of U.S.

Patent No. 6,599,460 and denying Sorensen's Motion for Reconsideration of

Markman Ruling Re Claim Construction of "Threshold Rate" be

AFFIRMED; in addition, Homeland respectfully requests that the district

court's the March 1, 2013 Order denying Homeland's Motion for Summary

Judgment of Invalidity and granting Sorensen's Cross-Motion for Summary

Judgment of Validity of U.S. Patent No. 6,599,460 be REVERSED.


Respectfully submitted,



September 16, 2013          /s/ R. Joseph Trojan
                            R. Joseph Trojan
                            Dylan C. Dang
                            TROJAN LAW OFFICES
                            Attorneys for Plaintiff/Cross-Appellant
                            Homeland Housewares, LLC

ADDENDUM

# ADDENDUM TABLE OF CONTENTS

Stipulation for Protective Order ...................................................... i

Proposed Protective Order ...................................................... xxiii

Signed Protective Order ............................................................xxv

Judgment ............................................................A0001

Ruling on Markman Hearing..................................................A0003

Order Granting Plaintiff's Motion for Summary Judgment of
    Non-Infringement and Denying Defendant's Motion for
    Reconsideration of "Threshold Rate" ...............................A0018

Ruling on Plaintiff's Motion for Summary Judgment and
    Defendant's Motion for Reconsideration of "Threshold
    Rate"................................................................A0021

Order on Cross-Motions for Summary Judgment Regarding
    Patent Validity....................................................A0037

Ruling on Cross- for Summary Judgment Regarding Patent
    Validity...........................................................A0038

Order Denying Defendant's Motion to Revise Summary
    Judgment of Non-Infringement.......................................A0054

U.S. Patent No. 6,599,460 ....................................................A0065

1  R. JOSEPH TROJAN, SBN 137067
2  TROJAN LAW OFFICES
   9250 Wilshire Blvd., Ste. 325
3  Beverly Hills, CA 90212
4  Telephone: 310-777-8399
   trojan@trojanlawoffices.com
5
6  Attorney for Plaintiff/Counterdefendant HOMELAND
   HOUSEWARES, LLC and Counterdefendant CAPITAL
7  BRANDS, LLC
8
   MELODY A. KRAMER, SBN 169984
9  KRAMER LAW OFFICE, INC.
10 9930 Mesa Rim Road, Suite 1600
   San Diego, California 92121
11 Telephone (858) 362-3150
12 mak@kramerlawip.com
13 Attorney for Defendant
   SORENSEN RESEARCH AND DEVELOPMENT TRUST
14
15              UNITED STATES DISTRICT COURT
16        FOR THE CENTRAL DISTRICT OF CALIFORNIA
17
18 HOMELAND HOUSEWARES, LLC.,    ) Case No. 11-CV-03720-GW(JEMx)
   a California company,         )
19                    Plaintiff, ) **STIPULATION FOR PROTECTIVE**
                                  ) **ORDER**
20 v.                            )
                                  )
21 SORENSEN RESEARCH AND         ) Courtroom 10
22 DEVELOPMENT TRUST,            ) Judge George H. Wu
                                  )
23                   Defendant.  )
   _____)
24 and related counterclaims.    )
25                                )
                                  )
26                                )
27                                )
28

                            i

1   1.   UNDERLINE{PURPOSES AND LIMITATIONS}

2   Disclosure and discovery activity in this action are likely to involve

3   production of confidential, proprietary, or private information for which special

4   protection from public disclosure and from use for any purpose other than

5   prosecuting this litigation may be warranted.   Accordingly, the parties hereby

6   stipulate to and petition the court to enter the following Stipulated Protective Order.

7   The parties acknowledge that this Order does not confer blanket protections on all

8   disclosures or responses to discovery and that the protection it affords from public

9   disclosure and use extends only to the limited information or items that are entitled

10   to confidential treatment under the applicable legal principles.   The parties further

11   acknowledge, as set forth in Section 14.4, below, that this Stipulated Protective

12   Order does not entitle them to file confidential information under seal; Civil Local

13   Rule 79-5 sets forth the procedures that must be followed and the standards that will

14   be applied when a party seeks permission from the court to file material under seal.

15

16   2.   UNDERLINE{DEFINITIONS}

17   2.1   UNDERLINE{Challenging Party:}   a Party or Non-Party that challenges the

18   designation of information or items under this Order.

19   2.2   UNDERLINE{"CONFIDENTIAL" Information or Items:}   information

20   (regardless of how it is generated, stored or maintained) or tangible things that

21   qualify for protection under Federal Rule of Civil Procedure 26(c).

22   2.3   UNDERLINE{Counsel (without qualifier):}   Outside Counsel of Record and

23   House Counsel (as well as their support staff).

24   2.4   UNDERLINE{Designated House Counsel:}   House Counsel who seek access to

25   "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" information in this

26   matter.

27   2.5   UNDERLINE{Designating Party:}   a Party or Non-Party that designates

28   information or items that it produces in disclosures or in responses to discovery as

2.

CASE NO. 11cv03720 GW (JEMx)

ii

1  "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES
2  ONLY".

3      2.6   <u>Disclosure or Discovery Material</u>:  all items or information,
4  regardless of the medium or manner in which it is generated, stored, or maintained
5  (including, among other things, testimony, transcripts, and tangible things), that are
6  produced or generated in disclosures or responses to discovery in this matter.

7      2.7   <u>Expert</u>:  a person with specialized knowledge or experience in a
8  matter pertinent to the litigation who (1) has been retained by a Party or its counsel
9  to serve as an expert witness or as a consultant in this action, (2) is not a past or
10  current employee of a Party or of a Party's competitor, and (3) at the time of
11  retention, is not anticipated to become an employee of a Party or of a Party's
12  competitor.

13      2.8   <u>"HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY"</u>
14  <u>Information or Items</u>:  extremely sensitive "Confidential Information or Items,"
15  disclosure of which to another Party or Non-Party would create a substantial risk of
16  serious harm that could not be avoided by less restrictive means.

17      2.9   <u>RESERVED.</u>

18      2.10  <u>House Counsel</u>:  attorneys who are employees of a party to this
19  action.  House Counsel does not include Outside Counsel of Record or any other
20  outside counsel.

21      2.11  <u>Non-Party</u>:  any natural person, partnership, corporation,
22  association, or other legal entity not named as a Party to this action.

23      2.12  <u>Outside Counsel of Record</u>:  attorneys who are not employees of
24  a party to this action but are retained to represent or advise a party to this action and
25  have appeared in this action on behalf of that party or are affiliated with a law firm
26  which has appeared on behalf of that party.

27      2.13  <u>Party</u>:  any party to this action, including all of its officers,
28  directors, employees, consultants, retained experts, and Outside Counsel of Record

1    (and their support staffs).

2            2.14  <u>Producing Party</u>:  a Party or Non-Party that produces Disclosure

3    or Discovery Material in this action.

4            2.15  <u>Professional Vendors</u>:  persons or entities that provide litigation

5    support services (e.g., photocopying, videotaping, translating, preparing exhibits or

6    demonstrations, and organizing, storing, or retrieving data in any form or medium)

7    and their employees and subcontractors.

8            2.16  <u>Protected Material</u>:  any Disclosure or Discovery Material that is

9    designated  as  "CONFIDENTIAL,"  or  as  "HIGHLY  CONFIDENTIAL  –

10    ATTORNEYS' EYES ONLY."

11            2.17  <u>Receiving Party</u>:  a Party that receives Disclosure or Discovery

12    Material from a Producing Party.

13

14        3.     <u>SCOPE</u>

15       The protections conferred by this Stipulation and Order cover not only

16    Protected Material (as defined above), but also (1) any information copied or

17    extracted from Protected Material; (2) all copies, excerpts, summaries, or

18    compilations of Protected Material; and (3) any testimony, conversations, or

19    presentations by Parties or their Counsel that might reveal Protected Material.

20    However, the protections conferred by this Stipulation and Order do not cover the

21    following information:  (a) any information that is in the public domain at the time

22    of disclosure to a Receiving Party or becomes part of the public domain after its

23    disclosure to a Receiving Party as a result of publication not involving a violation of

24    this Order, including becoming part of the public record through trial or otherwise;

25    and (b) any information known to the Receiving Party prior to the disclosure or

26    obtained by the Receiving Party after the disclosure from a source who obtained the

27    information lawfully and under no obligation of confidentiality to the Designating

28    Party.  Any use of Protected Material at trial shall be governed by a separate

1    agreement or order.

2

3        4.    DURATION

4        Even after final disposition of this litigation, the confidentiality obligations

5    imposed by this Order shall remain in effect until a Designating Party agrees

6    otherwise in writing or a court order otherwise directs.  Final disposition shall be

7    deemed to be the later of (1) dismissal of all claims and defenses in this action, with

8    or without prejudice; and (2) final judgment herein after the completion and

9    exhaustion of all appeals, rehearings, remands, trials, or reviews of this action,

10   including the time limits for filing any motions or applications for extension of time

11   pursuant to applicable law.

12

13       5.    DESIGNATING PROTECTED MATERIAL

14           5.1    Exercise of Restraint and Care in Designating Material for

15   Protection.  Each Party or Non-Party that designates information or items for

16   protection under this Order must take care to limit any such designation to specific

17   material that qualifies under the appropriate standards.  To the extent it is practical to

18   do so, the Designating Party must designate for protection only those parts of

19   material, documents, items, or oral or written communications that qualify – so that

20   other portions of the material, documents, items, or communications for which

21   protection is not warranted are not swept unjustifiably within the ambit of this Order.

22       Mass, indiscriminate, or routinized designations are prohibited.  Designations

23   that are shown to be clearly unjustified or that have been made for an improper

24   purpose (e.g., to unnecessarily encumber or retard the case development process or

25   to impose unnecessary expenses and burdens on other parties) expose the

26   Designating Party to sanctions.

27       If it comes to a Designating Party's attention that information or items that it

28   designated for protection do not qualify for protection at all or do not qualify for the

5.

1    level of protection initially asserted, that Designating Party must promptly notify all

2    other parties that it is withdrawing the mistaken designation.

3          5.2    Manner and Timing of Designations.    Except as otherwise

4    provided in this Order (see, e.g., second paragraph of section 5.2(a) below), or as

5    otherwise stipulated or ordered, Disclosure or Discovery Material that qualifies for

6    protection under this Order must be clearly so designated before the material is

7    disclosed or produced.  Designation in conformity with this Order requires:

8          (a)    for information in documentary form (e.g., paper or electronic

9    documents, but excluding transcripts of depositions or other pretrial or trial

10   proceedings), that the Producing Party affix the legend "CONFIDENTIAL" or

11   "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" to each page that

12   contains protected material.  If only a portion or portions of the material on a page

13   qualifies for protection, the Producing Party also must clearly identify the protected

14   portion(s) (e.g., by making appropriate markings in the margins) and must specify,

15   for each portion, the level of protection being asserted.

16         A Party or Non-Party that makes original documents or materials

17   available for inspection need not designate them for protection until after the

18   inspecting Party has indicated which material it would like copied and produced.

19   During the inspection and before the designation, all of the material made available

20   for inspection shall be deemed "HIGHLY CONFIDENTIAL – ATTORNEYS'

21   EYES ONLY."  After the inspecting Party has identified the documents it wants

22   copied and produced, the Producing Party must determine which documents, or

23   portions thereof, qualify for protection under this Order.  Then, before producing the

24   specified documents, the Producing Party must affix the appropriate legend

25   ("CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES

26   ONLY") to each page that contains Protected Material.  If only a portion or portions

27   of the material on a page qualifies for protection, the Producing Party also must

28   clearly identify the protected portion(s) (e.g., by making appropriate markings in the

6.

CASE NO. 11cv03720 GW (JEMx)

1    margins) and must specify, for each portion, the level of protection being asserted.

2           (b)   for testimony given in deposition or in other pretrial or trial

3    proceedings, that the Designating Party identify on the record, before the close of the

4    deposition, hearing, or other proceeding, all protected testimony and specify the level

5    of protection being asserted.   When it is impractical to identify separately each

6    portion of testimony that is entitled to protection and it appears that substantial

7    portions of the testimony may qualify for protection, the Designating Party may

8    invoke on the record (before the deposition, hearing, or other proceeding is

9    concluded) a right to have up to 21 days to identify the specific portions of the

10   testimony as to which protection is sought and to specify the level of protection

11   being asserted.   Only those portions of the testimony that are appropriately

12   designated for protection within the 21 days shall be covered by the provisions of

13   this Stipulated Protective Order. Alternatively, a Designating Party may specify, at

14   the deposition or up to 21 days afterwards if that period is properly invoked, that the

15   entire  transcript  shall  be  treated  as  "CONFIDENTIAL"  or  "HIGHLY

16   CONFIDENTIAL – ATTORNEYS' EYES ONLY."

17          Parties shall give the other parties notice if they reasonably expect a

18   deposition, hearing or other proceeding to include Protected Material so that the

19   other parties can ensure that only authorized individuals who have signed the

20   "Acknowledgment and Agreement to Be Bound" (Exhibit A) are present at those

21   proceedings.  The use of a document as an exhibit at a deposition shall not in any

22   way affect its designation as "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL –

23   ATTORNEYS' EYES ONLY."

24          Transcripts containing Protected Material shall have an obvious legend on the

25   title page that the transcript contains Protected Material, and the title page shall be

26   followed by a list of all pages (including line numbers as appropriate) that have been

27   designated as Protected Material and the level of protection being asserted by the

28   Designating Party.  The Designating Party shall inform the court reporter of these

CASE NO. 11cv03720 GW (JEMx)

1    requirements.  Any transcript that is prepared before the expiration of a 21-day
2    period for designation shall be treated during that period as if it had been designated
3    "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" in its entirety unless
4    otherwise agreed.  After the expiration of that period, the transcript shall be treated
5    only as actually designated.

6    (c)  for information produced in some form other than documentary and
7    for any other tangible items, that the Producing Party affix in a prominent place on
8    the exterior of the container or containers in which the information or item is stored
9    the legend "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – ATTORNEYS'
10   EYES ONLY".  If only a portion or portions of the information or item warrant
11   protection, the Producing Party, to the extent practicable, shall identify the protected
12   portion(s) and specify the level of protection being asserted.

13   5.3  Inadvertent Failures to Designate.  If timely corrected, an
14   inadvertent failure to designate qualified information or items does not, standing
15   alone, waive the Designating Party's right to secure protection under this Order for
16   such material.  Upon timely correction of a designation, the Receiving Party must
17   make reasonable efforts to assure that the material is treated in accordance with the
18   provisions of this Order.

19

20   6.    CHALLENGING CONFIDENTIALITY DESIGNATIONS

21   6.1  Timing of Challenges.  Any Party or Non-Party may challenge a
22   designation of confidentiality at any time.  Unless a prompt challenge to a
23   Designating Party's confidentiality designation is necessary to avoid foreseeable,
24   substantial unfairness, unnecessary economic burdens, or a significant disruption or
25   delay of the litigation, a Party does not waive its right to challenge a confidentiality
26   designation by electing not to mount a challenge promptly after the original
27   designation is disclosed.

28   6.2  Meet and Confer.  The Challenging Party shall initiate the dispute

1    resolution process by providing written notice of each designation it is challenging

2    and describing the basis for each challenge.  To avoid ambiguity as to whether a

3    challenge has been made, the written notice must recite that the challenge to

4    confidentiality is being made in accordance with this specific paragraph of the

5    Protective Order.  The parties shall attempt to resolve each challenge in good faith

6    and must begin the process by conferring directly (in voice to voice dialogue; other

7    forms of communication are not sufficient) within 14 days of the date of service of

8    notice.  In conferring, the Challenging Party must explain the basis for its belief that

9    the confidentiality designation was not proper and must give the Designating Party

10   an opportunity to review the designated material, to reconsider the circumstances,

11   and, if no change in designation is offered, to explain the basis for the chosen

12   designation.  A Challenging Party may proceed to the next stage of the challenge

13   process only if it has engaged in this meet and confer process first or establishes that

14   the Designating Party is unwilling to participate in the meet and confer process in a

15   timely manner.

16            6.3    Judicial Intervention.  If the Parties cannot resolve a challenge

17   without court intervention, the Designating Party shall file and serve a motion to

18   retain confidentiality under Civil Local Rule 7 (and in compliance with Civil Local

19   Rule 79-5, if applicable) within 21 days of the initial notice of challenge or within 14

20   days of the parties agreeing that the meet and confer process will not resolve their

21   dispute, whichever is earlier.   Each such motion must be accompanied by a

22   competent declaration affirming that the movant has complied with the meet and

23   confer requirements imposed in the preceding paragraph.  Failure by the Designating

24   Party to make such a motion including the required declaration within 21 days (or 14

25   days, if applicable) shall automatically waive the confidentiality designation for each

26   challenged designation.   In addition, the Challenging Party may file a motion

27   challenging a confidentiality designation at any time if there is good cause for doing

28   so, including a challenge to the designation of a deposition transcript or any portions

CASE NO. 11cv03720 GW (JEMx)

9.

ix

1   thereof. Any motion brought pursuant to this provision must be accompanied by a

2   competent declaration affirming that the movant has complied with the meet and

3   confer requirements imposed by the preceding paragraph.

4        The burden of persuasion in any such challenge proceeding shall be on the

5   Designating Party. Frivolous challenges and those made for an improper purpose

6   (e.g., to harass or impose unnecessary expenses and burdens on other parties) may

7   expose the Challenging Party to sanctions. Unless the Designating Party has waived

8   the confidentiality designation by failing to file a motion to retain confidentiality as

9   described above, all parties shall continue to afford the material in question the level

10  of protection to which it is entitled under the Producing Party's designation until the

11  court rules on the challenge.

12

13  7.    ACCESS TO AND USE OF PROTECTED MATERIAL

14       7.1   Basic Principles. A Receiving Party may use Protected Material

15  that is disclosed or produced by another Party or by a Non-Party in connection with

16  this case only for prosecuting, defending, or attempting to settle this litigation. Such

17  Protected Material may be disclosed only to the categories of persons and under the

18  conditions described in this Order. When the litigation has been terminated, a

19  Receiving Party must comply with the provisions of section 15 below (FINAL

20  DISPOSITION).

21       Protected Material must be stored and maintained by a Receiving Party at a

22  location and in a secure manner that ensures that access is limited to the persons

23  authorized under this Order.    Any electronic Protected Material shall be in

24  password-protected form.

25

26       7.2   Disclosure of "CONFIDENTIAL" Information or Items. Unless

27  otherwise ordered by the court or permitted in writing by the Designating Party, a

28  Receiving   Party   may   disclose   any   information   or   item   designated

CASE NO. 11cv03720 GW (JEMx)

10.

x

1    "CONFIDENTIAL" only to:

2              (a)  the Receiving Party's Outside Counsel of Record in this action, as

3    well as employees of said Outside Counsel of Record to whom it is reasonably

4    necessary to disclose the information for this litigation and who have signed the

5    "Acknowledgment and Agreement to Be Bound" that is attached hereto as Exhibit

6    A;

7              (b)  the officers, directors, and employees (including House Counsel) of

8    the Receiving Party to whom disclosure is reasonably necessary for this litigation

9    and who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit

10   A);

11             (c)  Experts (as defined in this Order) of the Receiving Party to whom

12   disclosure is reasonably necessary for this litigation and who have signed the

13   "Acknowledgment and Agreement to Be Bound" (Exhibit A);

14             (d)  the court and its personnel;

15             (e)  court reporters and their staff, professional jury or trial consultants,

16   and Professional Vendors to whom disclosure is reasonably necessary for this

17   litigation and who have signed the "Acknowledgment and Agreement to Be Bound"

18   (Exhibit A);

19             (f)  during their depositions, witnesses in the action to whom disclosure

20   is reasonably necessary and who have signed the "Acknowledgment and Agreement

21   to Be Bound" (Exhibit A), unless otherwise agreed by the Designating Party or

22   ordered by the court.  Pages of transcribed deposition testimony or exhibits to

23   depositions that reveal Protected Material must be separately bound by the court

24   reporter and may not be disclosed to anyone except as permitted under this

25   Stipulated Protective Order.

26             (g)  the author or recipient of a document containing the information or

27   a custodian or other person who otherwise possessed or knew the information.

28        7.3    Disclosure of "HIGHLY CONFIDENTIAL – ATTORNEYS'

1    EYES ONLY" Information or Items.  Unless otherwise ordered by the court or
2    permitted in writing by the Designating Party, a Receiving Party may disclose any
3    information or item designated "HIGHLY CONFIDENTIAL – ATTORNEYS'
4    EYES ONLY" only to:

5         (a)  the Receiving Party's Outside Counsel of Record in this action, as
6    well as employees of said Outside Counsel of Record to whom it is reasonably
7    necessary to disclose the information for this litigation and who have signed the
8    "Acknowledgment and Agreement to Be Bound" that is attached hereto as Exhibit
9    A;

10        (b)  Designated House Counsel of the Receiving Party to whom
11   disclosure is reasonably necessary for this litigation, who has signed the
12   "Acknowledgment and Agreement to Be Bound" (Exhibit A), and as to whom the
13   procedures set forth in paragraph 7.4(a)(1), below, have been followed];

14        (c)  Experts of the Receiving Party (1) to whom disclosure is reasonably
15   necessary for this litigation, (2) who have signed the "Acknowledgment and
16   Agreement to Be Bound" (Exhibit A), and (3) as to whom the procedures set forth in
17   paragraph 7.4(a)(2), below, have been followed];

18        (d)  the court and its personnel;

19        (e)  court reporters and their staff, professional jury or trial consultants,
20   and Professional Vendors to whom disclosure is reasonably necessary for this
21   litigation and who have signed the "Acknowledgment and Agreement to Be Bound"
22   (Exhibit A); and

23        (f)  the author or recipient of a document containing the information or a
24   custodian or other person who otherwise possessed or knew the information.

25        7.4   Procedures for Approving or Objecting to Disclosure of
26   "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" Information or Items
27   to Designated House Counsel or Experts.

28        (a)(1)  Unless otherwise ordered by the court or agreed to in

CASE NO. 11cv03720 GW (JEMx)

12.

xii

1  writing by the Designating Party, a Party that seeks to disclose to Designated House

2  Counsel any information or item that has been designated "HIGHLY

3  CONFIDENTIAL – ATTORNEYS' EYES ONLY" pursuant to paragraph 7.3(b)

4  first must make a written request to the Designating Party that (1) sets forth the full

5  name of the Designated House Counsel and the city and state of his or her residence,

6  and (2) describes the Designated House Counsel's current and reasonably

7  foreseeable future primary job duties and responsibilities in sufficient detail to

8  determine if House Counsel is involved, or may become involved, in any

9  competitive decision-making.

10          (a)(2)  Unless otherwise ordered by the court or agreed to in

11  writing by the Designating Party, a Party that seeks to disclose to an Expert (as

12  defined in this Order) any information or item that has been designated "HIGHLY

13  CONFIDENTIAL – ATTORNEYS' EYES ONLY" pursuant to paragraph 7.3(c)

14  first must make a written request to the Designating Party that (1) identifies the

15  general categories of "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY"

16  information that the Receiving Party seeks permission to disclose to the Expert, (2)

17  sets forth the full name of the Expert and the city and state of his or her primary

18  residence, (3) attaches a copy of the Expert's current resume, (4) identifies the

19  Expert's current employer(s), (5) identifies each person or entity from whom the

20  Expert has received compensation or funding for work in his or her areas of expertise

21  or to whom the expert has provided professional services, including in connection

22  with a litigation, at any time during the preceding five years,[1] and (6) identifies (by

23  name and number of the case, filing date, and location of court) any litigation in

24  connection with which the Expert has offered expert testimony, including through a

25

26  _____

27  [1] If the Expert believes any of this information is subject to a confidentiality obligation to a third-party, then the Expert should provide whatever information the Expert believes can be disclosed without violating any confidentiality agreements, and the Party seeking to disclose to the Expert shall be available to meet and confer with the Designating Party regarding any such engagement.

28

CASE NO. 11cv03720 GW (JEMx)

13.

1   declaration, report, or testimony at a deposition or trial, during the preceding five

2   years.

3        (b)   A Party that makes a request and provides the information

4   specified in the preceding respective paragraphs may disclose the subject Protected

5   Material to the identified Designated House Counsel or Expert unless, within 14 days

6   of delivering the request, the Party receives a written objection from the Designating

7   Party. Any such objection must set forth in detail the grounds on which it is based.

8        (c)   A Party that receives a timely written objection must meet

9   and confer with the Designating Party (through direct voice to voice dialogue) to try

10   to resolve the matter by agreement within seven days of the written objection.  If no

11   agreement is reached, the Party seeking to make the disclosure to Designated House

12   Counsel or the Expert may file a motion as provided in Civil Local Rule 7 (and in

13   compliance with Civil Local Rule 79-5, if applicable) seeking permission from the

14   court to do so.  Any such motion must describe the circumstances with specificity,

15   set forth in detail the reasons why the disclosure to Designated House Counsel or the

16   Expert is reasonably necessary, assess the risk of harm that the disclosure would

17   entail, and suggest any additional means that could be used to reduce that risk.  In

18   addition, any such motion must be accompanied by a competent declaration

19   describing the parties' efforts to resolve the matter by agreement (i.e., the extent and

20   the content of the meet and confer discussions) and setting forth the reasons

21   advanced by the Designating Party for its refusal to approve the disclosure.

22        In any such proceeding, the Party opposing disclosure to Designated

23   House Counsel or the Expert shall bear the burden of proving that the risk of harm

24   that the disclosure would entail (under the safeguards proposed) outweighs the

25   Receiving Party's need to disclose the Protected Material to its Designated House

26   Counsel or Expert.

27       8.   <u>RESERVED</u>

28       9.   <u>RESERVED</u>

14.

xiv

10.   PROTECTED   MATERIAL   SUBPOENAED   OR   ORDERED PRODUCED IN OTHER LITIGATION

If a Party is served with a subpoena or a court order issued in other litigation that compels disclosure of any information or items designated in this action as "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" that Party must:

(a)  promptly notify in writing the Designating Party.  Such notification shall include a copy of the subpoena or court order;

(b)  promptly notify in writing the party who caused the subpoena or order to issue in the other litigation that some or all of the material covered by the subpoena or order is subject to this Protective Order.  Such notification shall include a copy of this Stipulated Protective Order; and

(c)  cooperate with respect to all reasonable procedures sought to be pursued by the Designating Party whose Protected Material may be affected.[2]

If the Designating Party timely seeks a protective order, the Party served with the subpoena or court order shall not produce any information designated in this action as "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" before a determination by the court from which the subpoena or order issued, unless the Party has obtained the Designating Party's permission.  The Designating Party shall bear the burden and expense of seeking protection in that court of its confidential material – and nothing in these provisions should be construed as authorizing or encouraging a Receiving Party in this action to disobey a lawful directive from another court.

11.   A NON-PARTY'S PROTECTED MATERIAL SOUGHT TO BE PRODUCED IN THIS LITIGATION

---

[2] The purpose of imposing these duties is to alert the interested parties to the existence of this Protective Order and to afford the Designating Party in this case an opportunity to try to protect its confidentiality interests in the court from which the subpoena or order issued.

1        (a)    The terms of this Order are applicable to information produced by

2    a Non-Party in this action and designated as "CONFIDENTIAL" or "HIGHLY

3    CONFIDENTIAL – ATTORNEYS' EYES ONLY".  Such information produced by

4    Non-Parties in connection with this litigation is protected by the remedies and relief

5    provided by this Order.   Nothing in these provisions should be construed as

6    prohibiting a Non-Party from seeking additional protections.

7        (b)    In the event that a Party is required, by a valid discovery request,

8    to produce a Non-Party's confidential information in its possession, and the Party is

9    subject to an agreement with the Non-Party not to produce the Non-Party's

10    confidential information, then the Party shall:

11        1.    promptly notify in writing the Requesting Party and the

12    Non-Party that some or all of the information requested is subject to a confidentiality

13    agreement with a Non-Party;

14        2.    promptly provide the Non-Party with a copy of the

15    Stipulated Protective Order in this litigation, the relevant discovery request(s), and a

16    reasonably specific description of the information requested; and

17        3.    make the information requested available for inspection by

18    the Non-Party.

19        (c) If the Non-Party fails to object or seek a protective order from this

20    court within 14 days of receiving the notice and accompanying information, the

21    Receiving Party may produce the Non-Party's confidential information responsive to

22    the discovery request.   If the Non-Party timely seeks a protective order, the

23    Receiving Party shall not produce any information in its possession or control that is

24    subject to the confidentiality agreement with the Non-Party before a determination

25    by the court.[3]Absent a court order to the contrary, the Non-Party shall bear the

26    burden and expense of seeking protection in this court of its Protected Material.

27

28

---

[3] The purpose of this provision is to alert the interested parties to the existence of confidentiality rights of a Non-Party and to afford the Non-Party an opportunity to protect its confidentiality interests in this court.

12.   UNAUTHORIZED DISCLOSURE OF PROTECTED MATERIAL

If a Receiving Party learns that, by inadvertence or otherwise, it has disclosed Protected Material to any person or in any circumstance not authorized under this Stipulated Protective Order, the Receiving Party must immediately (a) notify in writing the Designating Party of the unauthorized disclosures, (b) use its best efforts to retrieve all unauthorized copies of the Protected Material, (c) inform the person or persons to whom unauthorized disclosures were made of all the terms of this Order, and (d) request such person or persons to execute the "Acknowledgment and Agreement to Be Bound" that is attached hereto as Exhibit A.

13.   INADVERTENT    PRODUCTION    OF    PRIVILEGED    OR OTHERWISE PROTECTED MATERIAL

When a Producing Party gives notice to Receiving Parties that certain inadvertently produced material is subject to a claim of privilege or other protection, the obligations of the Receiving Parties are those set forth in Federal Rule of Civil Procedure 26(b)(5)(B). If information is produced in discovery that is subject to a claim of privilege or of protection as trial-preparation material, the party making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return or destroy the specified information and any copies it has and may not sequester, use or disclose the information until the claim is resolved. This includes a restriction against presenting the information to the court for a determination of the claim. This provision is not intended to modify whatever procedure may be established in an e-discovery order that provides for production without prior privilege review. Pursuant to Federal Rule of Evidence 502(d) and (e), insofar as the parties reach an agreement on the effect of disclosure of a communication or information covered by the attorney-client privilege or work product protection, the parties may incorporate their agreement in the stipulated protective order submitted to the court.

17.

1

2      14.    MISCELLANEOUS

3          14.1   Right to Further Relief.  Nothing in this Order abridges the right

4      of any person to seek its modification by the court in the future.

5          14.2   Right to Assert Other Objections.  By stipulating to the entry of

6      this Protective Order no Party waives any right it otherwise would have to object to

7      disclosing or producing any information or item on any ground not addressed in this

8      Stipulated Protective Order.  Similarly, no Party waives any right to object on any

9      ground to use in evidence of any of the material covered by this Protective Order.

10         14.3   Export Control.  Disclosure of Protected Material shall be subject

11     to all applicable laws and regulations relating to the export of technical data

12     contained in such Protected Material, including the release of such technical data to

13     foreign persons or nationals in the United States or elsewhere.  The Producing Party

14     shall be responsible for identifying any such controlled technical data, and the

15     Receiving Party shall take measures necessary to ensure

16     compliance.

17         14.4   Filing Protected Material.  Without written permission from the

18     Designating Party or a court order secured after appropriate notice to all interested

19     persons, a Party may not file in the public record in this action any Protected

20     Material.  A Party that seeks to file under seal any Protected Material must comply

21     with Civil Local Rule 79-5.  Protected Material may only be filed under seal

22     pursuant to a court order authorizing the sealing of the specific Protected Material at

23     issue.  Pursuant to Civil Local Rule 79-5, a sealing order will issue only upon a

24     request establishing that the Protected Material at issue is privileged, protectable as a

25     trade secret, or otherwise entitled to protection under the law.  If a Receiving Party's

26     request to file Protected Material under seal pursuant to Civil Local Rule 79-5(d) is

27     denied by the court, then the Receiving Party may file the Protected Material in the

28     public record pursuant to Civil Local Rule 79-5(e) unless otherwise instructed by the

1   court.

2       15.   FINAL DISPOSITION

3       Within 60 days after the final disposition of this action, as defined in

4   paragraph 4, each Receiving Party must return all Protected Material to the

5   Producing Party or destroy such material.  As used in this subdivision, "all Protected

6   Material" includes all copies, abstracts, compilations, summaries, and any other

7   format reproducing or capturing any of the Protected Material.    Whether the

8   Protected Material is returned or destroyed, the Receiving Party must submit a

9   written certification to the Producing Party (and, if not the same person or entity, to

10  the Designating Party) by the 60 day deadline that (1) identifies (by category, where

11  appropriate) all the Protected Material that was returned or destroyed and (2) affirms

12  that the Receiving Party has not retained any copies, abstracts, compilations,

13  summaries or any other format reproducing or capturing any of the Protected

14  Material.  Notwithstanding this provision, Counsel are entitled to retain an archival

15  copy of all pleadings, motion papers, trial, deposition, and hearing transcripts, legal

16  memoranda, correspondence, deposition and trial exhibits, expert reports, attorney

17  work product, and consultant and expert work product, even if such materials contain

18  Protected Material.  Any such archival copies that contain or constitute Protected

19  Material remain subject to this Protective Order as set forth in Section 4

20  (DURATION).

21

22

23  IT IS SO STIPULATED, THROUGH COUNSEL OF RECORD.

24

25  DATED: June 27, 2011                    /s/R. Joseph Trojan_____
                                            Attorneys for Plaintiff/
26                                          Counterdefendants

27

28

1    DATED: June 27, 2011                              /s/Melody A. Kramer
2                                                      Attorneys for Defendant/
                                                       Counterclaimant
3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

20.

# EXHIBIT A

## ACKNOWLEDGMENT AND AGREEMENT TO BE BOUND

I, _____ [print or type full name], of _____ [print or type full address], declare under penalty of perjury that I have read in its entirety and understand the Stipulated Protective Order that was issued by the United States District Court for the Northern District of California on [date] in the case of _____ [insert formal name of the case and the number and initials assigned to it by the court]. I agree to comply with and to be bound by all the terms of this Stipulated Protective Order and I understand and acknowledge that failure to so comply could expose me to sanctions and punishment in the nature of contempt. I solemnly promise that I will not disclose in any manner any information or item that is subject to this Stipulated Protective Order to any person or entity except in strict compliance with the provisions of this Order.

I further agree to submit to the jurisdiction of the United States District Court for the Northern District of California for the purpose of enforcing the terms of this Stipulated Protective Order, even if such enforcement proceedings occur after termination of this action.

I hereby appoint _____ [print or type full name] of _____ [print or type full address and telephone number] as my California agent for service of process in connection with this action or any proceedings related to enforcement of this Stipulated Protective Order.


Date: _____

City and State where sworn and signed: _____


Printed name: _____

2.

1   [printed name]

2

3   Signature: _____

4   [signature]

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

3.

1 | R. JOSEPH TROJAN, SBN 137067
2 | TROJAN LAW OFFICES
   | 9250 Wilshire Blvd., Ste. 325
3 | Beverly Hills, CA 90212
4 | Telephone: 310-777-8399
   | trojan@trojanlawoffices.com
5 |
6 | Attorney for Plaintiff/Counterdefendant HOMELAND
   | HOUSEWARES, LLC and Counterdefendant CAPITAL
7 | BRANDS, LLC
8 |
   | MELODY A. KRAMER, SBN 169984
9 | KRAMER LAW OFFICE, INC.
   | 9930 Mesa Rim Road, Suite 1600
10 | San Diego, California 92121
11 | Telephone (858) 362-3150
   | mak@kramerlawip.com
12 |
13 | Attorney for Defendant
   | SORENSEN RESEARCH AND DEVELOPMENT TRUST
14 |
15 |            UNITED STATES DISTRICT COURT
16 |        FOR THE CENTRAL DISTRICT OF CALIFORNIA
17 |

| | |
|---|---|
| HOMELAND HOUSEWARES, LLC., a California company, | Case No. 11-CV-03720-GW(JEMx) |
| Plaintiff, | **[PROPOSED] PROTECTIVE ORDER** |
| v. | |
| SORENSEN RESEARCH AND DEVELOPMENT TRUST, | Courtroom 10 |
| | Judge George H. Wu |
| Defendant. | |
| and related counterclaims. | |

1

2    PURSUANT TO STIPULATION, IT IS SO ORDERED.

3

4

5    DATED: _____    _____

6                                        Hon. George H. Wu

7                                        United States District Judge

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1   R. JOSEPH TROJAN, SBN 137067
2   TROJAN LAW OFFICES
    9250 Wilshire Blvd., Ste. 325
3   Beverly Hills, CA 90212
    Telephone: 310-777-8399
4   trojan@trojanlawoffices.com
5
6   Attorney for Plaintiff/Counterdefendant HOMELAND
    HOUSEWARES, LLC and Counterdefendant CAPITAL
7   BRANDS, LLC
8
    MELODY A. KRAMER, SBN 169984
9   KRAMER LAW OFFICE, INC.
    9930 Mesa Rim Road, Suite 1600
10  San Diego, California 92121
    Telephone (858) 362-3150
11  mak@kramerlawip.com
12
13  Attorney for Defendant
    SORENSEN RESEARCH AND DEVELOPMENT TRUST
14

15              UNITED STATES DISTRICT COURT

16         FOR THE CENTRAL DISTRICT OF CALIFORNIA

17
    HOMELAND HOUSEWARES, LLC.,    ) Case No. 11-CV-03720-GW(JEMx)
18  a California company,          )
                        Plaintiff, ) [PROPOSED] PROTECTIVE
19                                 ) ORDER
    v.                             )
20                                 )
    SORENSEN RESEARCH AND          ) Courtroom 10
21  DEVELOPMENT TRUST,             ) Judge George H. Wu
                                   )
22                                 )
                        Defendant. )
23                                 )
                                   )
24  _____    )
    and related counterclaims.     )
25                                 )
                                   )
26                                 )
                                   )
27                                 )
                                   )
28

1

2    PURSUANT TO STIPULATION, IT IS SO ORDERED.

3

4

5    DATED: June 30, 2011                    /s/John E. McDermott

6                                            Hon. John E. McDermott

7                                            United States Magistrate Judge

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

JS-6

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| HOMELAND HOUSEWARES, LLC, | ) | CASE NO.  CV 11-3720-GW(JEMx) |
| | ) | |
| Plaintiff, | ) | |
| | ) | **JUDGMENT** |
| v. | ) | |
| | ) | |
| SORENSEN RESEARCH AND | ) | Hon. George H. Wu |
| DEVELOPMENT TRUST, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

[Proposed] Judgment

Case No. CV 11-3720-GW(JEMx)

1      IT IS HEREBY ADJUDGED that Plaintiff Homeland Housewares, LLC

2  ("Homeland") does not infringe United States Patent No. 6,599,460.  IT IS FURTHER

3  HEREBY ADJUDGED that Homeland is not entitled to a declaratory judgment that the

4  claims of United States Patent No. 6,599,460 are invalid and unenforceable. IT IS

5  FURTHER HEREBY ADJUDGED that Homeland is the prevailing party and shall recover

6  its costs.

Dated:  May 28, 2013

_____

Hon. George H. Wu
United States District Judge

Jointly Presented by:

KRAMER LAW OFFICE, INC.
Melody A. Kramer, Esq.
Attorney for Defendant
SORENSEN RESEARCH AND
DEVELOPMENT TRUST

and

TROJAN LAW OFFICES
R. Joseph Trojan, Esq.
Attorney for Plaintiff
HOMELAND HOUSEWARES, LLC

[Proposed] Judgment

Case No. CV 11-3720-GW(JEMx)

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| | | | |
|---|---|---|---|
| Case No. | CV 11-3720-GW(JEMx) | Date | July 5, 2012 |
| Title | Homeland Housewares, LLC v. Sorensen Research and Development Trust | | |

Present: The Honorable   GEORGE H. WU, UNITED STATES DISTRICT JUDGE

| Javier Gonzalez | None Present | |
|---|---|---|
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| None Present | None Present |

**PROCEEDINGS:**      **(IN CHAMBERS): RULING ON MARKMAN HEARING**

Attached hereto is the Court's ruling on the Markman Hearing. The Court would adopt Homeland's proposed construction of the terms "threshold rate." The Court would adopt Sorensen's proposed construction of the terms "flow chambers," "thin wall," "exit/entrance positions," and "inscribed spheres."

A Status Conference is set for **July 19, 2012 at 8:30 a.m.** Counsel may appear telephonically provided that notice is given to the clerk by July 17, 2012.

|  |  : |  |
|---|---|---|
| | Initials of Preparer   JG | |

_Homeland Housewares v. Sorensen Research and Dev. Trust_, Case No. CV-11-3720
Ruling on Markman Hearing

## I. Background

Plaintiff Homeland Housewares LLC ("Plaintiff" or "Homeland") filed suit against
Sorensen Research and Development Trust ("Defendant" or "Sorensen") on April 29, 2011,
seeking a declaratory judgment as to the invalidity and unenforceability of a patent held by
Sorensen, U.S. Patent No. 6,599,460 (the "'460 Patent"), and a declaratory judgment of non-
infringement of that patent. _See_ Compl., Docket No. 1. Homeland additionally seeks attorney's
fees. Compl. ¶ 16. Sorensen, in its Answer, asserted a counterclaim of infringement of the '460
Patent. _See_ Docket No. 14.

Sorensen sent a cease and desist letter to Homeland on March 18, 2011, accusing
Homeland of infringing the '460 Patent on account of Homeland's manufacture and sale of
certain blenders (the "Accused Products") that, according to Sorensen, infringed upon a plastic
injection molding method claimed by its '460 Patent. Compl. ¶ 9. Homeland's counsel promptly
responded to the cease and desist letter denying any infringement and differentiating Homeland's
product from the '460 Patent. Compl. ¶¶ 11-13. The '460 Patent claims a method of injection
molding that prevents "gaseous voids" from developing in "thin wall" plastic products as they are
molded; Homeland argues that the walls of its product are thick enough that it "has none of the
characteristic problems of gaseous voids described in the '460 Patent." Compl. ¶ 15.

The '460 Patent teaches that gaseous voids can be avoided using the following process.
Fluid plastic is injected into a mold cavity through what is known as a "gate". The fluid plastic
travels through "flow chambers" and then spreads to "thin wall" sections between the flow
chambers. The thickness of the thin wall sections increases in the direction of the flow.
Importantly, the increase in thickness of the "thin wall" sections cannot surpass a "threshold rate"
above which unwanted, problematic "gaseous voids" will form in at the thin wall cavity section.

The parties are now before the Court for a claim construction hearing.

## II. Legal Standard

The scope of a patent is delineated by its claims, namely the numbered paragraphs at the
end of the patent's specification. _Markman v. Westview Instruments, Inc._, 517 U.S. 371, 373
(1996). Patent infringement analysis involves two steps: (1) claim construction; and (2)
application of the properly construed claim to the accused product. _See TechSearch L.L.C. v.
Intel Corp._, 286 F.3d 1360, 1369 (Fed. Cir. 2002). Stated otherwise: first, the scope of the
claims are determined as a matter of law, and second, the properly construed claims are
compared to the allegedly infringing device to determine, as a matter of fact, whether all of the
limitations of at least one claim are present, either literally or by a substantial equivalent, in the
accused device. _See Teleflex, Inc. v. Ficosa North America Corp._, 299 F.3d 1313, 1323 (Fed.
Cir. 2002).

Claim construction is an issue of law for the Court to decide. _See Markman v. Westview
Instruments, Inc._, 52 F.3d 967, 970-71 (Fed. Cir. 1995) (en banc) (_Markman I_), _aff'd_, 517 U.S.
370 (1996). It is a procedural step intended to clarify the legal meaning of claim language in the

-1-

context of a particular case so that a jury can make a simple factual determination as to infringement or invalidity. *See Markman*, 517 U.S. at 370, 384-85. Indeed, before a jury can determine if patents are invalid or if they have been infringed, the Court must determine the meaning and scope of the patent claims at suit through claim construction. *See Markman I*, 52 F.3d at 976; *see also Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-24 (Fed. Cir. 2005) (setting forth in detail the process and rules governing claims construction), *cert. denied sub. nom, AWH Corp v. Phillips*, 546 U.S. 1170 (2006). Only after claim construction can the jury compare the allegedly infringing device against the claims. *See Markman I*, 52 F.3d at 976. The Court's hearing on the parties' proposed claims construction is called a "Markman hearing."

In conducting a Markman hearing, the words of an asserted claim are looked to first and are to be given their ordinary meaning, unless a special meaning is clearly defined in the specification. *See Phillips*, 415 F.3d at 1312; *Markman I*, 52 F.3d at 979-80; *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). The meaning is that which would be understood by a person having ordinary skill in the art. *See Markman I*, 52 F.3d at 979. Some cases have implied that if the claim terms are clear and unambiguous as to their ordinary meaning one need look no farther; however, "the specification is always highly relevant to the claim construction analysis." *Vitronics*, 90 F.3d at 1582. "Claims must be read in light of the specification of which they are a part." *See Markman I*, 52 F.3d at 979. However, a limitation should not be read into the claim from the preferred embodiment. *See, e.g. Comark Communications, Inc. v. Harris Corp.*, 156 F.3d 1182, 1186 (Fed. Cir. 1998). The Court may also consult the public record of the patent's prosecution history in construing the scope and meaning of the claim terms. *See Markman I*, 52 F.3d at 979-80. But, as with the specification, the prosecution history should not be used to enlarge, diminish, or vary the claim limitations. *See id.* In addition to the plain words of the patent claims, the specification and the prosecution history, the Court is authorized to consult extrinsic evidence, "including expert and inventor testimony, dictionaries, and learned treatises." *Phillips*, 415 F.3d at 1317. That said, "[a]fter *Phillips*, there is no question that the intrinsic evidence is the most important source for claim construction." Edward D. Manzo, Patent Claim Construction in the Federal Circuit § 1:32 (2011 ed.).

### III. Analysis

#### A. Identification of Disputed Terms

The parties have submitted a Joint Claim Construction Report ("JR")[1], opening briefs and respective replies in connection with the upcoming Markman hearing. Homeland requests that

---

[1] It appears as though Sorensen has not fully participated in the preparation of the JR as instructed by the Court in the April 9, 2012 minute order, where the parties were ordered to prepare a report with "1) identified terms, 2) each side's proposed definitions, 3) listed explanations in terms of importance, and 4) explanation why terms need to be interpreted and what impact on either the case or aspects of the construction." Docket No. 102. Sorensen's sections merely refer to the relevant sections of its opening and reply briefing. Sorensen did prepare a summary chart, and but it merely recites each side's proposed construction and cursorily summarizes Sorensen's arguments; Sorensen also does not dispute Homeland's accusation that "[Homeland] was unable to participate in the preparation of this summary chart as [Sorensen] did not provide it until after 8 pm the night before this brief was due." Docket No. 105 at 4.

-2-

the Court construe seven terms in Claim 1 of the '460 Patent: 1) "thin wall"; 2) "thin wall cavity section"; 3) "flow chambers"; 4) "exit positions"; 5) "entrance positions"; 6) "inscribed-sphere dimensions"; and 7) "threshold rate". Sorensen contends that only "threshold rate" requires judicial construction; the Court will consider the parties' arguments as to all seven terms.

Claim 1 of the '460 patent states (with disputed terms bolded):

1. A method of injection-molding a product that includes at least one **thin wall**, comprising the steps of:

(a) combining a plurality of mold parts to define a mold cavity for forming the product and at least one gate from which fluid plastic material may be injected into the mold cavity, wherein the mold cavity includes at least one **thin-wall cavity section** and at least two opposed **flow chambers** that adjoin opposite edges of the thin-wall cavity section for directing injected fluid plastic material from **exit positions** of the said at least two opposed flow chambers into corresponding **entrance positions** of the at least one thin-wall cavity section to thereby form at least one thin-wall portion of the product, wherein the at least one thin-wall cavity section includes at least one zone that is located between said at least two opposed flow chambers, and wherein within the at least one zone **inscribed-sphere dimensions** at each entrance position are smaller than inscribed-sphere dimensions at the corresponding exit position of the adjoining flow chamber; and

(b) injecting fluid plastic material from the gate into the mold cavity to form the product;

wherein step (a) comprises combining mold parts that define a said mold cavity in which within said at least one zone of the at least one thin-wall cavity section the thickness of the at least one thin-wall cavity section increases in the general direction of flow within the flow chambers adjoining said zone, with said increase being at less than a **threshold rate** to thereby prevent injected fluid plastic material so directed into the at least one zone from at any time surrounding any gaseous void within the at least one zone.

JR, Docket No. 105, at 2.

## B. Rule of definiteness

Before the Court proceeds to evaluate the parties' competing interpretations of the disputed terms, the Court would address an issue common to many of their arguments: the appropriate standard and application of the law of definiteness. Homeland argues in briefing that many of the terms in the '460 Patent "cannot be construed because they are indefinite," since the terms do not have a precise mathematical definition but instead are relative, such as "thin" and "threshold rate." *See* Docket No. 63 at 3, 6, 14. Sorensen, of course, denies that the terms are indefinite, and also contests Homeland's argument on the grounds that Homeland has applied the

-3-

A0006

wrong legal standard for determining definiteness. As a general matter, the Court would agree to some extent with Sorensen.

In order for a patent to properly "claim" an invention, the claims must be sufficiently definite. *See* 35 U.S.C. § 112 ("The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention"). The burden is on party asserting invalidity to prove indefiniteness. 35 U.S.C. § 282 ("A patent shall be presumed valid"). The evidentiary burden on such a party is to show indefiniteness by means of clear and convincing evidence. *Young v. Lumenis, Inc.*, 492 F.3d 1336, 1345 (Fed. Cir. 2007). The standard for determining whether a claim is impermissibly indefinite on account of the use of relative terms is set forth in a recent Federal Circuit case: "Claims using relative terms such as 'near' or 'adapted to' are insolubly ambiguous only if they provide no guidance to those skilled in the art as to the scope of that requirement." *Power-One, Inc. v. Artesyn Tech., Inc.* 599 F.3d 1343, 1348 (Fed. Cir. 2010).

Homeland argues that the "primary purpose" of the definiteness requirement is to "provide clear warning to others as to what constitutes infringement of the patent." Docket No. 63 at 4. However, a review of recent Federal Circuit caselaw discloses that in fact, "the test for indefiniteness does not turn on whether a potential infringer could determine infringement, but instead on whether the claim delineates to a [person of ordinary skill in the art] the bounds of the invention." Edward D. Manzo, Patent Claim Construction in the Federal Circuit § 4:2 (2011 ed.); *Star Scientific, Inc. v. R.J. Reynolds Tobacco Co.*, 537 F.3d 1357, 1371 (Fed. Cir. 2008) (disapproving any test where "claim definiteness requires that a potential infringer be able to determine if a process infringes"); *see also Invitrogen Corp v. Biocrest Mfg., L.P.*, 424 F.3d 1374, 1384 (Fed. Cir. 2005) ("'The test for indefiniteness does not depend on a potential infringer's ability to ascertain the nature of its own accused product to determine infringement, but instead on whether the claim delineates to a skilled artisan the bounds of the invention'") (quoting *SmithKline Beecham Corp. v. Apotex Corp.*, 403 F.3d 1331, 1341 (Fed. Cir. 2005)).

Homeland argues that if a claim's key term is "completely relative, having no precise meaning, then the claim would be indefinite ... it must have a definite meaning," and also assails terms as indefinite because their mathematical definition as applied to a particular embodiment of the patent "can only be determined empirically on a case-by-case basis." Docket No. 63 at 6-7, 14. Homeland's argument misses the mark. Time after time, courts have held patent terms to be sufficiently definite even if they do not provide mathematical specificity, but only are defined in relation to other parts of the patented invention or its environs. *See, e.g., Eibel Process Co. v. Minnesota & Ontario Paper Co.*, 261 U.S. 45 (1923) ("Expressions quite as indefinite as 'high' and 'substantial,' in describing an invention or discovery, in patent specifications and claims, have been recognized by this court as sufficient"); *Invitrogen Corp. v. Biocrest Mfg., L.P.* 424 F.3d 1374, 1383 (Fed. Cir. 2005) (holding that "improved" is a sufficiently definite term); *Young v. Lumenis, Inc.*, 492 F.3d 1336, 1346 (Fed. Cir. 2007) (holding that "near" is a sufficiently definite term); *see also Andrew Corp. v. Gabriel Elec., Inc.*, F.2d 819, 821 (Fed. Cir. 1988) (holding that "close to," "substantially equal" and "closely approximate" are sufficiently definite terms).

Thus, the Court rejects Homeland's contention that relative terms, simply by virtue of being relative, are insufficiently definite to render the patent valid.

-4-

## C. The Parties' proposed constructions of the disputed terms
### 1. "Thin wall" and "thin wall cavity section"

| Disputed Term or Phrase in '460 Patent, Claim 1 | Homeland's Proposed Construction | Sorensen's Proposed Construction |
|---|---|---|
| **thin wall** | a wall portion having a thickness of less than 1mm | a wall portion that is formed within a thin-wall cavity section of the mold cavity |
| **thin wall cavity section** | a section of the mold cavity that has a thickness of 1mm or less | a section of the mold cavity that includes one or more zones and adjoins to at least two opposed flow chambers |

      Homeland and Sorensen appear to be speaking over each other, to a certain extent, as to whether it is necessary to construe "thin wall" separately from and in addition to "thin wall cavity section"; the key point as to that dispute is that neither party appears to argue that the term "thin wall" would be constructed differently if standing alone than in the context of the term "thin wall cavity section."[2] Thus, the Court would consider the construction of these two terms at once.

      Sorensen contends that neither term requires any construction whatsoever, because Homeland "improperly seeks to impose a precise mathematical range of 1mm onto the term ["thin wall"], contrary to the context of the patent specification itself, deposition testimony of a co-inventor of the subject patent, as well as Homeland's own cited articles." JR, Docket No. 105 at 10. Sorensen additionally argues that the stand-alone term "thin wall" requires no construction because it is found only in the preamble to Claim 1, not in the body of the Claim. In both contexts (standing alone and embedded in "thin wall cavity section"), then, the parties disagree as to whether "thin wall" should be defined as a precise mathematical range of less than 1mm, as proposed by Homeland, or as a "term of degree that is inherently contextual" as proposed by Sorensen. JR, Docket No. 105, at 13.

      The construction of the term "thin wall cavity section" is of great moment in this case; if the Court finds that Homeland has proposed the proper construction, Sorensen's argument that Homeland is infringing its patents will be largely eviscerated:

> It is Homeland's contention that the accused products are not "thin wall" products because they are approximately 3 to 4 times thicker than the standard definition of the thickest "thin wall" [*i.e.* 1 mm,

---

[2]According to Homeland, "Sorensen attempts to distinguish 'thin wall' as it appears in the preamble from its usage in the body of the claim (e.g. 'Thin wall cavity section')." JR, Docket No. 105 at 5. However, nowhere in the briefing or the JR can the Court find any arguments put forth by Sorensen that "thin wall" as used in the preamble (standing alone) should have a different definition than when the term is embedded in the phrase "thin wall cavity section" - in both contexts Sorensen resists Homeland's suggested construction of a mathematical range.

> according to Homeland]. Therefore, Homeland's products would
> not infringe the '460 patent for the simple reason that they are not
> "thin wall" products that suffer "gaseous voids," and thus there
> would be no reason to use the claimed method to prevent a
> problem that does not exist in the first place.

JR, Docket No. 105 at 9.

Homeland turns to extrinsic evidence, and points to articles by persons of ordinary skill in the art of plastic injection molding stating that a "thin wall" is generally defined as a wall of 1mm or less; Homeland presents four such articles. *See* Docket No. 63 at 7, 8 n.2; Trojan Decl., Docket No. 105, Exhs. 7, 8, 9, 10. Homeland also notes that the preferred embodiment of the patent defines the thin wall as 0.15mm, and also notes that its suggested interpretation, *i.e.* less than 1mm, is not inconsistent with Sorensen's proposed interpretation of the term "thin wall," provided the flow chambers are thicker than the less-than-1mm-thick thin wall. *See* Docket No. 64 at 3-4.

Sorensen argues that all of the intrinsic evidence available, such as the specification, make clear that the term "thin wall" is relative, and should not be interpreted to have a mathematically precise definition such as the one proposed by Homeland. *See* Docket No. 57 at 5. Sorensen presents its own interpretation: "A person of ordinary skill in the art of injection molding reading the patent would understand that the term 'thin wall' refers to the relative nature between a thin-wall cavity section and the relatively thicker walled cavity sections of the flow chambers." Docket No. 69 at 5. Sorensen then argues that at least two of the four articles presented by Homeland "explicitly acknowledge that thin wall is a relative term." Docket No. 69 at 3. As to the article by Guojun Xu, both parties are, in part, correct: "Thin wall injection molding ... is conventionally defined as molding parts that have a nominal wall thickness of 1 mm or less .... Thin wall is relative, however. It can also be named 'thin wall' as the flow length/thickness is above 100 or 150." Trojan Decl., Docket No. 105, Exh. 7 at 1. As to the article by Kurt Weiss, again, both parties can find some support for their interpretation of the term: "These days, 'thin wall' is generally defined by portable electronics parts having a wall thickness less than 1mm. For large automotive parts, 'thin' may mean 2mm." Trojan Decl., Docket No. 105, Exh. 8 at 1. Sorensen also cites various patents (unrelated to the suit) claiming thin-wall molding techniques that contain only relative definitions of "thin wall." Docket No. 69 at 4.[3]

In sum, whether a person of ordinary skill in the art of plastic injection molding would understand the bounds of the '460 Patent if the term "thin wall" has only a relative definition presents a close question. However, Sorensen has presented sufficient evidence to show that in

---

[3] Sorensen also presents deposition testimony of an inventor of the '460 Patent, Jens Ole Sorensen; Homeland, however, has presented caselaw indicating that the "inventor testimony as to the inventor's subjective intent is irrelevant to the issue of claim construction." *Howmedica Osteonics Corp. v. Wright Med. Tech., Inc.*, 540 F.3d 1337, 1347 (Fed. Cir. 2008). While not all of the quoted testimony can fairly be said to touch upon Mr. Sorensen's "subjective intent," the remaining quoted sections presented by Sorensen is not dispositive or particularly helpful to deciding the issue in any event. *See, e.g.*, Docket No. 57 at 6 ("Q: Is there anywhere in the '460 Patent that defines thin-wall cavity section in relation to the thick-wall section? A: I think it's inherent in the whole patent.").

-6-

some contexts, a term can be defined relatively and still be sufficiently definite that the patent is
valid.[4]  In contrast, Homeland's argument fails because it assumes that any relative definition
must by nature fail for indefiniteness.  Thus, the Court would adopt Sorensen's proposed
construction of "thin wall," and that definition should also be used to construe "thin walled
cavity section".[5]

### 2. "Flow chambers"

| Disputed Term or Phrase in '460 Patent, Claim 1 | Homeland's Proposed Construction | Sorensen's Proposed Construction |
|---|---|---|
| **flow chambers** | "Opposed flow chambers... for directing injected fluid plastic material" are channels, located on opposite sides of the thin wall cavity section, which are connected to the gate for "directing" injected fluid plastic material from the gate into the thin-wall cavity section. The flow chambers "direct" the flow of the fluid plastic material in that the plastic material must flow through the channels before spreading to the thin-wall cavity section. | sections of a mold cavity that adjoin to opposite edges of a thin-wall cavity section for at least directing injected fluid plastic material from exit positions into corresponding entrance positions located in the thin-wall cavity section, wherein in a zone of the thin-wall cavity section the inscribed-sphere dimensions of the exit positions are larger than the inscribed sphere dimensions of the corresponding entrance positions |

The construction of "flow chambers" is an important issue because Homeland contends
that the Accused Products do not, in fact, have flow chambers, if that term is properly construed.
Homeland says that flow chambers direct the flow of the plastic during the injection process, and
as such, they must be attached to a "gate," which is the point where the plastic is injected into the
mold.  Homeland avers that what Sorensen deems to be "flow chambers" in the Accused

---

[4]An interpretation could be adopted between the positions of the parties - *i.e.*, a definition that is both
relative, in that it defines a wall as "thin" only in relation to the thickness of the other elements of the product, and
also mathematically precise, such as limiting a "thin wall" for purposes of the '460 Patent to those where the ratio of
cavity wall thickness to flow chamber is less than a certain number.  This is different from Homeland's suggestion
because it does not consider the thinness of the "thin wall" in a vacuum.

[5]Homeland states in the Joint Report: "there is no material distinction between 'thin wall' and 'thin-wall
cavity section' as discussed below, since if 'thin wall' is defined to be 1 mm or less, then 'thin-wall cavity section'
means a section of the cavity that is 1 mm or less in thinness."  JR, Docket No. 105 at 7.

-7-

Products, are in fact merely "ribs" that assist in the already-made Accused Product's operation in
that they "create turbulence in the blending process .... Their function relates to how the device is
used, not how it is made." JR, Docket No. 105 at 16.

  Sorensen rejoins that a flow chamber does not need to be attached to a gate; a flow
chamber merely has to "at least" direct the flow of the plastic from an exit position in one thin
walled cavity section to the entrance position of another, where the exit position is larger than the
entrance.  Sorensen points out that the patent specification discusses an alternative embodiment
where a flow chamber is not attached to a gate; therefore, intrinsic evidence suggests that the
proper interpretation of a flow chamber would not include a requirement that it is attached to a
gate. *See* Docket No. 69 at 9.

  Homeland argues that the construction of "flow chambers" is also relevant to the validity
of the patent in the following manner.  If a flow chamber is not attached to a gate, then Homeland
argues the flow chamber cannot work, and "the claim is invalid for lack of enablement under 35
U.S.C. § 112." JR, Docket No. 105 at 17.  The reason Homeland says the flow chambers cannot
function unless attached to a gate is that then "the fluid plastic would flow directly into the 'thin-
wall cavity section' instead flowing [*sic*] though the 'flow chambers' thus defeating the intended
purpose of the invention." Docket No. 64 at 9.  Since a proper construction preserves the validity
of the patent (*see Tate Access Floors, Inc. v. Interface Architectural Resources, Inc.*, 279 F.3d
1357, 1369 (Fed. Cir. 2002)), Homeland argues that "flow chamber" must be construed so as to
be attached to a gate.

  Sorensen emphasizes that it is Homeland's burden to show a lack of enablement by clear
and convincing evidence and they have failed to present anything other than attorney arguments[6]
as to enablement.  Docket No. 69 at 9; *see Morton Intern., Inc. v. Cardinal Chem. Co.*, 5 F.3d
1464, 1469 (Fed. Cir. 1993).  Sorensen asserts that the plain language of the specification
indicates that a flow chamber is not always attached to a gate, and additionally points to the
testimony of co-inventor Jens Ole Sorensen purportedly indicating that a flow chamber can
function without a gate. *See* Docket No. 69 at 10.  However, such testimony is far from clear as
to the issue of whether a flow chamber can exist without being attached to a gate:

  Q:  So in the case of the Magic Bullet, you can at least
  agree that the plastic fills the space between the ribs both from the
  gate between the ribs and also from flowing from one rib to the
  other, correct?

  A:  Yes, but not everywhere between the flow channels -
  flow chambers do we get any plastic from the gate. At the bottom
  of the flow chambers, we get between - at the bottom between the
  flow channels we get some flow from the gate.  Up higher we only
  get flow from the flow chambers.

---

[6]Homeland has also argued that the preferred embodiment of the '460 Patent states that the flow chamber
must be attached to a gate. *See* Docket No. 63 at 9.  However, the preferred embodiment cannot be used to limit the
claim, thus such argument carries little force. *See Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 913 ("it is
improper to read limitations from a preferred embodiment described in the specification-even if it is the only
embodiment-into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to
be so limited").

-8-

Docket No. 69 at 11.

Given that the patent specification expressly contemplates flow chambers unconnected to a gate, and that a patent specification "acts as a dictionary" for the terms of a patent, the Court would adopt Sorensen's interpretation of the term "flow chambers." *See Victronics Corp.*, 90 F.3d at 1582. While this finding would, it seems, preclude Homeland from arguing that the Accused Products do not contain flow chambers based only on the "ribs" being unattached to a gate, it would of course not prevent Homeland from asserting its enablement arguments at a different procedural juncture, so as to argue that the patent is invalid based on the adopted construction.[7]

       3. *"Exit positions" and "entrance positions"*

| Disputed Term or Phrase in '460 Patent, Claim 1 | Homeland's Proposed Construction | Sorensen's Proposed Construction |
|---|---|---|
| at least two opposed flow chambers that adjoin opposite edges of the thin-wall cavity section for directing injected fluid plastic material from **exit positions** of the said at least two opposed flow chambers into corresponding **entrance positions** of the at least one thin-wall cavity section | **Exit positions** are discrete points in the flow chambers where the fluid plastic material exits the flow chambers and enters the thin-wall cavity section.<br><br>**Entrance positions** are discrete points in the thin-wall cavity section where the fluid plastic material enters from the flow chambers. | An **exit position** is a flow path for injected plastic that is situated in a flow chamber and leading to a corresponding entrance position that is situated in another section of the mold cavity.<br><br>An **entrance position** is a flow path for injected plastic that is situated in a thin-wall cavity section and leading from a corresponding exit position that is situated in different section of the mold cavity |

The main point of contention between the parties is whether an "exit position" and/or "entrance position" can consist of a "flow path," as advocated by Sorensen, or whether an exit/entrance position must be a discrete point within the flow chamber, *i.e.* the specific point at which the fluid plastic exits the flow chamber or enters the thin-walled cavity section, as

---

[7]At the Markman hearing, Homeland suggested that the Court adopt its construction of "flow chambers" excising the portion of it requiring the flow chamber to be attached to a gate, because Homeland's definition would be easier for a jury to comprehend. The Court would decline to do so, because any eventual jury will need to understand all of the terms and phrasing of the patent's claims in any event, and Sorensen's construction merely parrots the claim language.

-9-

proposed by Homeland.

Again, the construction of these terms will have a significant impact on the case as a whole. Homeland contends that the ribs in the Accused Products, which Sorensen argues are flow chambers, have no openings that could constitute "discrete points of exit" for the fluid plastic, and thus, do not infringe the '460 Patent. *See* Docket No. 105 at 20.  Sorensen thus construes "exit position" to be simply a "path" leading to another section of the mold cavity, which definition could encompass the entire flow chamber.  Similarly, Homeland asserts that an entrance position must be a discrete point in the thin walled cavity section, whereas Sorensen argues that the thin-walled cavity section as a whole can be an entrance position.

Homeland seems to be correct in noting that Sorensen's construction could essentially equate exit and entrance positions with, respectively, flow chambers and thin-walled cavity sections, and thus would improperly read out some limitations in the claim. *See Callicrate v. Wadsworth Mfg, Inc.*, 427 F.3d 1361, 1369 (Fed. Cir. 2005).  However, the patent's diagrams indicate that the entrance and exit positions are not specific points or holes, as Homeland appears to suggest, but instead merely sections along the thin walled cavity section (in the case of an entrance position) or flow chamber (in the case of an exit position).  Moreover, Sorensen made clear at the Markman hearing that the fluid plastic exits the flow chambers and enters the thin walled cavity section all along the sides of these sections of the mold cavity, not at one specific point in each.

An additional argument raised by Homeland is that the grammar of the claim supports their interpretation of the terms exit/entrance positions; they argue:

> The claim expressly recites 'exit positions' and 'entrance positions'
> in the plural, so there must be more than one exit and more than
> one entrance position .... Under Sorensen's construction there can
> be only one long exit position and one long entrance position,
> which clearly contradict the language of the claim.

Docket No. 64 at 5. The Court would not find this argument particularly helpful, as the language of Claim 1 belies Homeland's simplistic grammatical conclusions; it speaks of "directing injected fluid plastic material from **exit positions** of the said at least two opposed flow chambers into corresponding **entrance positions** of the at least one thin-wall cavity section."  Homeland's argument fails to lend much support to their argument because the plural nature of the term is likely due to the fact that it corresponds to the "at least two" opposed flow chambers, which would necessarily lead to plural exit positions out of them and plural entrance positions into the thin walled chambers.

Sorensen raises the argument that "designing 'discrete and distinct points' into a mold cavity requires that there be a steel mold part that surrounds the 'discrete and distinct points' prohibiting this portion of the mold cavity from being filled with plastic." Docket No. 69 at 14. This argument appears to mischaracterize Homeland's proposed construction; the Court does not understand Homeland to suggest that an entrance/exit point is an additional aperture within the thin walled cavity section or the flow chamber, but instead, a specific point in each where the fluid plastic exits or enters, as the case may be.

In sum, given the overall workings of the patent and the diagrams thereof, the Court would adopt Sorensen's construction of "entrance/exit positions", since a person of ordinary skill

-10-

in the art would not understand these terms to speak of discrete openings, but instead the lengths
of the flow chambers and thin walled cavity sections through which the fluid plastic flows.

### 4. *"Inscribed sphere dimensions"*

| Disputed Term or Phrase in '460 Patent, Claim 1 | Homeland's Proposed Construction | Sorensen's Proposed Construction |
|---|---|---|
| ...and wherein within the at least one zone **inscribed-sphere dimensions at each entrance position** are smaller than **inscribed-sphere dimensions at the corresponding exit position** of the adjoining flow chamber; | The spherical diameter of each discrete point where the fluid plastic material enters the thin-wall cavity section is smaller than the spherical diameter of each corresponding discrete point where the fluid plastic exits the flow chamber. | An **inscribed-sphere dimension at an entrance position** is the diameter of the largest sphere that will fit into the mold cavity at the entrance position. An **inscribed-sphere dimension at an exit position** is the diameter of the largest sphere that will fit into the mold cavity at the entrance position. |

     The parties' disagreement over these terms is largely just a restatement of the argument
over the proper definitions of entrance/exit positions. Homeland argues:

> [T]he diameter of the exit opening is not synonymous with the width of the
> flow chambers (which is what Defendant's proposed construction would
> mean). Nor is the diameter of the entrance opening synonymous with the
> width of the thin wall cavity section. Sorensen has argued that the respective
> "inscribed-sphere dimensions" are calculated by measuring the flow chambers
> and the thin wall sections themselves. In other words, according to Sorensen,
> the spherical diameter at the exit position is just the thickness of the flow
> chamber, and the spherical diameter at the entrance position is just the
> thickness of the thin wall section. By this logic, the  limitation –
> "inscribed-sphere dimensions at each entrance position are smaller than
> inscribed-sphere dimensions at the corresponding exit position of the
> adjoining flow chamber"—means only that the thin wall section is smaller
> (i.e. thinner) than the adjoining flow chamber .... Under Sorensen's
> construction the claim is incredibly broad because it would cover all products
> having a thin wall section that is smaller (i.e. thinner) than an adjoining flow
> chamber.

JR, Docket No. 105 at 25. This argument has some appeal; again, Sorensen's construction seems
to read out the limitations of the "exit/entrance position" terms.

     However, Sorensen directs the Court to the diagrams in the specification, where it does
appear that the inscribed spheres are the largest spheres that can be drawn in the thin walled

-11-

cavity chambers and flow chambers. Docket No. 57 at 19. Sorensen also presents the testimony
of Jens Ole Sorensen, which is (again) not entirely clear, but appears to support its construction
since he tries to put the "inscribed sphere" term into layman's terms as follows: "[Y]ou can think
of putting a small balloon into that position and blowing it up until it starts its changing shape,
because the walls will change the shape of it." Docket No. 57 at 19.

Homeland appears to argue in briefing that the term also fails for indefiniteness, but
presents only cursory argument on the matter (*see* Docket No. 63 at 10) and does not provide any
case citations, so the Court would not find that it have met its evidentiary burden; Homeland's
indefiniteness argument really boils down to a reiteration of their proposed construction of
exit/entrance positions:

> [S]ince the 'exit positions' and 'entrance positions' cannot be precisely determined, it is
> impossible to determine whether the 'inscribed-sphere dimensions at each entrance
> position are smaller than inscribed-sphere dimensions at the corresponding exit position
> of the adjoining flow chamber.' Therefore the claim is indefinite[.]

Docket No. 63 at 11 (quoting Claim 1 of the '460 Patent). While Sorensen seems plainly correct
in noting that "an inscribed sphere is a readily understood mathematical concept," (Docket No.
69 at 17), the point remains that *where* these spheres are to be inscribed remains a thorny issue.
Sorensen repeats again and again that it is perfectly simple to just inscribe the spheres "at a pair
of corresponding exit and entrance positions" (*id.*), but as Homeland notes, that would render
identical a) the maximum width of the thin walled cavity chambers and the inscribed sphere at
the entrance position thereof, and b) the maximum width of the flow chamber and the inscribed
sphere at the exit position thereof.

Since the patent diagrams and the text of the claim makes clear that what is key about the
inscribed spheres is that the sphere inscribed at the entrance point to the thin wall cavity section
is smaller than that inscribed at the exit position of flow chamber, and since the Court has
adopted Sorensen's construction of entrance and exit positions, the Court would similarly adopt
Sorensen's construction of "inscribed spheres."

### 5. *"Threshold rate"*

| Disputed Term or Phrase in '460 Patent, Claim 1 | Homeland's Proposed Construction | Sorensen's Proposed Construction |
|---|---|---|
| **threshold rate** | the rate of increase in the thickness of the thin wall section as empirically determined by conducting test strips at the time the mold is made in order to prevent gaseous voids. | the increase in the thickness of the thin-wall cavity section within a zone below which void-based irregularity formation between the adjoining flow chambers is prevented |

The construction of the term "threshold rate" is another critical issue in this case. During
the patent prosecution process, the '460 Patent was initially rejected as being obvious in light of

-12-

two other, similar patents, the "Allen" and "Smith" Patents. *See* JR, Docket No. 105 at 31. The
Allen patent taught that "thin walled" sections are necessary to prevent gaseous voids, and the
Smith patent taught that the "thin walled" sections must increase in thickness in the direction of
the flow of plastic. *See id.* However, what is purportedly new about the '460 Patent is that the
increase in the thickness of the thin walls, which must increase in the direction of the flow of
fluid plastic, must be at a certain rate, the "threshold rate," if gaseous voids are to be prevented.
Indeed, Sorensen distinguished its application from the Allen and Smith patents by noting that
"There is nothing in the applied references that suggest that void-based irregularities can be
prevented ... by limiting the rate of the thin-wall-cavity-section-thickness increase in said general
direction to less than a threshold rate." Trojan Decl., Exh 2; *see* Docket No. 63 at 12. In other
words, in order for gaseous voids to be prevented in plastic injection molding technique, the
Allen patent's key teaching was that the walls must be thin, the Smith patent's key teaching was
that the thin sections should increase in thickness in the direction of the plastic, and the '460
Patent's key teaching is that such increase must not occur at more than a threshold rate.

Sorensen argues that the term "threshold rate" needs no more specific construction than
the term's everyday meaning, and cites the dictionary definition of threshold as well as testimony
where Jens Ole Sorensen states, "Threshold is a common English word and it is not defined, it is
not used in any special sense in this patent." Docket No. 57 at 22. It explains that once the
threshold rate "exceeds a certain mathematical value, which value depends on variables including
mold cavity geometries and the type and amount of plastic used, void-based irregularities can
form in that thin-wall cavity section." Docket No. 69 at 21.

Unlike in the dispute regarding the term "thin wall," Homeland here does not attempt to
construct a relative term to have one precise, across the board mathematical meaning. Instead,
Homeland argues that the "threshold rate" should be constructed as the rate "as determined by
conducting test strips at the time the mold is made" such that gaseous voids do not form. *See*
Docket No. 63 at 13. Homeland persuasively notes that the patent specification itself dictates
that the threshold rate can only be determined by conducting such empirical tests. *Id.* Indeed,
Sorensen also notes that the specification envisions that the threshold rate for a given product
would be determined by conducting empirical tests as to that specific product. Docket No. 57 at
22.

Given the language of the specification, and Sorensen's admission that the "value" of the
"threshold rate" for a given item would vary based on "mold cavity geometries and the type and
amount of plastic used," it is hard to see how they can plausibly argue that the "threshold rate" of
the Accused Products should not be construed so as to involve an empirical test to see *what that
rate is,* in the case of the Accused Products. The Court would thus adopt Homeland's proposed
construction.

Homeland neatly sums up the difficulty in construing this term when it argues: "The logic
of the claim is circular: gaseous voids are prevented by increasing the thickness of the thin wall
at less than a threshold rate, but the threshold rate itself can only be determined by repeated
testing until gaseous voids are prevented." Docket No. 63 at 13. This is, in essence, a
definiteness argument, since a person of ordinary skill in the art would not know what the
threshold rate is until that person conducted testing on the particular product to see at what rate
of increase gaseous voids are prevented; once that testing is complete, however, the person need

-13-

not have referred to a "threshold rate" at all, but has instead, in some senses, discovered for herself that rate.  If the threshold rate is just the rate of increase at which gaseous voids do not occur, then it is difficult to see how the '460 Patent is different from that of Smith; while Smith's patent did not speak of a threshold rate, any product lacking gaseous voids would (according to Sorensen's definition) have been made at below such a rate.[8]

## IV.  Conclusion

The Court would adopt Homeland's proposed construction of the terms "threshold rate". The Court would adopt Sorensen's proposed construction of the terms "flow chambers", "thin wall", "exit/entrance positions", and "inscribed spheres".

---

[8]The Court would note that these worries of circularity do not appear to be cured by Homeland's construction, as discussed above.

-14-

A0017



# UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| HOMELAND HOUSEWARES, LLC, a California company,<br><br>    Plaintiff,<br><br>v.<br><br>SORENSEN RESEARCH AND DEVELOPMENT TRUST,<br><br>    Defendant.<br><br>AND RELATED COUNTERCLAIMS. | CASE NO. CV 11-3720-GW(JEMx)<br><br>**ORDER GRANTING PLAINTIFF HOMELAND HOUSEWARES, LLC'S MOTION FOR SUMMARY JUDGMENT OF NON-INFRINGEMENT OF U.S. PATENT NO. 6,599,460 and DENYING DEFENDANT'S MOTION FOR RECONSIDERATION OF MARKMAN RULING RE: CLAIM CONSTRUCTION OF "THRESHOLD RATE"**<br><br>Hon. George H. Wu<br>Courtroom 10<br><br>Hearing: August 23, 2012 at 8:30 a.m. |

TROJAN LAW OFFICES
BEVERLY HILLS

-1-

Civ. Action No. 2:11-cv-03720-GW-JEMx

These matters came before the Court on Plaintiff/Counter-defendant Homeland Housewares, LLC and Counter-defendant Capital Brands, LLP's (collectively, "Homeland") Renewed Motion for Summary Judgment of Non-infringement of U.S. Patent No. 6,599,460 (hereinafter "the '460 Patent"), and Defendant/Counter-claimant Sorensen R&D Trust's (hereinafter "Sorensen") Motion for Reconsideration of Markman Ruling re: Claim Construction of "Threshold Rate."

The Court, having considered all papers and oral arguments submitted in support of, and in opposition to, Homeland's Renewed Motion for Summary Judgment, and for good cause appearing, finds that Homeland has demonstrated there is no genuine issue of material fact as to the non-infringement of the '460 Patent.

The Court further having considered all papers and oral arguments submitted in support of, and in opposition to, Sorensen's Motion for Reconsideration, finds that Sorensen has failed to present newly discovered evidence, or otherwise demonstrate that the Court committed clear error or that the initial Markman construction of "threshold rate" was manifestly wrong.

**IT IS HEREBY ORDERED THAT:**

1.    Plaintiff Homeland's Renewed Motion for Summary Judgment on its First Count for Declaratory Judgment of Non-Infringement of the '460 Patent is

-2-    Civ. Action No. 2:11-cv-03720-GW-JEMx

1     GRANTED.

2         2.     Defendant Sorensen's Counterclaim for Infringement of the '460

3 Patent is hereby DISMISSED WITH PREJUDICE.

4

5         3.     Defendant Sorensen's Motion for Reconsideration of Markman

6 Ruling re: Claim Construction of "Threshold Rate" is DENIED.

7

8

9 **IT IS SO ORDERED.**

10

11

12 Dated: August 30, 2012

*George H. Wu*

13                                     Hon. George H. Wu
United States District Judge

14

15

16

17 Presented by:
Trojan Law Offices

18

19

20 /s/ R. Joseph Trojan
R. Joseph Trojan

21 Dylan C. Dang

22 Attorneys for Plaintiff
9250 Wilshire Blvd., Suite 325

23 Beverly Hills, CA 90212

24 Telephone (310) 777-8399
Facsimile (310) 777-8348

25

26

27

28                                -3-                Civ. Action No. 2:11-cv-03720-GW-JEMx

TROJAN LAW OFFICES
Beverly Hills

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| | | | |
|---|---|---|---|
| Case No. | CV 11-3720-GW(JEMx) | Date | August 23, 2012 |
| Title | Homeland Housewares, LLC v. Sorensen Research and Development Trust | | |

| | | | |
|---|---|---|---|
| Present: The Honorable | GEORGE H. WU, UNITED STATES DISTRICT JUDGE | | |

| Javier Gonzalez | Laura Elias | |
|---|---|---|
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| R. Joseph Trojan | Joseph McAvoy |
| Dylan C. Dang | Patricia A. Shackelford |

**PROCEEDINGS:**      **PLAINTIFF/COUNTER DEFENDANTS' RENEWED MOTION FOR SUMMARY JUDGMENT OF NON-INFRINGEMENT OF U.S. PATENT NO. 6,599,460 (filed 07/26/12);**

~~**DEFENDANT'S MOTION FOR RECONSIDERATION OF MARKMAN**~~
**RULING RE CLAIM CONSTRUCTION OF "THRESHOLD RATE" (filed 07/16/12);**

**STATUS CONFERENCE**

Court hears oral argument. The Tentative circulated and attached hereto, is adopted as the Court's final ruling. The Court **GRANTS** Homeland's motion for summary judgment as to non-infringement. This ruling will also be dispositive of Sorensen's counterclaim for infringement. The case will move forward as to Homeland's invalidity/unenforceability declaratory judgment claim. Counsel for plaintiff will file a proposed order forthwith. Defendant's Motion for Reconsideration of Markman Ruling re Claim Construction of "Threshold Rate" is **DENIED.**

The status conference is continued to **August 30, 2012 at 8:30 a.m.** Parties may appear telephonically provided that counsel advise the clerk by August 28, 2012.

| | : | 20 |
|---|---|---|
| Initials of Preparer | JG | |

*Homeland Housewares v. Sorensen Research and Dev. Trust*, Case No. CV 11-3720
Tentative Rulings on: (1) Defendant Sorensen's Motion for Reconsideration of Markman
Hearing and (2) Plaintiff Homeland Housewares' Motion for Summary Judgment & Defendant's
Rule 56(d) Motion

## I. Background

Plaintiff Homeland Housewares LLC ("Plaintiff" or "Homeland") filed suit against
Sorensen Research and Development Trust ("Defendant" or "Sorensen") on April 29, 2011,
seeking a declaratory judgment as to the invalidity and unenforceability of a patent held by
Sorensen, U.S. Patent No. 6,599,460 (the "'460 Patent"), and a declaratory judgment of non-
infringement of that patent. *See* Compl., Docket No. 1. Sorensen, in its Answer, asserted a
counterclaim of infringement of the '460 Patent. *See* Docket No. 14. Plaintiff manufactures and
sells food blenders called the "Magic Bullet" and the "Baby Bullet" (collectively the "Accused
Products") which are sold along with "an assortment of plastic cups and mugs." Docket No. 124
at 6.

The '460 Patent claims a method of injection molding that prevents "gaseous voids" from
developing in "thin wall" plastic products as they are molded. SUF, SDF ¶ 1.[1] It teaches that
gaseous voids can be avoided using the following process. Fluid plastic is injected into a mold
cavity through what is known as a gate. SUF ¶ 32. The fluid plastic is directed through "flow
chambers" and then spreads to "thin wall" sections between the flow chambers. SUF, SDF ¶ 4.
The thickness of the thin wall sections increases in the direction of the flow. *Id.* Importantly, the
rate of increase in thickness of the "thin wall" sections cannot surpass a "threshold rate" above
which unwanted, problematic "gaseous voids" will form. The "threshold rate" is to be
determined empirically by conducting test strips. SUF, SDF ¶ 17.

The parties are now before the Court for Defendant's motion for reconsideration of one of
the terms constructed at the Markman hearing held by this Court on May 7, 2012, as well as
Plaintiff's renewed motion for summary judgment and Defendant's Rule 56(d) request.

## II. Legal Standards

### A. Motion for Reconsideration

A motion for reconsideration is an "extraordinary remedy, to be used sparingly." *Kona
Enters., Inc. v. Estate of Bishop*, 229 F.3d 877, 890 (9th Cir. 2000) (citation omitted). Indeed,
"[m]otions for reconsideration are generally unwelcome." Schwarzer, Tashima, et al., *California
Practice Guide: Federal Civil Procedure Before Trial* (2011) § 12:158.1, at 12-60. Reconsidera-
tion is generally only appropriate where the Court is presented with newly- discovered evidence,
the Court "committed clear error or the initial decision was manifestly unjust," or where there is
an intervening change in controlling law. *See School Dist. No. 1J v. ACandS, Inc.*, 5 F.3d 1255,

---

[1]Plaintiff Homeland's statement of undisputed facts is found at Docket No. 118-3 and shall be referenced as
"SUF." Defendant Sorensen's statement of disputed facts is found at Docket No. 129-1, and shall be referenced as
"SDF."

-1-

1263 (9th Cir. 1993). Local Rule 7-18 of the Central District of California imposes similar requirements:

> A motion for reconsideration of the decision on any motion may be made only on the grounds of (a) a material difference in fact or law from that presented to the Court before such decision that in the exercise of reasonable diligence could not have been known to the party moving for reconsideration at the time of such decision, or (b) the emergence of new material facts or a change of law occurring after the time of such decision, or (c) a manifest showing of a failure to consider material facts presented to the Court before such decision. No motion for reconsideration shall in any manner repeat any oral or written argument made in support of or in opposition to the original motion.

C.D. Cal. L.R. 7-18.

### B. Summary Judgment

Summary judgment shall be granted when a movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In other words, summary judgment should be entered against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Parth v. Pomona Valley Hosp. Med. Ctr.*, 630 F.3d 794, 798-99 (9th Cir. 2010). Further,

> [i]f the party moving for summary judgment meets its initial burden of identifying for the court the portions of the materials on file that it believes demonstrate the absence of any genuine issue of material fact, the nonmoving party may not rely on the mere allegations in the pleadings in order to preclude summary judgment [, but instead] must set forth, by affidavit or as otherwise provided in Rule 56, specific facts showing that there is a genuine issue for trial.

*T.W. Elec. Serv., Inc., v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (internal citations and quotation marks omitted). At the summary judgment stage, the Court does not make credibility determinations or weigh conflicting evidence, and views all evidence and draws all inferences in the light most favorable to the non-moving party. *See id.* at 630-31 (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

As applied in the context of a patent infringement claim, a mere disagreement between experts is not sufficient to raise a triable issue of fact; rather, an expert's opinion must present "sufficient detail for the court to determine whether that factual foundation would support a finding of infringement under the claim construction adopted by the court, with all reasonable

-2-

inferences drawn in favor of the non-movant." *Rambus Inc. v. Hynix Semiconductor Inc.*, 628 F.
Supp. 2d 1114, 1122 (N.D. Cal. 2008) (quoting *Arthur A. Collins, Inc. v. N. Telecom Ltd.*, 216
F.3d 1042, 1046-48 (Fed. Cir. 2000)).

### C. Rule 56(d)

In response to a summary judgment motion, a nonmoving party may obtain relief
pursuant to Fed. R. Civ. P. 56(d) ("Rule 56(d)") if it "shows by affidavit or declaration that, for
specified reasons, it cannot present facts essential to justify its opposition." A party seeking
relief under Rule 56(d) in the Ninth Circuit must show: "(1) it has set forth in affidavit form the
specific facts it hopes to elicit from further discovery; (2) the facts sought exist; and (3) the
sought-after facts are essential to oppose summary judgment." *Family Home and Fin. Ctr., Inc.
v. Fed. Home Loan Mortg. Corp.*, 525 F.3d 822, 827 (9th Cir. 2008). The party must also show
that it "diligently pursued its previous discovery opportunities, and . . . demonstrate that allowing
additional discovery would . . . preclude[ ] summary judgment." *Bank of Am., NT & SA v.
PENGWIN*, 175 F.3d 1109, 1118 (9th Cir. 1999); *Brocade Commc'ns Sys., Inc. v. A10 Networks,
Inc.*, 843 F. Supp. 2d 1018, 1027 (N.D. Cal. 2012).

### III. Analysis

#### A. The Court Denies Defendant Sorensen's Motion for Reconsideration.

Sorensen seeks reconsideration of the term "threshold rate" as constructed by this Court
at the Markman hearing. The Court's analysis of why Homeland's construction of that term
should be adopted was, in pertinent part, as follows:

> Sorensen argues that the term "threshold rate" needs no more
> specific construction than the term's everyday meaning . . . It
> explains that once the threshold rate "exceeds a certain mathematical
> value, which value depends on variables including mold cavity
> geometries and the type and amount of plastic used, void-based
> irregularities can form in that thin-wall cavity section." Docket No.
> 69 at 21.
>
> . . . Homeland argues that the "threshold rate" should be
> constructed as the rate "as determined by conducting test strips at the
> time the mold is made" such that gaseous voids do not form. *See*
> Docket No. 63 at 13. Homeland persuasively notes that the patent
> specification itself dictates that the threshold rate can only be
> determined by conducting such empirical tests. *Id.* Indeed, Sorensen
> also notes that the specification envisions that the threshold rate for a
> given product would be determined by conducting empirical tests as
> to that specific product. Docket No. 57 at 22.
>
> Given the language of the specification, and Sorensen's
> admission that the "value" of the "threshold rate" for a given item
> would vary based on "mold cavity geometries and the type and
> amount of plastic used," it is hard to see how they can plausibly

-3-

> argue that the "threshold rate" of the Accused Products should not be
> construed so as to involve an empirical test to see *what that rate is . .*
> *. [.]*

Markman Order, Docket No. 113 at 13. The Court had also discussed how the concept of a
"threshold rate" appeared to be the novel aspect of the '460 Patent, as compared to two prior
patents, the Smith patent and the Allen patent. Sorensen in its motion for reconsideration asserts
that the Court has made two factual errors and two legal errors in its construction of the term
"threshold rate." The Court would consider each in turn.

First, Sorensen argues that the Court erred in finding that the Allen and/or Smith patents
taught anything at all regarding the prevention of gaseous voids. The Court determined in its
Markman Order that "The Allen patent taught that 'thin walled' sections are necessary to prevent
gaseous voids, and the Smith patent taught that the 'thin walled' sections must increase in
thickness in the direction of the flow of plastic." *Id.* Sorensen argues that there are "no
teachings whatsoever" in Allen or Smith regarding gaseous voids. Yet the "summary of the
invention" section of the Allen patent refers to how the "thin panel section" must be positioned
"so that there are no voids in the plastic." Allen, at column 2, lines 53-55 (Docket No. 110, Exh.
B at 14). Sorensen does not explain away this reference. As for the Smith patent, the "summary
of the invention" section states that "[a]s the thickness . . . increases, the flow of plastic will
move uniformly." Smith, column 3, lines 46-48 (Docket No. 110, Exh. C at 25). No
reconsideration of the construction of "threshold rate" is warranted based on the Court's analysis
of the relevance of the Allen or Smith patents.

Second, Sorensen argues that the Court erred in interpreting the prosecution history of the
'460 patent. The Court found that the Examiner had tentatively rejected the patent as obvious in
light of the Allen and Smith patents, and found that fact supported the notion that threshold rate
must involve some empirical testing, because the Examiner needed some grounds upon which it
eventually determined that the '460 was non-obvious and thus allowable; as discussed above,
without the component of empirical testing, "threshold rate" is a circular concept that would not
have allowed the examiner to reach a finding of non-obviousness. Sorensen provides the
Examiner's statement of reasons for allowance, after considering the potential obviousness in
light of Smith and Allen, which was:

> The prior art does not teach or suggest the thickness of the thin
> wall section increasing in the direction of flow *at less than a*
> *threshold rate* to prevent injected fluid plastic directed into the
> zone from at any time surrounding any gaseous void within the
> zone . . . The declaration [submitted by the inventors] . . . is
> sufficient to overcome the rejection of claims 1-34 based upon
> Smith . . . The declaration shows that increase in thickness of the
> thin wall cavity is *not at a rate* to prevent injected fluid plastic
> directed into the zone from at any time surrounding any gaseous
> void within the zone.

-4-

Docket No, 114 at 7.  In other words, the Examiner eventually allowed the claims of the '460
because, unlike Smith, the '460 Patent teaches that the wall thickness increases at less than a
threshold rate, whereas the Smith patent had not so taught.  But then, the Court is back to its
original conclusion: if what distinguishes the '460 patent is the threshold rate, then the threshold
rate cannot simply be constructed as "whatever rate below which gaseous voids do not form," as
that would be an entirely circular definition that would not have reasonably permitted the
Examiner to change the tentative rejection to a final allowance decision.

Sorensen's third and fourth arguments (taken together) are that the Court improperly
inserted a step of empirical testing into a claim that did not require it, since only the specification,
not the claims, mentions empirical testing to determine the threshold rate. *See Markman v.
Westview Instruments, Inc.*, 52 F.3d 967, 980 (Fed. Cir. 1995) (the claim, not the specification,
sets the parameters of the patentee's right to exclude).  Yet, again, there is no other way for the
term to be constructed, because without the use of empirical testing to determine the threshold
rate, in Homeland's words, "it is impossible to determine whether this claim limitation is met by
[any] accused product."  Docket No. 128 at 8.  Sorensen has simply never responded adequately
to this Court's finding that any construction of "threshold rate" that lacks a component of
empirical testing would be entirely circular.

Sorensen analogizes to the boiling point of water, saying that just as the boiling point of
water will vary based on altitude (actually based on barometric pressure), the threshold rate
below which gaseous voids will not form will vary based on the particular product and mold
cavity. *See* Docket No. 114 at 10.  However, this example proves precisely the opposite point:
unlike Sorensen's proposed construction of threshold rate, there is a *formula* by which the boiling
point of water can be determined at each different altitude.  The boiling point of water is not
simply defined as "the threshold temperature above which water turns from liquid to vapor" -
there is a mathematical formula according to which a person can know for sure whether or not, at
any given altitude and any given temperature, the water will boil.  In other words, the mere fact
that a threshold value is variable does not mean it can only be defined in a circular manner - *i.e.*,
"the value above which [the relevant event] occurs."  On the contrary, just as in the case of
boiling water, a variable threshold value can be meaningfully defined through a mathematical
formula or by reference to the empirical testing necessary to determine the threshold value in a
specific set of circumstances

In sum, the Court should deny Sorensen's motion for reconsideration as to the term
"threshold rate."[2]

### B.  The Court will grant Homeland's motion for summary judgment

Summary judgment of non-infringement requires a two-step analysis.  First, the claims of
the patent must be construed to determine their scope, as a question of law. *Pitney Bowes, Inc. v.*

---

[2] Sorensen complains that the Court, in its final Markman order, did not cite to the supplemental briefing it
submitted, uninvited, during the period between the Markman hearing and the Court's issuance of the Markman
order. The Court would find that first, the arguments presented therein are virtually identical to those raised in the
motion for reconsideration, thus they have now been addressed, and second, that the supplemental briefing was
improper because the Court had indicated that the matter had been taken under submission on the basis of the initial
Markman briefs and argument, and had not invited supplemental briefing.

-5-

*Hewlett-Packard Co.*, 182 F.3d 1298, 1304 (Fed. Cir. 1999) (internal citation omitted). Second, "a determination must be made as to whether the properly construed claims read on the accused device." *Id.* To find infringement, "the court must determine that every claim limitation is found in the accused device." *Playtex Prods., Inc. v. Procter & Gamble Co.*, 400 F.3d 901, 909 (Fed. Cir. 2005) (internal citations omitted). The determination of infringement is generally a question of fact. *Lockheed Martin Corp. v. Space Sys./Loral, Inc.*, 324 F.3d 1308, 1318 (Fed. Cir. 2003). Since the ultimate burden of proving infringement rests with the patentee, an accused infringer may establish that summary judgment is proper "either by providing evidence that would preclude a finding of infringement, or by showing that the evidence on file fails to establish a material issue of fact essential to the patentee's case." *Novartis Corp. v. Ben Venue Labs., Inc.*, 271 F.3d 1043, 1046 (Fed. Cir. 2001); *see also Pixion v. Citrix Sys., Inc.*, No. C 09-03496 SI, 2012 U.S. Dist. LEXIS 113929, at *16 (N.D. Cal. Aug. 13, 2012).

      Homeland argues that summary judgment in its favor is warranted because the Accused Products do not infringe on the '460 Patent. There are four claim limitations that Homeland argues are not found in the Accused Products: 1) the Accused Products do not suffer from the problem of "gaseous voids" because they are not "thin-walled"; (2) the Accused Products do not have "flow chambers"; (3) the Accused Products do not have "exit/entrance positions" or "inscribed sphere dimensions"; (4) the Accused Products do not have walls that increase in thickness at a rate less than a "threshold rate". The Court will discuss each in turn, before considering Sorensen's 56(d) motion.

      As a general matter, Sorensen has nowhere in its papers identified which *components* of Plaintiff's products infringe the '460 Patent. Sorensen's Preliminary Infringement Contentions ("Contentions") list "Magic Bullet Hi-Speed Blender/Mixer System" and "Baby Bullet Baby Food Making System" as the Accused Products. *See* Decl. of R. Joseph Trojan ("Trojan Decl."), Docket No. 121, Exh. 8 at 2. Then, the Contentions present three drawings, allegedly depicting Homeland's products. Sorensen has not disclosed which component cup the drawings found in its Contentions claim to depict. Homeland, though, has ventured guesses as to which products allegedly infringe the '460 Patent, given the drawings. *See* Docket No. 124 at 8. It is on this shaky ground that the Court must tread in evaluating whether there is a genuine issue of material fact as to whether the Accused Products infringe upon the '460 Patent.

     **1. There is a genuine issue of material fact as to whether the Accused Products are "thin walled."**

      Homeland argues that since "gaseous voids" do not form in their products, "there would be no reason to employ the injection molding process claimed in the '460 patent to prevent a problem that does not exist." Docket No. 124 at 10. The evidence Homeland proffers in support of the fact that gaseous voids do not form in their products is a declaration by Mr. Joe Meyer (the "Meyer Declaration"), who is the Managing Director of the non-party Chinese company Capital Bay Ltd., which "supervises production and quality control of the two third-party Chinese factories" that manufacture the Accused Products. Meyer Decl., Docket No. 120, ¶ 1. He testifies that he has personal knowledge of "the injection molding process that is used to make the accused products" and that gaseous voids "have never been a problem in the accused products." *Id.* ¶¶ 1, 15. Additionally, Homeland argues that gaseous voids have never posed a

-6-

problem in manufacturing the Accused Products because the Accused Products do not have "thin walls" - instead, Homeland argues that its products feature thick walls which are two to three times thicker than what Homeland dubs the "standard" definition of "thin" - 1mm or less.

As noted by Sorensen, this Court rejected Homeland's construction of "thin" as 1mm at the recent Markman hearing. *See* Markman Order, Docket No. 113 at 5-6. Homeland appears to be trying to get around the Court's rejection of its construction by claiming that the walls simply must be thick, because if they were thin, then the problem of "gaseous voids" would have arisen during manufacturing. Yet neither side appears to argue that in *every* thin-walled product ever manufactured, the issue of gaseous voids *must* arise; the patent merely teaches one method of preventing the voids. Thus, Homeland has failed to show that there is no genuine issue of material fact as to whether the Accused Products contain "thin walls," because that question cannot be answered by consulting either the 1mm standard this Court already rejected, or, merely by pointing to the lack of gaseous voids. In other words, there is a genuine issue of material fact as to whether the Accused Products are "thin walled."

All that said, the Court would note that Sorensen has presented no evidence to counter Mr. Meyer's testimony that gaseous voids have never been a problem in manufacturing the Accused Products. Sorensen does, though, object to the above-quoted paragraphs of the Meyer Declaration, calling Mr. Meyer's testimony concerning why gaseous voids do not form (namely his conclusion that the walls are "thick enough" that they do not occur) a mere parroting of Homeland's rejected construction of "thin wall" and impermissible expert testimony by a lay witness. *See* Docket No. 129-2 at 5. The Court would not find that these objections constitute grounds to exclude Mr. Meyer's testimony that gaseous voids *simply were never a problem* in manufacturing the Accused Products, leaving aside *why* they were never a problem. Mr. Meyer, as head of the company supervising the manufacturing of the Accused Products, obviously has personal knowledge as to what problems arise on the factory floor. Thus, the Court would note as background for the remaining analysis that Sorensen has offered no evidence that gaseous voids, the problem the '460 Patent purports to solve, have ever been an issue in the manufacturing of the Accused Products, whereas Homeland has offered evidence that gaseous voids have never been a problem.[3]

### 2. There is no genuine dispute that the Accused Products lack flow chambers.

Homeland asserts that the Accused Products do not include "flow chambers," which this Court has constructed to mean (in pertinent part) "sections of a mold cavity that adjoin to opposite edges in a thin wall cavity section for at least directing injected fluid plastic material . . ." Markman Order, Docket No. 113 at 6-7. The Court rejected Homeland's proposed construction which would have required a flow chamber to be attached to a "gate" (*i.e.* the point where

---

[3]For instance, Sorensen has uncovered zero documents that show Homeland grappling with this problem, and Sorensen has not elicited testimony in depositions or otherwise from employees at Homeland with personal knowledge of the problem of gaseous voids ever having been encountered in the Accused Products.

-7-

the fluid plastic is injected).[4]  *Id.*  Sorensen contends that the "ribs" (*i.e.* protrusions emanating
vertically along the plastic cups to which the blender attaches) of the Accused Products are
actually flow chambers; Homeland asserts that the ribs are there to "create turbulence in the
blending process" and "have no function in the molding process," as Mr. Meyer testifies.  Meyer
Decl., Docket No. 120, ¶ 16.

  Homeland also presents the results (in photographic form) of two empirical tests which
appear to show that the flow chambers do not direct the flow of plastic: a "dye test" and a "short
shot test."  First, Homeland injected dye into the mold, and photographed the results.  Again, the
Court has constructed "flow chamber" such that it must "direct[] injected fluid plastic material."
When dye is injected *into the gate* (the point where the plastic is normally injected), the
photographs show that the dye scatters every which way, not into the ribs.  *See* Meyer Decl.,
Docket No. 120, Exh. 12.  If the ribs were flow chambers, argues Homeland, then the flow of the
dye would have been directed by the ribs instead of scattering about willy-nilly.  Further,
Homeland argues, if the ribs were flow chambers, then the dye would not only direct the flow,
but would direct the flow into the (possibly thin) wall sections; in contrast, when the dye was
injected directly *into the ribs* (as opposed to through the gate), the dye continued to flow along
the rib, and did not spill out into the (possibly thin) wall sections.  *See* Meyer Decl., Docket No.
120, Exh. 12; Docket No. 124 at 12.

  Homeland also presents the results of another test, called "short shot testing."  This test
was conducted by Homeland allegedly *at the request of Sorensen* (Docket No. 124 at 14), and is
a series of photographs taken during the formation of the product when made according to the
same injection process as is used to make the Accused Products; in other words, the "short shots"
are still photographs of unfinished Accused Products, taken during the molding process and
showing what the Accused Products look like at different stages during their metamorphosis
from liquid plastic to (for example) a Magic Bullet Blender cup.  *See* Meyer Decl., Docket No.
120, ¶ 9.[5]  These photographs show that the walls of the Accused Products form by the plastic
flowing down at an even rate as to the ribs and the walls, away from the gate.  In other words, the
walls of the cup appear to be forming evenly without regard for the location of the ribs.  If the
ribs were directing the flow of the plastic, as the claim limitation requires, then (in Homeland's
words) "there would be gaps in the wall sections where the plastic had not yet joined together."

---

  [4]Sorensen argues that Homeland is now impermissibly resting upon its rejected construction, in arguing that
the ribs are not flow chambers.  If Homeland had argued that the ribs are not flow chambers *solely* because they are
not connected to the gate, then the Court would be persuaded by Sorensen's reasoning.  However, that is not
Homeland's argument.  Homeland argues that leaving aside the issue of whether the ribs are attached to the gate or
not, the photographs from the dye test and the short shot test show that the ribs do not function to direct the flow of
the plastic.  Instead, the plastic flows evenly all around the cup's forming edge, and the location of the ribs is
irrelevant to the molding of the cup.  The ribs function only to aid the blending process performed by the finished
product, not aid in the molding process as the cup is formed.

  [5]Sorensen's evidentiary objection that the short shot test is unauthenticated because it is only a single set of
shots which Homeland allegedly did not identify "which of the two products it is, when and where they were made,
by whom they were made, whether they were made with the same test or production molds, who verified whether
they were made with the same injection process as used in production" (Docket No. 129-2 at 6) is denied; the Meyer
Declaration addresses each of these issues.

Docket No. 124 at 15.

   In sum, Homeland has presented photographic evidence from two tests, the dye test and the short shot test, which appear to conclusively show that the Accused Products do not feature "flow chambers," because what Sorensen had argued were flow chambers are in fact merely ribs that assist in the blending process once the completed product is used, but which play no role whatsoever in the molding or manufacturing process. Unless Sorensen can present more than a scintilla of evidence that the ribs do in fact function as flow chambers (or otherwise show that the flow chambers taught by the '460 Patent are present in the Accused Products), then summary judgment in favor of Homeland is warranted.

   Has Sorensen, then come up with any evidence that the ribs are in fact flow chambers, even a scintilla? It appears that the answer is no. Sorensen does not deny that it has conducted no testing whatsoever that could show how the Accused Products do in fact utilize flow chambers. Nor do they refer to any photographs of the Accused Products and illuminate for the Court where the flow chambers must be found. Instead, Sorensen argues that (1) the dye test is inaccurate because the viscosity of dye is different from that of plastic; (2) the short shot test does in fact show that the ribs direct the flow of plastic. Sorensen also raises evidentiary objections to both tests.

   As to the dye test, Sorensen merely states conclusorily that dye and plastic do "not flow at the same rate or direction" and thus concludes that the dye test is not an accurate indicator of the flow of plastic. Crucially, Sorensen backs up this assertion only a declaration from inventor Jens Ole Sorensen, who testifies that "they [Homeland] have not mixed the plastic with the dye, so each substance would flow according to its own viscosity. Therefore, the dye and plastic would not flow at the same rate or direction as the other." Decl. of Jens Ole Sorensen ("Sorensen Decl."), Docket No. 130-2, ¶ 14. Yet Sorensen never ran its own tests showing dye (or anything) doing anything different, despite having had access to the physical samples used to create the photographs here. Indeed, when Homeland demanded that Sorensen "produce the documents of whatever it did that would support its infringement claim," Sorensen offered only "drawings that document its measurements and analysis of infringement . . . and additionally offered to make available the physical samples." SUF, SDF ¶ 42. In other words, Sorensen has only presented the three drawings found in the Contentions, as the sum total of documents evidencing testing they did to support the infringement claim; they have thus presented no evidence that the results of the dye and short shot tests are in genuine dispute.

   Perhaps realizing that its infringement claim could not withstand summary judgment with merely this flimsy dispute as to the facts, Sorensen then offers evidentiary objections to the dye test, contending that Meyer is not an expert witness and thus cannot offer scientific or technical knowledge; even as an expert, Sorensen contends, Meyer's dye test should be excluded because it is not clear that his opinions are the product of reliable principles and methods. The Court would not agree. Meyer is offering his personal knowledge of a test he personally "directed," and regardless of whether the Court takes note of his conclusion that the photographs show that the ribs are not flow chambers for purposes of the '460 Patent (which may indeed be improper expert opinion testimony), the Court has no reason to exclude the photographic results of the dye test he personally conducted and no reason to decline to make common sense deductions from those photographs. The results of the dye test show that the flow of the *dye* was not directed by

-9-

the ribs, this is not contested. Sorensen has offered less than a scintilla of evidence that dye
would flow in a different direction than would plastic, in fact it has offered only the word of Jens
Ole Sorensen without any further substantiation. Thus, the result of the dye test, that the ribs do
not direct the flow of plastic, is not a matter of genuine dispute.

Proceeding to the next test, the short shot test, Sorensen raises similar arguments as those
discussed above in an attempt to form a smoke screen around the fact that it has conducted zero
experiments of its own that contradict the results of the simple tests put forward by Homeland.
First, Sorensen attempts to argue that the short shot photographs do in fact show that the plastic
flowed from the ribs into the wall sections, because one (and only one, out of many) of the short
shots show an inverted circular line, with the ends of the line being located along a rib.
However, Sorensen does explain how this inverted circular line indicates that the ribs direct the
flow of plastic, nor does Sorensen attempt to explain away the fact that all of the other short shot
samples do not feature this inverted circular line.

Thus, again, lacking any evidence to support its infringement claims and lacking any
comprehensible argument or evidence contradicting Homeland's evidence of non-infringement,
Sorensen resorts to evidentiary objections to the short shot test. Sorensen argues that the tests
lack foundation, but the tests were conducted at Sorensen's behest (even if the instructions for
the test were, it appears, not followed to the letter, *see* Sorensen Decl., Docket No. 130-2, ¶¶ 9-
10), the short shots were produced to Sorensen in November 2011 (thus Sorensen had ample time
to inspect the pictures and run its own, similar tests, if it so desired), and the samples themselves
were inspected in person by Sorensen on November 7, 2011. *See* Supplemental Trojan Decl.,
Docket No. 135, ¶ 10. Moreover, the declaration of Joe Meyer suffices to authenticate the
photographic results of the short shot test. *United States v. Workinger*, 90 F.3d 1409, 1415 (9th
Cir. 1996) ("A document can be authenticated by the testimony of a witness with knowledge.").

In sum, Sorensen has presented no evidence[6] that the ribs (or any other feature of the
Accused Products) are flow chambers, whereas Homeland has submitted argument and evidence
that they are not flow chambers. Thus, there is no *genuine* dispute as to the fact that the Accused
Products lack flow chambers. Therefore, there is no genuine dispute as to whether the Accused
Products infringe the '460 Patent. Summary judgment would thus be granted in Homeland's
favor.[7]

### 3. There is no genuine dispute as to the Accused Products' lack of exit/entrance positions and inscribed spheres.

Given that the Court would find it undisputed that the Accused Products lack flow
chambers, it follows that the Accused Products also lack "exit positions" and "entrance
positions," two key claim limitations, as the Court's construction of those terms (which adopted
Sorensen's proposed construction) defines the exit/entrance positions by reference to the flow

---

[6]Jens Ole Sorensen, incredibly, even testified at his deposition that no testing has ever been performed to
determine whether the plastic flowed "from the ribs" or "from the gate down between the ribs." Trojan Decl.,
Docket No. 121, Exh. 9.

[7]The Court will discuss the other arguments raised in the motion for summary judgment despite finding that
the undisputed lack of "flow chambers" is ample grounds upon which the motion should be granted.

-10-

chambers. Similarly, the "inscribed spheres" limiting the claims are to be inscribed at the exit/entrance positions, thus without exit/entrance positions, the Accused Products cannot contain inscribed spheres as the term is used in the '460 Patent.

Sorensen presents diagrams purporting to show where the exit/entrance positions are, and where the inscribed spheres should be drawn. Sorensen Decl., Docket No. 130-2, Exh. 2. However, those drawings all assume that the ribs are flow chambers, a contention this Court has now found is not a matter of genuine dispute. Where Homeland makes the logical argument that without flow chambers, there can be no entrance/exit positions and no inscribed spheres due to this Court's construction of the terms at the Markman hearing, Sorensen merely presents a drawing where it, itself, drew entrance/exit positions and inscribed spheres onto a drawing it itself made of one of the Accused Products. Obviously, Homeland has the better argument here, and summary judgment is warranted for the additional reason that along with flow chambers, there is no genuine dispute as to Accused Products' lack exit/entrance positions and inscribed spheres.

**4. There is no genuine dispute as to whether the Accused Products feature walls that increase in thickness at less than a threshold rate.**

Homeland next argues that the Accused Products do not have "thin wall cavity sections" that increase in thickness, away from the flow of the plastic, at less than a "threshold rate" above which gaseous voids will form. Homeland accurately observes that even if you leave aside the contested construction of "threshold rate," in order for a product to include this claim limitation, the walls would need to increase in thickness; Homeland's products, it argues, have walls of uniform, not increasing, thickness. Sorensen does not appear to argue that a product with walls of uniform thickness could infringe the '460 Patent.[8]

Homeland presents engineering drawings that show the specifications of the Accused Products (Meyer Decl., Docket No. 120, Exhs. 2-7, filed under seal), and then compares the specifications in those drawings to three actual samples of the Accused Products, by means of using an electronic caliper to discern the wall thickness of the samples. Meyer Decl., Docket No. 120, Exh. 9 (filed under seal). This process showed that the thickness of the walls of the product do not vary by more than 0.1mm, which Homeland argues is the tolerance (allowable limit of variation) of its plastic molded parts. *See id.*; Decl. of William J. Tobin, Docket No. 119, ¶ 19 & Exh. B.[9] These photographs and the engineering specifications are properly authenticated by the Meyer Declaration. Both the engineering drawings and the photographs of the caliper

---

[8] Such a contention, though, is not unimaginable. Walls of uniform thickness presumably increase in thickness at a rate of zero. Zero must be below any threshold rate. Thus it appears *logically* possible for a product with walls of uniform thickness to still increase in thickness at less than a threshold rate. Sorensen did not make this argument, however, and more importantly, an argument that walls of uniform thickness "increase in thickness" at a rate of zero would represent a strange interpretation of the words "increasing in thickness" at odds with the term's everyday meaning, and would impermissibly expand the realm of products excluded by the patent.

[9] The Court should find that Sorensen's objections to the expert testimony of William J. Tobin is largely moot as the only point relied upon therein by this Order is the fact that the "tolerance" of the accused products is 0.1mm; Sorensen does not challenge this specific fact (but instead argues that there is a variation in the Accused Products' wall thickness that exceeds this accepted tolerance).

-11-

measurements were produced to Sorensen by October 2011. *See* Supplemental Trojan Decl., Docket No. 135-1, ¶¶ 8-9.

However, Sorensen produced to Homeland during discovery photographs that purport to depict one of the Accused Products, which show a variation of more than 0.1mm. *See* Trojan Decl., Docket No. 121, Exh. 17. Unlike Homeland's photographs, though, Sorensen's photographs are unauthenticated: none of the declarations Sorensen cites in its brief authenticate them. The photographs were submitted by Homeland as Exhibit 17 to the Trojan Declaration, and are identified by Homeland as "documents produced by Sorensen." Sorensen did not attach these photographs an exhibit to any of their own submitted declarations. Neither Sorensen, nor Paul Philip Brown (who aided Sorensen in research prior to the filing of the lawsuit, *see* Decl. of Melody A. Kramer, Docket No. 130-1, Exh. 4) nor Sorensen's counsel Melody Kramer has testified as to where or when the photographs were taken, or what the photographs depict. Thus, the photographs found at Exhibit 17 of the Trojan Declaration are unauthenticated, inadmissible, and cannot create an issue of genuine dispute as to the thickness of the walls of the Accused Products.

Sorensen also submitted drawings in its Contentions that depict a product with walls that increase in thickness. *See* Trojan Decl., Docket No. 121, Exh. 8. As for these drawings, Jens Ole Sorensen and Paul Philip Brown (who collected the data Sorensen used to make the drawings) testified that they did not record any measurements other than those displayed on the drawings themselves; there are no logs of which product the drawings depict, when the measurements were made, or how many measurements were taken. *See* Kramer Decl., Docket No. 130-1, Exhs. 3 & 4 (transcripts of Mr. Brown's deposition). All in all, again, Sorensen has failed to present even a scintilla of evidence to counter the weighty evidence put forward by Homeland, this time in regards to the question of whether the walls of the Accused Products are of uniform thickness.[10]

The Court is not weighing the credibility of the evidence put forth by both sides as to this matter, which would be inappropriate on summary judgment motion. Instead, Sorensen has put forward *no* admissible evidence indicating that the walls are *not* of uniform thickness, and given that Homeland has put forth authenticated photographic evidence of the Accused Products as well as the engineering specifications for the Accused Products, all indicating that the walls *are* of uniform thickness, the Court would find that there is no genuine dispute as to this issue. Therefore, it is not genuinely disputed that the walls do not increase in thickness at less than a threshold rate, since there is no evidence that they increase in thickness at all. Thus, the Accused

---

[10]One underdeveloped argument raised by Sorensen is that Jens Ole Sorensen states in his declaration that "[t]o get a proper measurement of wall thicknesses you should take the average across from the axis of two readings across from each other on the product." Sorensen Decl., Docket No. 130-2, ¶16. If Sorensen contends that Homeland's method of measuring wall thickness is invalid, and that accounts for the discrepancy between the testing, the Court would agree that summary judgment is not warranted as dueling experts would be required to show which method properly shows the wall thickness. Yet Sorensen does not fully flesh out this argument, instead resting on unauthenticated photographs that use *the same method as that used by Homeland*, and argues that the photographs establish a dispute of genuine fact. Indeed, Sorensen does not submit any photographs or data logs of any tests performed showing wall thickness of the Accused Products using Sorensen's own suggested averaging technique. Thus, the Court is not convinced that Sorensen has shown there is any method that could be used that would reach a different result from that reached by Homeland: the walls of the Accused Products are of uniform thickness.

-12-

Products lack this claim limitation.  Summary judgment is warranted based on the absence of an
increase in thickness of the Accused Products' walls, then, as well.

   Homeland also argues that summary judgment is warranted because no empirical testing
was ever conducted to determine what the "threshold rate" of increase of wall thickness would be
such that gaseous voids were never formed.  Homeland asserts that no testing was ever done to
determine the threshold rate for the Accused Products.  Mr. Brown testifies that Sorensen also
never determined the threshold rate for the Accused Products.  Trojan Decl., Docket No. 121,
Exh. 16 (transcript of Mr. Brown's deposition).  Given that the Court constructed "threshold
rate" as a rate that must be determined using test strips, and given that Homeland contends (and
Sorensen does not deny) that no such tests were ever performed by Homeland (or anyone),
summary judgment of non-infringement is warranted on this grounds as well.  That said, this is
merely an additional grounds for granting summary judgment, as is clear from the discussion
*supra* as to flow chambers and walls that do not increase in thickness at less than a threshold rate.

   In sum, the Court would GRANT Homeland's motion for summary judgment as to non-
infringement.[11]

### C. The Court would deny Defendant's Rule 56(d) request for a deferred ruling on Plaintiff's summary judgment motion.

   Sorensen argues, in less than two pages of its brief, that the Court should defer ruling on
this renewed summary judgment motion because it "cannot present the full set of facts essential
to justifying its opposition at this time" (Docket No. 129 at 9), in that Sorensen has not yet taken
the deposition of Mr. Meyer or Mr. Tobin, Sorensen had not, prior to briefing its opposition: (1)
taken Mr. Meyer's desposition; (2) taken Mr. Tobin's declaration; (3) taken a Rule 30(b)(6)
deposition of Homeland Housewares, or (4) completed additional discovery related to the Court's
construction of the term "threshold rate."

   As to the depositions, Sorensen has not identified in its briefing any specific facts it hopes
to elicit from these deponents that could defeat summary judgment here, let alone set forth those
specific facts in affidavit form, as required.  *See Family Home and Fin. Cent., Inc.*, 525 F.3d at
827 ("The requesting party must show: (1) it has set forth in affidavit form the *specific facts* it
hopes to elicit from further discovery; (2) the facts sought exist; and (3) the sought-after facts are
essential to oppose summary judgment.") (emphasis added).  Morever, it appears that Sorensen
has been far from diligent in noticing and taking these three depositions, each in different ways.

   As for the deposition of non-party Mr. Meyer, a resident of China, Sorensen noticed the
deposition on April 30, 2012.  *See* Supplemental Trojan Decl., Docket No. 135, Exh. 3.
However, Sorensen did not follow the requisite procedures for deposing a non-party foreign
national, and also rejected Homeland's offer for his deposition to be taken by videoconference,
citing admissibility concerns.  *Id.* at Exh. 5.  It appears that Sorensen demanded that Homeland
transport Mr. Meyer to the United States for his deposition on its own dime, and Sorensen did

---

[11]Sorensen contends that Homeland's motion for summary judgment did not comply with the local rules
because Homeland did not wait ten days after the parties' in-person meet-and-confer session.  *See* C.D. Cal. L.R. 7-
3.  Homeland, though, notes persuasively that this is a *renewed* motion for summary judgment; any meet-and-confer
session that occurred recently was extraneous to the session timely held on November 7, 2011 before the motion was
originally filed in March 2012.  *See* Docket No. 135 at 6.

-13-

not take any steps necessary to take his deposition according to the Hague Convention protocols. *Id.* The Court would not find that Sorensen has been diligent in taking this deposition, given that it was aware of the challenges of deposing a non-party foreign national as early as four months ago, and has taken no steps towards a compromise of a videotaped deposition or meeting the requirements of conducting an in-person deposition.

As to the deposition of Mr. Tobin, Sorensen represents that it was waiting until the date of expert discovery cutoff and until Mr. Tobin's report was made final. The Court has some sympathy for this line of reasoning. However, Mr. Tobin was identified as a declarant in the original summary judgment motion Homeland filed in March 2012, and Homeland told Sorensen that he would be available between April 9 and May 18, 2012. *See* Suppl. Trojan Decl., Docket No. 135, Exh. 6. Sorensen did not serve him with a deposition notice until July 31, 2012, and a deposition date was set for August 17, 2012. *See* Suppl. Trojan Decl., Docket No. 135 ¶ 7. The Court would not find that Sorensen was sufficiently diligent in taking this deposition as would be necessary to justify a delay pursuant to Rule 56(d). It was only after the motion was refiled that Sorensen noticed his deposition; meanwhile, Sorensen had been aware for months that the motion was pending and would involve Tobin's testimony.

Lastly, as to the 30(b)(6) deposition, even though discovery has been open in this case since June 2011, Sorensen did not notice Homeland until July 31, 2012, after the filing of this summary judgment motion, noticing the deposition for August 17, 2012. *See* Suppl. Trojan Decl., Docket No. 135, Exh. 1; Kramer Decl., Docket No. 130-1, Exh. 2. This sort of last minute scramble to notice a deposition is completely incompatible with the level of diligence required of a party moving for relief under Rule 56(d). Even though Sorensen claims that it has not been able to take a 30(b)(6) deposition because of "a claimed emergency of the deponent," that does not excuse the late noticing of the deposition. *See* Kramer Decl., Docket No. 130-1, ¶6. In fact, even though discovery has been open for more than a year, Sorensen had taken zero depositions in this case before briefing its opposition to this motion. *See* Suppl. Trojan Decl., Docket No. 135, ¶ 2.

As to the Court's construction of "threshold rate," which Sorensen contends will necessitate "previously unanticipated discovery on facts relating to every detail of how the molds in question were made to determine what types of testing was done in the design process" (*see* Docket No. 129 at 9), this new discovery could not support a deferral of the summary judgment ruling, because the finding that there is no genuine issue of material fact as to whether the Accused Products have flow chambers (to take just one example of a claim limitation not found in the Accused Products) is completely irrelevant to the matter of the empirical testing that must be done to determine the threshold rate. Therefore, no discovery that Sorensen might take concerning empirical testing used to determine a "threshold rate" could change the result of this summary judgment ruling in Homeland's favor.

To be clear, while the Court rests largely on Sorensen's lack of diligence in discovery in denying the Rule 56(d) motion, the Court could just as equally rest on its lack of asserted specific facts that could aid its cause. Had Sorensen stated that it knew, for one reason or another, that the dye or short shot tests were fabricated, and could elicit that fact in discovery, that might present a different scenario. Had Sorensen stated that it could and would promptly run its own tests that would contradict the results of the dye or shot shot tests, that too might present a

-14-

different scenario. Instead, after more than a year of opportunities to take discovery and run tests, Sorensen has presented no evidence whatsoever showing that the Accused Products do in fact contain all the claim limitations, and has not even suggested what type of evidence it might present in that regard. Relief under Rule 56(d) is not warranted here.

## III. Conclusion

The Court would GRANT Homeland's motion for summary judgment as to non-infringement.[12] This ruling would also seem to be dispositive of Sorensen's counterclaim for infringement. The case will still move forward as to Homeland's invalidity/unenforceability declaratory judgment claim.

---

[12]The Court would note that it has ignored the parties' dispute as to whether Sorensen is a "patent troll" and has disregarded all argument and evidentiary objections related to that issue; the Court has ruled on this motion without regard to other actions filed by either party or events that transpired therein. *See, e.g.,* Kramer Decl., Docket No. 130-1, ¶ 5.

-15-

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 11-3720-GW(JEMx) | Date | March 1, 2013 |
|---|---|---|---|
| Title | *Homeland Housewares, LLC v. Sorensen Research and Development Trust* | | |

Present: The Honorable   GEORGE H. WU, UNITED STATES DISTRICT JUDGE

| Javier Gonzalez | None Present | |
|---|---|---|
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

Attorneys Present for Plaintiffs:                Attorneys Present for Defendants:

None Present                         None Present

PROCEEDINGS:      (IN CHAMBERS): COURT ORDER RE:

PLAINTIFF/COUNTER-DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OF INVALIDITY OF U.S. PATENT NO. 6,599,460 (filed 12/14/12);

DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT OF VALIDITY OF U.S. PATENT NO. 6,599,460 (filed 01/24/13);

PLAINTIFF/COUNTER-DEFENDANTS' REQUEST TO STRIKE EVIDENCE SUBMITTED BY DEFENDANT IN SUPPORT OF ITS OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT OF INVALIDITY OF U.S. PATENT NO. 6,599,460 (Filed 01/25/13).

     The Tentative issued on February 28, 2013, is adopted as the Court's final ruling. The Court would deny Homeland's motion for summary judgment of invalidity, and grant summary judgment in favor of Sorensen that Homeland has not produced sufficient evidence to proceed with its invalidity counterclaims. The Court would strike the Osswald Report, Dkt. Nos.164-2 and 167-3, and order Sorensen to file a copy of the Osswald Report with paragraphs 5(a)-(b), 28-31, 34-43, and 65-66 redacted.

Initials of Preparer   JG

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| | | | |
|---|---|---|---|
| Case No. | CV 11-3720-GW(JEMx) | Date | February 28, 2013 |
| Title | *Homeland Housewares, LLC v. Sorensen Research and Development Trust* | | |

Present: The Honorable    GEORGE H. WU, UNITED STATES DISTRICT JUDGE

| Javier Gonzalez | Cindy Nirenberg | |
|---|---|---|
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| R. Joseph Trojan | Melody A. Kramer |
| | Patricia Shackelford |

PROCEEDINGS:    **PLAINTIFF/COUNTER-DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OF INVALIDITY OF U.S. PATENT NO. 6,599,460 (filed 12/14/12);**

**DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT OF VALIDITY OF U.S. PATENT NO. 6,599,460 (filed 01/24/13);**

**PLAINTIFF/COUNTER-DEFENDANTS' REQUEST TO STRIKE EVIDENCE SUBMITTED BY DEFENDANT IN SUPPORT OF ITS OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT OF INVALIDITY OF U.S. PATENT NO. 6,599,460 (Filed 01/25/13).**

The Court's Tentative Ruling is circulated and attached hereto. Court hears oral argument. For reasons stated on the record, the above-entitled motions are **TAKEN UNDER SUBMISSION**. Court to issue ruling.

| | : | 15 |
|---|---|---|
| Initials of Preparer | JG | |

*Homeland Housewares, LLC v. Sorensen Research and Development Trust*, Case No. CV-11-3720, Tentative Rulings on Cross-Motions for Summary Judgment re Patent Validity (Plaintiff Homeland Housewares, LLC's seeking summary judgment that patent is invalid as obvious and indefinite, and Defendant Sorensen Research and Development Trust's seeking summary judgment that patent is valid)

## I. Background

Plaintiff Homeland Housewares, LLC ("Plaintiff" or "Homeland") filed suit against Sorensen Research and Development Trust ("Defendant" or "Sorensen") on April 29, 2011, seeking a declaratory judgment of noninfringement, invalidity, and unenforceability of Sorensen's U.S. Patent No. 6,599,460 (the "'460 patent" or "'460"). *See* Compl., Dkt. No. 1. Sorensen counterclaimed for infringement. *See* Dkt No. 34. Homeland manufactures and sells food blenders called the "Magic Bullet" and the "Baby Bullet" which are sold along with "an assortment of plastic cups and mugs." Dkt. No. 124 at 6. Sorensen alleges that those plastic cups are molded using an infringing process. *Id.* at 7.

The '460 patent claims a method of injection molding that prevents gaseous voids from developing in "thin wall" plastic products as they are molded. Dkt. No. 140. It teaches that gaseous voids can be avoided using the following process. Fluid plastic is injected into a mold cavity through what is known as a gate. *Id.* The fluid plastic is directed through "flow chambers" and then spreads to "thin wall" sections between the flow chambers. *Id.* The thickness of the "thin wall" sections increases in the direction of the flow. *Id.* Importantly, the rate of increase in thickness of the "thin wall" sections cannot surpass a "threshold rate" above which unwanted, problematic "gaseous voids" will form. *Id.* The Court construed the term "threshold rate" by adopting Homeland's construction that the "threshold rate" is "the rate of increase in thickness of the thin wall section as empirically determined by conducting test strips at the time the mold is made in order to prevent gaseous voids." *Markman* Order, Dkt. No. 113 at 12. The Court also construed the terms "flow chambers," "thin wall," "exit/entrance positions," and "inscribed spheres." *Id.* at 5-12.

Sorensen moved for reconsideration of the Court's construction of the term "threshold rate" on July 16, 2012. Dkt. No. 114. Homeland moved for summary judgment as to non-infringement of the '460 patent on July 26, 2012. Dkt. No. 118. The Court ruled on both motions on August 23, 2012, denying Sorensen's motion for reconsideration and granting Homeland's motion for summary judgment of non-infringement. Dkt. No. 140. Sorensen then moved to dismiss Homeland's cause of action for declaratory judgment of invalidity and unenforceability, or in the alternative for entry of final judgment of non-infringement under Fed. R. Civ. P. 54(b). Dkt. No. 147. The Court denied the motion. Dkt. No. 151.

Homeland now moves for summary judgment of invalidity of the '460 patent under 35 U.S.C. § 103(a) as obvious and under 35 U.S.C. § 112, ¶ 2 as indefinite. Dkt. No. 158. Sorensen cross-moves for summary judgment that the '460 patent is valid. Dkt. No. 167. Homeland argues that the Court should invalidate all of the claims of the '460 patent, while Sorensen argues that the Court only has jurisdiction over the claims that have actually been at issue.

-1-

## II. Legal Standards

### A. Summary Judgment

A grant of summary judgment under Rule 56, Fed. R. Civ.P., is entirely appropriate, in a patent as in any other case, where there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law." *SRI Int'l v. Matsushita Elec. Corp. of Am.*, 775 F.2d 1107, 1116 (Fed. Cir. 1985).

The party moving for summary judgment bears the burden of establishing that there are "no genuine issues as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The moving party must produce evidence that would entitle it to a directed verdict if the evidence went uncontroverted at trial. *C.A.R. Trans. Brokerage Co., Inc. v. Darden*, 213 F.3d 474, 480 (9th Cir. 2000).

Once this initial burden is met, the burden shifts to the non-moving party to "designate 'specific facts' showing that there is a genuine issue for trial" in order to avoid summary judgment. *Celotex*, 477 U.S. at 324. "A motion for summary judgment may not be defeated, however, by evidence that is 'merely colorable' or 'is not significantly probative.'" *C.A.R. Trans. Brokerage*, 213 F.3d at 480 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)).

### B. Jurisdiction Over Non-asserted Claims of a Patent

A case or controversy exists when "the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Arris Group, Inc. v. British Telecomm. PLC*, 639 F.3d 1368 (Fed. Cir. 2011) (quoting *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007)). "It is well-established that, in patent cases, the existence of a 'case or controversy must be evaluated on a claim-by-claim basis.'" *Streck, Inc. v. Research & Diagnostic Sys., Inc.*, 665 F.3d 1269, 1281 (Fed. Cir. 2012), *cert. denied*, 132 S. Ct. 2442 (2012) (quoting *Jervis B. Webb Co. v. So. Sys., Inc.*, 742 F.2d 1388, 1399 (Fed. Cir. 1984) (holding that district court lacked jurisdiction over patent claims that had been dropped from the suit in the plaintiff's infringement contentions and otherwise). "[J]urisdiction must exist at all stages of review, not merely at the time the complaint [was] filed." *Id.* at 1282 (citations and quotations omitted).

### C. Indefiniteness - 35 U.S.C. § 112, ¶ 2

A patent must contain "one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention." 35 U.S.C. § 112, ¶ 2. This definiteness requirement is met when the claims "clearly distinguish what is claimed from what went before in the art and clearly circumscribe what is foreclosed from future enterprise." *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1347 (Fed. Cir. 2005) (quoting *United Carbon Co. v. Binney & Smith Co.*, 317 U.S. 228 (1942)). "The definiteness requirement, however, does not compel absolute clarity. Only claims 'not amenable to construction' or 'insolubly ambiguous' are indefinite." *Datamize*, 417 F.3d at 1347 (citation omitted). "If the meaning of the claim is discernible, even though the task may be formidable and the conclusion

-2-

may be one over which reasonable persons will disagree, we have held the claim sufficiently clear to avoid invalidity on indefiniteness grounds." *Id.*

"In the face of an allegation of indefiniteness, general principles of claim construction apply." *Id.* at 1348; *Exxon Research and Engineering Co. v. United States*, 265 F.3d 1371, 1376 (Fed. Cir. 2001). An accused infringer must show by "clear and convincing evidence that a skilled artisan could not discern the boundaries of the claim based on the claim language, the specification, and the prosecution history, as well as an artisan's knowledge of the relevant art area." *Halliburton Energy Servs., Inc. v. M-I LLC*, 514 F.3d 1244, 1249-50 (Fed. Cir. 2008). Indefiniteness is a question of law, and although a court may consider extrinsic evidence, it does so to assist in the construction of the written document, and it does not make factual evidentiary findings. *Exxon*, 265 F.3d at 1376 (applying *Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1454 (Fed. Cir. 1998) to 35 U.S.C. § 112, ¶ 2).

### D. Obviousness - 35 U.S.C. § 103(a)

A claimed invention is unpatentable if the differences between the invention and the prior art "are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art." 35 U.S.C. § 103(a); *see also Graham v. John Deere Co.*, 383 U.S. 1, 14 (1966). It is the moving party's burden to prove by clear and convincing evidence that the asserted claims are invalid. 35 U.S.C. § 282; *Intel Corp. v. VIA Techs., Inc.*, 319 F.3d 1357, 1366 (Fed. Cir. 2003).

The determination of whether an invention is obvious is a legal conclusion that is based on factual inquiries, including: (1) the scope and content of the prior art; (2) the level of ordinary skill in the art; (3) the differences between the prior art and the claimed invention; and (4) any objective evidence of non-obviousness. *Graham*, 383 U.S. at 17-18. "[A] court can take account of the inferences and creative steps that a person of ordinary skill in the art would employ," and "need not seek out precise teachings directed to the specific subject matter of the challenged claim," but it may be important to identify a reason that would have prompted a person of ordinary skill to combine elements of prior art. *KSR Int'l. Co. v. Teleflex, Inc.*, 550 U.S. 398, 418 (2007). "One of the ways in which a patent's subject matter can be proved obvious is by noting that there existed at the time of invention a known problem for which there was an obvious solution encompassed by the patent's claims. *Id.* at 419-420. Where "the content of the prior art, the scope of the patent claim, and the level of ordinary skill in the art are not in material dispute, and the obviousness of the claim is apparent in light of these factors, summary judgment is appropriate." *Id.* at 427.

### E. Motions for Judgment of Patent "Validity"

"A patent shall be presumed valid." 35 U.S.C. § 282. "[C]ourts do not declare patents to be valid, and only declare that they have not been proved to be invalid. . . ." *Ball Aerosol & Specialty Container, Inc. v. Limited Brands, Inc.*, 555 F.3d 984, 994 (Fed. Cir. 2009) (vacating judgment that patent was "valid").

### F. Requests to Strike Untimely Evidence Directed to Issues the Court Has Already Decided

"Papers submitted to the district court after the ruling that is challenged on appeal should be stricken from the record on appeal." *Kirshner v. Uniden Corp. of Am.*, 842 F.2d 1074, 1077 (9th Cir. 1988). "We are here concerned only with the record before the trial judge when *his* decision was made." *Id.* (citation and quotation omitted).

### III. Analysis

Before proceeding to the discussion of discrete issues, the Court notes that the determination of the parties' duelling motions has been complicated that they are in large part hypothetical because they are contrary to the Court's claim construction. Both parties acknowledge the hypothetical, in-the-alternative nature of their arguments, at least in part. Homeland confessed that it:

> brought this motion for summary judgment in order to prevent Sorensen from making these exact contradictory arguments on appeal regarding infringement and validity. Sorensen has already made clear its intention to appeal the Court's claim construction and non-infringement rulings when it moved for entry of final judgment of non-infringement under FRCP 54(b) to clear the way for appeal. *See* Dkt #147-1. If Sorensen maintains that the claims are definite because the Court correctly construed "threshold rate" as requiring empirical testing, then it cannot argue for purposes of infringement that the Court's claim construction is wrong. If it insists that the Court's construction is wrong for infringement, then it cannot argue here that the claims are valid because of the same claim construction. The patent is either not infringed or indefinite. Sorensen has to pick its poison.

Homeland's Reply in Support of its MSJ, Dkt. 174 at 3. While Sorensen is of course free to argue on appeal that the Court's claim construction is wrong, the fact that it plans to do so does not entitle Homeland to ask this Court, after granting summary judgment of noninfringement to Homeland based on the Court's construction, to consider hypothetical questions concerning the claim construction the Court rejected.

For its part, Sorensen acknowledges that the Court has construed the claims, and it notes that it is arguing according to the Court's construction, while repeating that it disagrees with that construction. Sorensen's Opposition to Homeland's MSJ, Dkt. No. 164 at 20 n.10. But because Sorensen, like Homeland, appears to have at least one eye on appellate proceedings that have not yet begun, it took Homeland's bait and submitted evidence to support the validity of its claims under the already-rejected position on claim construction. *See, e.g.*, Sorensen's Cross-Motion, Dkt. 167-1 at 5 ("Sorensen's expert witness . . . opine[s] that the term "threshold rate," whether defined as proposed by Sorensen or as construed by the Court, does not render the patent indefinite."). There was a time for Sorensen to present evidence supporting the definiteness of its claim under its proposed construction, but that time passed when the Court adopted Homeland's proposed construction.

-4-

In sum, the parties' alternating reliance on and revisiting of the Court's *Markman* Order conflicts with this Court's prior considered (and reconsidered) rulings, and Fed. R. Civ. P. 1.

### A. Any Judgment Would Be Limited to Claims 1-4, 15-16, 18-21 and 32-33

Homeland sought a declaratory judgment of non-infringement and invalidity of all claims of the '460 patent against Sorensen in response to a cease and desist letter that did not specify which claims were infringed. Complaint, Dkt. No. 1. Sorensen counterclaimed for infringement of only claims 1-4, 15-16, 18-21 and 32-33. Def.'s MSJ, Dkt. No. 166 at 10. In response, Homeland limited the scope of the case by pursuing its invalidity counterclaim only against the asserted claims, and not pursuing any invalidity argument as to claims 5-14, 17, 22-31, and 34. *See* Homeland's Amended Preliminary Invalidity Contentions (limited to claims 1-4, 15-16, 18-21, and 32-33). Dkt. No. 165-7.

Homeland argues that the Court should exercise its discretion to invalidate all of the claims of the '460 patent if it invalidates the asserted claims, citing *Chiron Corp v. Genetech Inc.*, 363 F.3d 1247, 1260 (Fed. Cir. 2004) (holding that it was not error to instruct the jury that the validity of the dependent claims stands or falls with the validity of the independent claims where the validity challenges to the independent claims in fact coincided with the validity challenges to the dependent claims). *Chiron*, however, did not involve a situation in which there was no case or controversy concerning some of the invalidated claims.

Sorensen relies on *Streck, Inc. v. Research & Diagnostic Sys., Inc.*, 665 F.3d 1269 (Fed. Cir. 2012). In *Streck*, the patentee brought an infringement action, then narrowed the scope of its claims at the start of litigation pursuant to the local patent rules, and did so even further before any dispositive rulings by the court. *Id.* at 1283-84. The accused infringer's counterclaim was limited to the "asserted claims," and its initial invalidity contentions addressed the same fifteen claims identified by the patentee. *Id.* The accused infringer later attempted to broaden the reach of the counterclaim, as Homeland does now. *Id.* The Federal Circuit affirmed the district court's rejection of the accused infringer's attempt to put all of the patent's claims at issue, reasoning that there was no case or controversy as to the non-asserted claims.

*Streck* applies here, and the Court would hold that it only has jurisdiction over claims 1-4, 15-16, 18-21 and 32-33.

### B. The Court Would Hold that Homeland Has Failed to Present a Genuine Dispute as to Indefiniteness

#### 1. Threshold Rate

The parties disagree on whether the term "threshold rate," as construed by the Court, is indefinite. Homeland argues that the "threshold rate" is not quantifiable because a person of ordinary skill in the art would have to practice the claimed method to determine the threshold rate, and that the claims do not give adequate notice of their scope or provide a clear measure of the invention because a person of ordinary skill in the art would not know how to control the multitude of variables to consistently and accurately determine the rate, as there is no set formula. Pl.'s MSJ, Dkt. No. 158-2 at 16-20.

Homeland's argument is based on an incorrect legal premise. It would not matter that a skilled artisan would need to perform the '460 patent to determine its bounds; definiteness only

-5-

requires that the bounds can be determined at any time, whether before, during, or after practicing the claimed method. *Star Scientific, Inc. v. R.J. Reynolds Tobacco Co.*, 537 F.3d 1357, 1372-73 (Fed. Cir. 2008) (holding that claim definiteness does not require that a potential infringer be able to determine if a process infringes before practicing the claimed process); *Invitrogen Corp. v. Biocrest Mfn., L.P.*, 424 F.3d 1374, 1384 (Fed. Cir. 2005) (rejecting accused infringer's argument that it would have had to practice the claimed process in order to determine if it was infringing). And the Court previously rejected Homeland's "no set formula" argument, in its *Markman* Order. Dkt. No. 113 at 4.

To its credit, Homeland acknowledges the holdings of *Star Scientific* and *Invitrogen*, and clarifies that it does not argue that the claims of the '460 patent are indefinite merely because Homeland could not determine whether its products infringed from reading the claims. Homeland's MSJ, Dkt. No. 158-2 at 18 n.10. The Court would not find Homeland's attempt to distinguish those cases persuasive on these facts. It is not true that infringement is unknown until after performing the claimed methods. Homeland won its motion for summary judgment of non-infringement by showing, among other things, that it did not perform empirical testing to determine the threshold rate as required by the construed claim. Dkt. No. 140 at 13. Homeland's indefiniteness argument is therefore inconsistent with its own argument in its motion for summary judgment of non-infringement, and more importantly, the Court's order granting that motion.

·Time after time, courts have held patent terms sufficiently definite that did not provide mathematical specificity but were defined in relation to other parts of the patented invention or its environs. Dkt. No. 113 at 4. A claim is deemed sufficiently definite if "one skilled in the art would understand the bounds of the claim when read in light of the specification." *Exxon*, 265 F.3d at 1375. A patentee need not define his invention with mathematical precision in order to comply with the definiteness requirement. *Oakley, Inc. v. Sunglass Hut Int'l*, 316 F.3d 1331, 1341 (Fed. Cir. 2003).

Homeland argues that the claim is circular, and cites a passage from the Court's *Markman* Order in support of that argument:

> a person of ordinary skill in the art would not know what the threshold rate
> is until that person conducted testing on the particular product to see at
> what rate of increase gaseous voids are prevented; once that testing is
> complete, however, **the person need not have referred to a "threshold
> rate" at all, but instead, in some senses, discovered for herself that rate.**
> If the threshold rate is just the rate of increase at which gaseous voids do
> not occur, then it was difficult to see how the '460 Patent was different
> from Smith; while Smith's Patent did not speak of a threshold rate, any
> product lacking gaseous voids would (according to Sorensen's definition)
> have been made at below such a rate.

*Markman* Order, Dkt. No. 113 at 13 (emphasis added). In the passage, the Court was addressing **Sorensen's** proposed construction. But the Court adopted **Homeland's** construction, which did

-6-

not present the same problem.[1]

Sorensen's proposed construction would have made its claims cover any use of any existing or future method that merely happened to not produce gaseous voids in a given product run. *See United Carbon*, 317 U.S. at 236 ("The statutory requirement of particularity and distinctness in claims is met only when [the claims] clearly distinguish what is claimed from what went before in the art and clearly circumscribe what is foreclosed from future enterprise."). The claim as properly construed by the Court to include empirical testing does not suffer from this defect. *Halliburton*, 514 F.3d at 1253-54 (holding construction that covered all future improvements was not sufficiently definite); *Athletic Alternatives, Inc. v. Prince Mfg., Inc.*, 73 F.3d 1573 (Fed. Cir. 1996) (In analyzing indefiniteness, "[w]here there is an equal choice between a broader and a narrower meaning of a claim, and there is an enabling disclosure that indicates that the applicant is at least entitled to a claim having the narrower meaning, we consider the notice function of the claim to be best served by adopting the narrower meaning."). Circularity is no longer an issue in the case due to the Court's claim construction, and Homeland's continued argument along these lines ignores the Court's claim construction – the very construction Homeland advocated.

Homeland also argues that the term "threshold rate" as construed by the Court is indefinite because Sorensen admits the term has no meaning. Pl.'s Motion, Dkt. No. 158-2 at 14-15. Homeland cites testimony by the inventor, Ole Sorensen, stating that the term "is not used in any special sense in this patent," as well attorney argument in Sorensen's claim construction brief. *Id.* (citing Dkt. No. 57). Sorensen disputes Homeland's characterization of the record, and cites testimony by Mr. Sorensen explaining that the rate is a "slope" determined by the following:

> The first thing you do is you decide how much thicker you want the cup at
> the rim than at the bottom. Okay. Then you make a test strip to see if
> that's possible without getting a void. If you get a void, you have to try like
> half that slope. If the rim's okay, you may want to say, well, let me try if I
> can give it somewhere between half and full. So you slowly narrow
> yourself down into finding a maximum rate you can get if it doesn't work
> the first time.

Sorensen Depo., 96:4-98:1; Kramer Decl. Ex. 5, Dkt. No. 166.

The Court construed the term "threshold rate" to require empirical testing. *Markman Order*, Dkt. No. 113 at 13. Mr. Sorensen's testimony is consistent with the Court's construction of "threshold rate" and does not suggest that the term is ambiguous. *Id.* Indeed, the Court was able to understand the bounds of the claim in determining that Homeland did not infringe because Homeland did not practice the trial-and-error method that Mr. Sorensen describes. Dkt. 140 at 134. *See Orthokinetics, Inc. v. Safety Travel Chairs, Inc.*, 806 F.2d 1565, 1575-76 (Fed. Cir. 1986) (reversing district court holding of indefiniteness where the claim required a travel

---

[1] Though in a footnote in the *Markman* Order the Court expressed reservations about whether Homeland's construction cured the circularity, the Court, now considering the issue for the third time, again concludes that the empirical testing construction does not present a circularity problem. Dkt. No. 113 at 13 n. 8; Dkt. No. 140 at 4-5. In this motion, Homeland merely cites the Court's original observations and adds nothing to persuade the Court its original determination was incorrect.

-7-

chair "dimensioned" to fit into a car). In *Orthokinetics*, the dimensions of the travel chair needed to be different depending on the target car, so measuring each car was a necessary and understandable part of making a travel chair according to the claim, and the term was "as accurate as the subject matter permits." *Id.* That aspect of *Orthokinetics* is very much like this case, in which practicing the method involves determining through empirical testing a threshold rate of thickness increase for each mold.

Sorensen argues that since the Court was capable of construing the term "threshold rate," it cannot be insolubly ambiguous. *See Bancorp Servs., LLC v. Hartford Life Ins. Co.*, 359 F.3d 1367, 1371 (Fed. Cir. 2004); Def.'s Motion, Dkt. No. 197 at 15. This argument is incorrect. A district court's ability to construe a claim does not necessarily prevent a finding of indefiniteness. *Star Scientific*, 537 F.3d at 1371 (affirming the rejection of the same argument and stating "[i]n and of itself, a reduction of the meaning of a claim term into words is not dispositive of whether the term is definite. And if reasonable efforts at claim construction result in a definition that does not provide sufficient particularity and clarity to inform skilled artisans of the bounds of the claim, the claim is insolubly ambiguous and invalid for indefiniteness." (citation omitted)). However, the Court's ability to apply its construction in the context of a motion for summary judgment of noninfringement shows that the claim term is not insolubly ambiguous.

Sorensen also argues that Homeland is judicially estopped from arguing that its own definition of "threshold rate" is indefinite. Sorensen argues that Homeland stated during the *Markman* Hearing that the claims would be indefinite unless the Court adopted its construction. Def.'s Motion, Dkt. No. 167 at 14. Judicial estoppel is an equitable doctrine that may be invoked by a court at its discretion. *New Hampshire v. Maine*, 532 U.S. 742, 750 (2001). The Supreme Court has identified three factors to guide a district court in determining whether judicial estoppel applies: (1) whether a party's later position is "clearly inconsistent" with its earlier position; (2) whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled; and (3) whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped. *Id.*

Here, Sorensen notes that Homeland repeatedly stated in briefing that "[i]n order for the claim to be definite" the Court had to adopt Homeland's construction, and stated that if the Court adopted Sorensen's construction, Homeland would seek to bring an expedited motion for summary judgment that the '460 patent is invalid. Dkt. 167 at 4 (quoting Dkt. Nos. 63, 64, 111).[2] Thus, the first factor is satisfied, because Homeland's argument that its own construction is indefinite is "clearly inconsistent" with its earlier position. The second factor is partially satisfied, because the Court accepted Homeland's position, but the Court has not necessarily been misled, because the claim term would certainly have been indefinite under Sorensen's proposed construction, and the Court can independently reexamine the question of whether the Court's construction resolved any potential indefiniteness problem. The third factor is satisfied because Homeland would be unfairly advantaged by obtaining a summary judgment of non-infringement based on a claim construction that it told the Court would be definite and then turning around and

---

[2] Now, after the Court adopted Homeland's construction, Homeland has brought the motion it threatened to bring if the Court adopted Sorensen's construction.

-8-

arguing that the construed claim is indefinite. The Court therefore would find that Homeland is judicially estopped from arguing indefiniteness.[3]

  The Court would therefore grant summary judgment in favor of Sorensen that Homeland has failed to demonstrate the existence of a material issue concerning whether the term "threshold rate" renders the asserted claims indefinite.

   2. <u>Exit Positions, Entrance Positions, and Inscribed-Sphere Dimensions</u>

  Sorensen also moves for summary judgment that the terms "exit positions," "entrance positions," and "inscribed-sphere dimensions" are not indefinite. Def.'s MSJ, Dkt. No. 167 at 14. Sorensen contends that Homeland has no facts supporting its allegation that those terms are indefinite. *Id.* Sorensen also cites the testimony of its expert, Dr. Osswald, that the meaning of those terms are discernible to a person skilled in the art. *Id.*

  In the *Markman* Order, the Court construed "exit position" to mean "a flow path for injecting plastic that is situated in a flow chamber and leading to a corresponding entrance position that is situated in another section of the mold cavity" and "entrance position" to mean "a flow path for injected plastic that is situated in a thin-wall cavity section and leading from a corresponding exit position that is situated in different section of the mold cavity." *Markman* Order, Dkt. No. 113 at 9. The Court construed "inscribed-sphere dimension" to mean " the diameter of the largest sphere that will fit into the mold cavity at the [given] position." *Id.* at 11.

  In its claim construction briefing, Homeland suggested that "inscribed-sphere dimensions" was indefinite "but present[ed] only cursory argument on the matter and [did] not provide any case citations," so the Court found it had not met its evidentiary burden. *Id.* at 12. (citation omitted). Homeland's opposition to Sorensen's motion for summary judgment on indefiniteness suffers from the same defect. Homeland asserts that the "technical sounding terms are gibberish" and that it is impossible to determine the meaning of the terms. Dkt. No. 178 at 7-9. Homeland's only legal support is *Momenta Pharma. V. Inc. v. Amphastar Pharma., Inc.*, 2012 U.S. Dist. LEXIS 89387, 24-25 (D. Mass., June 27, 2012), which denied summary judgment because of a genuine factual dispute about how a person in the art would understand the term. But here, Homeland offers no *evidence* of such a factual dispute. *Id.* at Dkt. No. 178 at 6-8. The Court's review of Homeland's expert report also finds no support for Homeland's position. Dkt. No. 178-1. And Homeland's bare assertion that there is no way to determine the boundaries of the terms is contradicted by the only evidence on record: as explained in the *Markman* Order, Sorensen pointed to specific text and diagrams explaining the limitations. Dkt. No. 113 at 9-11. While the terms sound very technical, the Court was able to understand their boundaries, in the context of the specification, from the perspective of a person of ordinary skill in the art. *Source Search Technologies, LLC v. LendingTree, LLC.*, 588 F.3d 1063, 1077 (Fed. Cir. 2009) ("[T]his court measures indefiniteness according to an objective measure that recognizes artisans of ordinary skill are not mindless 'automatons.'").

  The Court would therefore grant summary judgment in favor of Sorensen that Homeland has failed to demonstrate the existence of a genuine issue as to any material fact concerning whether the terms "exit positions," "entrance positions," and "inscribed-sphere dimensions"

---

[3] However, this determination is necessary to the Court's holding only in the alternative, because when considered on the merits, "threshold rate" is not indefinite.

render the asserted claims indefinite.

### 3.    Thin Walled

Homeland argues in its opposition to summary judgment that the term "thin walled" is indefinite. This argument was not in its invalidity contentions, Dkt. No. 168-3, which Homeland argued were its basis for invalidity in opposing the motion to dismiss. Dkt. No. 145. Thus, Homeland abandoned this argument and it should not be addressed by the Court. *See CytoLogix Corp. v. Ventana Medical Systems, Inc.,* 424 F.3d 1168, 1176 (Fed. Cir. 2005) (holding that failure to pursue an invalidity theory waives it); *O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.,* 467 F.3d 1355, 1366 (Fed. Cir. 2006) (holding that district court did not abuse its discretion in excluding a theory when a party did not amend its contentions with diligence to assert it).

### C.    *The Court Would Hold that Homeland Has Failed to Present a Genuine Issue as to Obviousness*

Homeland argues that the '460 patent is obvious in light of two prior art patents: U.S. Patent No. 5,839,603 ("Smith") and U.S. Patent No. 4,117,950 ("Allen"). Dkt. No. 159 at 8. In support of its contention, Homeland cites the prosecution history of the '460 patent, Declaration and Expert Report of William J. Tobin ("Tobin Report"), and the prior art patents. Homeland notes that the Court previously remarked that "thin walled" sections are necessary to prevent gaseous voids, and Smith taught that the "thin walled" sections must increase in thickness in the direction of the flow of the plastic.[4] *Markman* Order, Dkt. No. 113 at 13; Dkt. No. 140 at 4. Thus, Homeland argues that there is no material dispute relating to the combination except to the limitation of "threshold rate" as construed by the Court. Dkt. No. 159 at 9-11. As to "threshold rate," Homeland argues that (1) Sorensen admits empirical testing was known in the art; (2) the patent does not claim that its use of test strips was innovative; and (3) Dr. Osswald's opinion states that the "threshold rate" could be determined using known methods. Dkt. 174 at 4-5.

In opposition to Homeland's motion, and in its own cross-motion, Sorensen argues that (1) the examiner was persuaded that Smith and Allen did not teach the '460 patent; (2) a declaration submitted by the inventor during prosecution of the '460 patent showed that the method in Smith produced voids, and Homeland did not produce evidence to the contrary; and (3) Homeland's argument that Smith taught empirical testing is merely hindsight-bias. Dkt. 164 at 9-14, Dkt. 179 at 20-23. Sorensen also argues that Homeland's obviousness and indefiniteness arguments are in tension, because if the method was obvious, such that person skilled in the art would have come up with it anyway, then that person would necessarily understand the boundaries of the method. *Id.* at 24.

The determination of whether an invention is obvious is a legal conclusion that is based on factual inquiries, including: (1) the content and scope of the prior art; (2) the level of ordinary

---

[4] Homeland correctly references the Court's description of Allen and Smith in the *Markman* Order. However, in denying Sorensen's motion for reconsideration, the Court clarified its *Markman* Order language by pointing out that the "summary of the invention" section of Allen refers to how the "thin panel section" must be positioned "so that there are no voids in the plastic." Dkt. No. 140 at 4; Dkt. No. 159-4 at 2:53-56. It is not that Allen teaches that thin panel sections themselves prevent voids; rather, Allen teaches than if thin panels are used, the ribs between them must be close enough such that no voids will form in the thin panel section.

-10-

skill in the art; (3) the differences between the prior art and the claimed invention; and (4) any objective evidence of non-obviousness. *Graham*, 383 U.S. at 17-18. Invalidity must be proven by clear and convincing evidence, and that standard is not changed by virtue of the fact that the USPTO previously considered the combination of Allen and Smith. *Microsoft Corp. v. i4i Ltd. P'ship*, ___ U.S. ___, 131 S. Ct. 2238, 2240 (2011) ("Nothing in § 282's text suggests that Congress meant . . . to enact a standard of proof that would rise and fall with the facts of each case."); *Sciele Pharma Inc. v. Lupin Ltd.*, 684 F.3d 1253, 1260 (Fed. Cir. 2012) ("As the Supreme Court explained in *i4i*, there is no heightened burden of proof when a reference was previously considered by the PTO, and no lowered burden of proof if a defendant raises a new reference or argument during litigation.").[5]

1.     The Scope and Content of the Prior Art

Allen is an invention relating to the molding of plastic closures incorporating ribs and thin wall sections to minimize the amount of plastic needed. Dkt. No. 159-4 at 1:5-8; 2:43-59. Allen discloses that "ribs are placed close enough together that the thin panel sections between the ribs are completely before the closure rim is formed so that there are no voids in the plastic." Dkt. No. 159-4 at 2:53-56. Smith is also an invention relating to the molding of plastic closures. Dkt. No. 159-5. Smith discusses Allen as prior art and states that the object of its invention was to supply an alternative to the prior art. Dkt. No. 159-5 at 1:20-35. Smith accomplishes this goal by using alternating walls of tapering and uniform thickness. Dkt. No. 159-5 at 1:39-42.

The parties dispute whether using empirical testing to determine the threshold rate is within the prior art. Homeland contends that empirical testing is within the scope of the prior art because the patent does not claim to have invented test strips and because Dr. Osswald opines that common methods could be used to determine the "threshold rate." Pl's Reply Br., Dkt. No. 174 at 6. Sorensen responds that Homeland has no actual *evidence* that skilled artisans at the time of the invention knew to make test strips to find the threshold rate below which voids would be prevented, and that the inventor, Ole Sorensen, declared that he personally was unaware of the method in the thirty years he was in the industry prior to making the invention claimed in the '460 patent. Sorensen Decl., Dkt. 164-3 at ¶¶ 4-9.

The Court would hold that Homeland has not offered evidence sufficient to create a genuine dispute as to obviousness. Homeland has not offered evidence that empirically determining a "threshold rate" that prevents the formation of gaseous voids in thin wall plastic molding, for instance, with test strips, is found in the prior art. Homeland cites to Dr. Osswald's report, but that report only opines that **in light of the '460 patent**, a person skilled in the art could use known empirical methods to determine the threshold rate, not that the stated methods had been used in that way prior to the patent. Dkt. No. 167-3 at 28-26. Sorensen does not claim that trial and error was unknown prior to the '460 patent. But Homeland presents no evidence

---

[5] Sorensen repeatedly cites *Tokai Corp. v. Easton Enterprises, Inc.*, 632 F.3d 1358 (Fed. Cir. 2011) for the proposition that a party challenging validity based on the same prior art that was before the USPTO during prosecution must overcome "the additional burden of administrative correctness." Sorensen fails to note *i4i*'s impact on *Tokai*. At least one district court has held that it is unclear whether *Tokai* survives *i4i*. *Pfizer Inc., v. Teva Pharms. USA, Inc.*, 803 F.Supp.2d. 409, 440 n.69 (E.D. Va. 2011). It appears that the proposition for which Sorensen cites *Tokai* does not, in fact, survive *i4i*.

-11-

that trial and error to **find a rate of increase less than the threshold rate** was known.

Homeland does not offer any evidence that the prior art taught or suggested that gaseous voids could be prevented by keeping the slope of increase below a certain rate. In fact, **Homeland's** expert denied the very existence of the physical phenomena underlying the "threshold rate" limitation, testifying that "[t]here is not a threshold rate of thickness that prevents the formation of voids." Dkt. No. 160 at 9.

      2.    The Level of Skill in the Art

The second step in the *Graham* analysis is to determine the level of ordinary skill in the art. *Graham*, 383 U.S. at 14. "A less sophisticated level of skill generally favors a determination of nonobviousness, and thus the patentee, while a higher level of skill favors the reverse." *Innovention Toys, LLC v. MGA Entertainment, Inc.*, 637 F.3d 1314, 1323 (Fed. Cir. 2011) (citation omitted). Each party relies solely on expert testimony to determine the level of skill of a person skilled in the art. Homeland's expert, Mr. Tobin, opined that a person skilled in the art would have at least three years of experience in injection molding. Tobin Report, Dkt. No. 160 at 2. Sorensen's expert, Dr. Osswald, opined that a person skilled in the art would have a bachelor's degree in the field of mechanical engineering or materials science engineering and five years of industrial experience in injection molding. Osswald Report, Dkt. No. 167-3 at 9. Thus, the parties each advocate for a level of skill that would favor the other side.

Although the parties disagree on the exact amount of experience a person skilled in the art would have, the parties have not offered any argument suggesting the difference is relevant, and both agree that their disagreement over the level of skill is not material. Dkt. Nos. 158-2 at 6, Dkt. 164 n8. The Court would hold that there is no genuine material dispute over the level of skill of a person skilled in the art, and assume for this motion that a person skilled in the art would have a bachelor's degree in the field of mechanical engineering or materials science engineering and five years of industrial experience in injection molding. *See Tokai Corp, v. Easton Enterprises, Inc.*, 632 F.3d 1358, 1369 (Fed. Cir. 2011) (where district court adopted the level of skill in the art that would weigh in favor of an obviousness determination contrary to the Court's determination, the parties' disagreement did not create a genuine issue of material fact).


      3.    Difference Between the Prior Art and the Claimed Invention

The third step in the *Graham* analysis is to determine the difference between the prior art and the claimed in invention. *Graham*, 383 U.S. at 14. As explained above, Allen lacks the increasing thickness in the panels and Smith lacks ribs. There is also no reference in Smith or Allen to empirically determining a threshold rate below which the rate of tapering should remain to prevent void formation.

The parties disagree as to the difference between the prior art and the claimed invention. Homeland argues that there is no difference between the claimed invention and the prior art because the term "threshold rate" is an observation already present in the art and not an invention. Pl.'s Motion, Dkt. No. 158-2 at 11-12. But Homeland offers no evidence that supports its "mere observation" theory in light of the Count's construction, under which a merely observed threshold rate does not infringe. Instead, Homeland cites to Mr. Tobin's construction

-12-

that the "threshold rate" would be the rate at which plastic enters the mold, not the Court's construction of the rate of increase in the thickness of the wall of the "thin wall" section of the mold. *Id.* at 12; Tobin Report, Dkt. No. 160 at 10.

Homeland further argues that the "threshold rate" limitation does not distinguish the invention from the prior art because it is not necessary to determine a "threshold rate" to prevent gaseous voids. Pl.'s Motion, Dkt. No. 158-2 at 12-13. That argument also ignores the Court's claim construction. The claim limitation is not satisfied by the mere absence of gaseous voids in a molding process. The Court determined that the "threshold rate" was the rate of increase in the thickness of the thin wall section as empirically determined by conducting test strips at the time the mold is made in order to prevent gaseous voids. *Markman* Order, Dkt. No. 113 at 13. The limitation was highly meaningful – it was one of the grounds that entitled Homeland to summary judgment of non-infringement. *See* Order Granting Summary Judgment of Noninfringement, Dkt. No. 140 at 13.

Argument and testimony that ignores the Court's claim construction is useless, and can give rise to sanctions. *Exergen Corp. v. Wal-Mart Stores, Inc.*, 575 F.3d 1312, 1321 (Fed. Cir. 2009) ("Once a district court has construed the relevant claim terms, and unless altered by the district court, then that legal determination governs for purposes of trial."); *Edwards Lifesciences AG v. CoreValve, Inc.*, 2011 U.S. Dist. LEXIS 12022, 28-29 (D. Del., Feb. 7, 2011) (warning that sanctions could be awarded for repeatedly arguing rejected claim construction).

There is simply no recognition in Smith of the problem that gaseous voids will form if the thickness of the thin wall section increased above a certain rate, and perforce no teaching that the problem could be prevented by keeping the increase below that threshold rate, and no teaching that empirical testing should be used to determine the rate. Further, Homeland has not offered any evidence that empirical testing to determine the threshold rate was known anywhere else in the prior art.

4.    Objective Evidence of Nonobviousness

While Sorensen has not offered any objective indicia of nonobviousness, Homeland's expert's attack on the patent provides some. Homeland's expert testified that "[t]here is not a threshold rate of thickness that prevents the formation of voids," and that "the increase in thickness of the thin wall section has little to do with the formation or prevention of voids." Dkt. No. 160 at 9-10. That denial that the claimed invention even works at all is strong objective evidence of nonobviousness. *See U.S. v. Adams*, 383 U.S. 39, 51-52 (1996) (battery patent not obvious because the successful operating characteristics it achieved were "unexpected" and experts expressed disbelief that it worked); *Ruiz v. A.B. Chance Co.*, 234 F.3d 654, 668 (Fed. Cir. 2000) (reversing district court bench trial holding of obviousness because the court failed to consider secondary considerations of commercial success and testimony by a prior art inventor expressing skepticism at the invention).

5.    Determination of Obviousness

The Court determines that Homeland does not present a genuine issue regarding obviousness of the '460 patent. The Court should grant the substance of Sorensen's motion for summary judgment that the '460 patent is not invalid under 35 U.S.C. § 103, but clarify that it is

-13-

merely granting summary judgment of Homeland's failure to present sufficient evidence to try its invalidity case, rather than holding the patent "valid".

### D. The Court Would Strike the Portions of the Osswald Declaration Constituting Untimely Evidence Directed to the Already-Resolved Question of Infringement

Homeland moves to strike portions of the Declaration and Expert Report of Dr. Osswald: paragraphs 5(a)-(b), 28-31, 34-43, and 65-66, all of which deal with the short shot and dye tests of Mr. Meyer. Dkt. Nos. 175, 180. *Id.* Homeland argues that the paragraphs in question are an attempt to introduce evidence of infringement, when the Court has already granted summary judgment of non-infringement. *Id.* Sorensen replies that the Meyer tests were cited by Homeland in its invalidity contentions as the basis for nonenablement. Dkt. No. 177.

The Court has repeatedly addressed the issue of evidence relating to short shot and dye tests submitted by Mr. Meyer. In granting summary judgment of non-infringement, the Court thoroughly outlined Sorensen's lack of diligence in discovery and Sorensen's failure to assert specific facts that would aid in its cause for additional discovery. Dkt. No. 140 14-15. The Court later allowed Sorensen additional discovery because "[a]lthough Homeland's summary judgment motion re invalidity will be made on limited and clearly-defined bases, the Court would ensure that the motion is decided on a full and adequate record as to those bases." Dkt. No. 151 at 5. The Court allowed Sorensen to submit an expert report rebutting Homeland's "invalidity contentions and evidence." *Id.* at 6. The Court also allowed Sorensen to depose Mr. Meyer and produce all related documents relating to invalidity. *Id.* at 6-7.

The Court unambiguously allowed Sorensen discovery relating only to invalidity. Paragraphs 5(a)-(b), 28-31, and 34-43 directly deal with non-infringement. Enablement is not at issue in either the motion for summary judgment or the cross-motion for summary judgment. Paragraphs 65-66 address enablement. The Court holds the cited paragraphs to be irrelevant to the summary judgment motions. *See United States v. Wofford,* 560 F.3d 341, 350 (9th Cir. 2009) (excluding irrelevant testimony a claim not at issue in the case). Nothing required Sorensen to include irrelevant portions of its expert's report in its submissions concerning the motions under consideration.

Sorensen asks the Court to only disregard, rather than strike, the paragraphs at issue. Dkt. 177 at 9-11. In doing so, Sorensen's purpose in attempting to include those paragraphs becomes transparent. Having failed to timely submit the infringement evidence in question in connection with the infringement summary judgment motion, Sorensen now wants that evidence in the record for purposes of appeal, even though the Court was not given an opportunity to consider it in the infringement context. That tactic is improper. *Kirshner v. Uniden Corp. of Am.,* 842 F.2d 1074, 1077-78 (9th Cir. 1988). Thus, the Court strikes paragraphs 5(a)-(b), 28-31, 34-43, and 65-66 of the Osswald Report.[6]

---

[6] Sorensen asks the Court to strike a portion of Homeland's opposition to the cross-motion for summary judgment, Dkt. No. 178, which argues that the term "thin wall" is indefinite. Request to Strike, Dkt. No. 185-2. As noted above, the Court did not consider this argument because it was waived; Homeland has not moved to amend its invalidity contentions to include this claim. Though the Court notes the impropriety of the argument, Homeland's argument merely repeats an argument already on the record, which makes it very different from Sorensen's attempt to include new evidence on issues Sorensen had a full and fair opportunity to present evidence about earlier. *See* Dkt. No. 113. Thus, the Court denies Sorensen's request to strike portions of Homeland's opposition brief.

-14-

The Court is aware of Sorensen's Motion for Sanctions Pursuant to Fed. R. Civ. P. 11 Sanctions and related Motion for Reconsideration to Revise the Summary Judgment of Non-Infringement Because it Was Procured Through Fraud. Dkt. Nos. 182, 186. The Court will take up the infringement issues, to the extent warranted, in connection with those motions. Sorensen's repeated effort to improperly pack the record for appeal with evidence that it did not present when the Court was actually deciding the issues to which the evidence is relevant does not help Sorensen's case on the merits, whatever it may be.

## IV. Conclusion

The Court would deny Homeland's motion for summary judgment of invalidity, and grant summary judgment in favor of Sorensen that Homeland has not produced sufficient evidence to proceed with its invalidity counterclaims. The Court would strike the Osswald Report, Dkt. Nos.164-2 and 167-3, and order Sorensen to file a copy of the Osswald Report with paragraphs 5(a)-(b), 28-31, 34-43, and 65-66 redacted.

-15-

A0053

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| | |
|---|---|
| Case No.   CV 11-3720-GW(JEMx) | Date   March 25, 2013 |
| Title   *Homeland Housewares, LLC v. Sorensen Research and Development Trust* | |

Present: The Honorable   **GEORGE H. WU, UNITED STATES DISTRICT JUDGE**

| Javier Gonzalez | None Present | |
|---|---|---|
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| None Present | None Present |

**PROCEEDINGS:**      **(IN CHAMBERS): COURT ORDER RE:**

**DEFENDANTS' MOTION FOR SANCTIONS PURSUANT TO F.R.C.P. 11 (filed 02/14/13)**

**DEFENDANTS' MOTION TO REVISE THE COURT'S ORDER FOR SUMMARY JUDGMENT OF NON-INFRINGEMENT (DOC #140) BECAUSE IT WAS PROCURED THROUGH FRAUD (filed 02/21/13)**

Attached hereto is the Court's Final Rulings on Motion for Rule 11 Sanctions and Motion to Revise Court's Order of Summary Judgment of Non-Infringement Because It Was Procured Through Fraud.  Defendants' motions are **DENIED**.

Initials of Preparer   JG

*Homeland Housewares, LLC v. Sorensen Research and Development Trust*, Case No. CV-11-3720l; Final Rulings on Motion for Rule 11 Sanctions and Motion to Revise Court's Order of Summary Judgment of Non-Infringement Because It Was Procured through Fraud

## I. Background

Plaintiff Homeland Housewares, LLC ("Plaintiff" or "Homeland") filed suit against Sorensen Research and Development Trust ("Defendant" or "Sorensen") on April 29, 2011, seeking a declaratory judgment of noninfringement, invalidity, and unenforceability of Sorensen's U.S. Patent No. 6,599,460 (the "'460 patent" or "'460"). *See* Compl., Docket No. 1. Sorensen counterclaimed for infringement. *See* Docket No. 34. Homeland manufactures and sells food blenders called the "Magic Bullet" and the "Baby Bullet" which are sold along with "an assortment of plastic cups and mugs." Docket No. 124 at 6. Sorensen alleged that those plastic cups are molded using an infringing process. *Id.* at 7.

The Court has considered the key issues regarding claim construction, infringement, and validity multiple times. The Court construed the disputed claims. Docket No. 113. The Court considered, and denied, Sorensen's motion to reconsider the construction of the term "threshold rate." Docket No. 140. The Court granted Homeland's motion for summary judgment of non-infringement. Docket No. 140. The Court denied Sorensen's motion to enter judgment in the case without addressing Homeland's invalidity counterclaims. Docket No. 151. The Court denied Homeland's motion for summary judgment of invalidity, and granted Sorensen's motion for cross-summary judgment on Homeland's invalidity defense. Docket No. 191.

Sorensen now moves for sanctions pursuant to Fed. R. Civ. P. 11 based on Homeland's repeated presentation to the Court of an allegedly fraudulent declaration, and presentation of misleading argument concerning the prosecution history of the '460 patent ("Rule 11 Mot."). Docket No. 182. Based on the same alleged misrepresentations, Sorensen also moves for "revision" of the Court's summary judgment of noninfringement ("Mot. to Revise"). Docket No. 186.

## II. Legal Standards

### A. *Sanctions Pursuant to Fed. R. Civ. P. 11*

"Rule 11 is 'aimed at curbing abuses of the judicial system.'" *Bus. Guides, Inc. v. Chromatic Communs. Enters.*, 498 U.S. 533, 542 (1991) (quoting *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 397 (1990)). Rule 11 provides that by filing a pleading or other paper, "an attorney . . . certifies that to the best of [his] knowledge, information, and belief, formed after an inquiry reasonable under the circumstances," the paper complies with Rule 11's requirements. Fed. R. Civ. P. 11(b). Such requirements include that "the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or establishing new law," Fed. R. Civ. P. 11(b)(2), and that "the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery," Fed. R. Civ. P. 11(b)(3). *See Holgate v. Baldwin*, 425 F.3d 671, 676 (9th Cir. 2005).

-1-

Sanctions may be imposed under Rule 11 when a pleading "is frivolous, legally unreasonable, or without factual foundation." *Zaldivar v. City of Los Angeles*, 780 F.2d 823, 829 (9th Cir. 1986) (abrogated on other grounds in *Cooter*, 496 U.S. 384 (1990)); *see Security Farms v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers*, 124 F.3d 999, 1016 (9th Cir. 1997). There is no requirement of bad faith. *See Zaldivar*, 780 F.2d at 831. The Ninth Circuit has held that "Rule 11 sanctions should be applied if a competent attorney, after reasonable inquiry, would not have a good faith belief in the merit of a legal argument." *Amwest Mortg. Corp. v. Grady*, 925 F.2d 1162, 1164 (9th Cir. 1991).

"Rule 11 is an extraordinary remedy, one to be exercised with extreme caution" and "reserve[d] . . . for the rare and exceptional case where the action is clearly frivolous, legally unreasonable or without legal foundation, or brought for an improper purpose." *Operating Engineers Pension Trust v. A-C Co.*, 859 F.2d 1336, 1344-45 (9th Cir. 1988).

### B. *Motion for Reconsideration/Revision*

Unless already the subject of a separate final judgment, any order of the Court "may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities." Fed. R. Civ. P. 54(b). In the Central District of California, the vehicle for requesting such revision is a motion for reconsideration. Local Rule 7-18 governs motions for reconsideration:

> A motion for reconsideration of the decision on any motion may be made only on the grounds of (a) a material difference in fact or law from that presented to the Court before such decision that in the exercise of reasonable diligence could not have been known to the party moving for reconsideration at the time of such decision, or (b) the emergence of new material facts or a change of law occurring after the time of such decision, or (c) a manifest showing of a failure to consider material facts presented to the Court before such decision. No motion for reconsideration shall in any manner repeat any oral or written argument made in support of or in opposition to the original motion.

L.R. 7-18. A motion for reconsideration is an "extraordinary remedy, to be used sparingly." *Kona Enters., Inc. v. Estate of Bishop*, 229 F.3d 877, 890 (9th Cir. 2000) (citation omitted). Indeed, "[m]otions for reconsideration are generally unwelcome." Schwarzer, Tashima, et al., *California Practice Guide: Federal Civil Procedure Before Trial* (2013) § 12:158.1. Reconsideration is generally only appropriate where the Court is presented with newly-discovered evidence, where the Court "committed clear error or the initial decision was manifestly unjust," or where there is an intervening change in controlling law. *See School Dist. No. 1J v. ACandS, Inc.*, 5 F.3d 1255, 1263 (9th Cir. 1993).

### III. Analysis

#### A. *The Court Denies Sorensen's Motion for Rule 11 Sanctions*

Sorensen's Rule 11 Motion is based on Homeland's filing of an allegedly fraudulent declaration by Joe Meyer, allegedly misleading arguments about the prosecution history of the

-2-

'460 patent, and allegedly misleading filing of portions of the prosecution history. The Court addresses each in turn.

### 1. The Allegedly Fraudulent Meyer Declaration

In support of its successful motion for summary judgment of noninfringement, Homeland filed a declaration from Joe Meyer that provided the foundation for the results of "short shots" and "dye tests" that Homeland submitted in support of its motion. Docket 140 at 8-10. The Court held that the two tests demonstrated that the accused products did not have "flow chambers," which is a limitation of the asserted claims. *Id.* at 9. In accepting Homeland's evidence, the Court noted that Sorensen did not present even a scintilla of evidence demonstrating infringement, and that Sorensen admitted that it conducted no testing whatsoever to demonstrate that the accused products did have flow chambers. *Id.* at 9-10. Instead, Sorensen merely argued that Homeland's dye tests were inaccurate because the viscosity of the dye is different from that of the plastic, argued that the short shots in fact showed that the accused products had flow chambers, and raised evidentiary objections to the tests. *Id.* at 9-10.

Sorensen now argues that the Meyer declaration was fraudulent in six ways: (a) the dye in the dye tests was easily removable, and not fixed with the plastic; (b) Meyer did not personally perform the dye tests or have physical custody of them; (c) Homeland's counsel, not a person of skill in the art, formulated the methodology of the dye tests; (d) Homeland's expert referred to the dye tests as a "tool and die maker's trick;" (e) Meyer did not "direct the testing," since Plaintiff's counsel provided the instructions; and (f) Meyer's representations about the manufacturing parameters for the short shots were false. Rule 11 Mot. at 7-11. The Court finds that only the last issue has any merit. The Court addresses each in turn:

#### a. The Dye in the Dye Test Was Easily Removable

That the dye in the dye test was easily removable is irrelevant in the absence of any evidence that it was removed. A variation of this issue was already presented to the Court at summary judgment: Sorensen's opposition was in part based on its argument that the plastic was not mixed with the dye, and so was not probative. *See* Docket No. 140 at 9. And, Sorensen presented this exact same issue to the Court in its October 26, 2012 Notice of Intention to Not Depose Plaintiff Witness Joe Meyer. Docket No. 152 at 2 ("Chen Min tells David Hiu and Joe Meyer . . . this dye in cup is very easy to erase, the plastic and dye are not fix together"). Sorensen identifies no false representation that Homeland made concerning the removability of the dye. And Homeland has submitted a sworn declaration that dye shots have never been tampered with, manipulated or altered in any way. Trojan Decl. In Supp. of Homeland's Opp'n. To Rule 11 Mot., ¶ 6. The Court holds that this is not a Rule 11 issue.

#### b. Meyer Did Not Personally Perform the Dye Tests

Meyer never claimed to have personally performed the dye tests; his declaration stated that he had "personal knowledge of the injection molding process that is used to make the accused products" and that he "directed the testing that is described herein." Docket 120, ¶ 1. It is true that the Court's ruling, while correctly noting that Meyer directed the tests, in one place mistakenly stated that he personally conducted them. Docket 140 at 9. But that small, and read

-3-

in context, inconsequential error (nobody's perfect) was not the result of anything that Homeland did. And again, Sorensen presented this very same issue to the Court in its Notice of Intention to Not Depose Plaintiff Witness Joe Meyer. Docket No. 152 at 1 ("It has just been discovered that Joe Meyer did not personally conduct either the "dye tests" or create the "short shots" as Homeland has lead the Court and parties to believe."). The Court holds that this is not a Rule 11 issue.

### c. The Idea for the Dye Test Originated with Counsel

That the idea for the dye test came from counsel does not demonstrate any falsehood, since Meyer never claimed to have independently conceived of the tests. There is nothing sinister, as Sorensen argues, in counsel's statement that he "conceived of these color test shots as being the best way to put an end to the case." Rule 11 Mot. at 9. Presumably, most testing done in support of litigation is performed with the ultimate aim of "putting an end to the case." Further, Sorensen presented this very same issue to the Court in its Notice of Intention to Not Depose Plaintiff Witness Joe Meyer. *Id.* The Court holds that this is not a Rule 11 issue.

### d. The Dye Tests are a "Trick"

Sorensen's characterization of the dye tests as fraudulent because Homeland's expert referred to it as "a tool and die maker's trick" is a gross misinterpretation of the expert's statement, which merely explained that it would not be published in a scientific journal because it was a well known "trick of the trade" that nobody would be interested in publishing. Rule 11 Mot. at 9. Indeed, Sorensen's own expert admitted at deposition that he has seen dye testing used in the industry to "confirm . . . if material flows into a certain place or a certain direction." Trojan Decl. In Support of Homeland's Opp'n. To Rule 11 Mot., Ex. 3. at 55-5:15.[1] The Court holds that this is not a Rule 11 issue.

### e. Meyer's Claim that He Directed the Testing

Meyer's statement that he "directed the testing" is not false merely because the instructions for the testing came from counsel. Once again, Sorensen presented this exact issue to the Court in its Notice of Intention to Not Depose Plaintiff Witness Joe Meyer. The email traffic that Sorensen cites shows that Meyer was indeed the person who directed the factory floor workers to perform the testing. Kramer Decl. in Support of Rule 11 Mot., Docket 183-1 at 16-21. And Meyer has submitted a supplemental declaration explaining that he visited with the individual who ran the tests in person and spoke with him on the phone about the production of the short shots, and reviewed the results to ensure that they were produced appropriately. Meyer Decl. In Support of Homeland's Opp'n. to Rule 11 Mot., Docket 188-1. ¶¶ 5-7. The Court holds that this is not a Rule 11 issue.

---

[1] Sorensen argued at the hearing that the Court should not rely on Sorensen's expert's testimony on this point because the Court struck the portions of Sorensen's expert's report that fully explained and put into context his statements about the dye tests. But the Court is here considering the cited testimony to evaluate Sorensen's claim that Homeland committed a fraud on the Court. That is an extraordinary allegation, and Homeland is entitled to rely on record evidence to refute it. That Sorensen's expert's report might have created genuine issues of fact as to infringement if it had been timely submitted is a different question which the Court does not here consider.

-4-

*f.  Meyer's Representations About the Manufacturing Parameters of the Short Shots*

This issue is the only one in which Sorensen actually identifies a false statement.  The Meyer declaration stated that "'short shots' were made according to the same injection molding process used to make the accused products (*i.e.* using the same parameters of injection pressure, injection speed, and injection time) as set forth below." Docket No. 120, ¶ 9.  Meyer then provided the following table:

|  | Number marked on cup | | | | | |
|---|---|---|---|---|---|---|
|  | 40 | 45 | 50 | 55 | 60 | 70 |
| Injection Pressure (kg/N) | 40 | 45 | 50 | 55 | 60 | 70 |
| Injection Speed (cm3/s) | 40 | 45 | 45 | 45 | 50 | 50 |
| Injection time (second) | 2 | 2 | 2.5 | 3.5 | 3.5 | 4 |

*Id.*  But, the recently disclosed emails submitted by Sorensen show that someone at the factory told Meyer that:

> The data for the normal injection of the tall cup is:
> Injection pressure, kg/N: 100-120
> Injection speed, cm3/[ ]s: 35
> Injection time, seconds: 4

Kramer Decl. Ex. 1 at HH000291.  Meyer passed that information along to Homeland's counsel. *Id.*  But, that information was not presented in the Meyer declaration, which instead recited that the short shots "were made according to the same injection molding process used to make the accused products (*i.e.* using the same parameters of injection pressure, injection speed, and injection time)." Docket No. 120, ¶ 9.  In light of the email providing the normal injection parameters, the statement in the Meyer declaration is false.

But, it does not appear that anyone was mislead by that false statement.  First, the table provided in the Meyer Declaration, on its face, shows different parameters for each of the short shots, so at most, only one of them could even have possibly have been made using the "same parameters of injection pressure, injection speed, and injection time" as the normal product molding process.  Second, Sorensen was aware of this issue, and in its opposition to summary judgment, specifically objected to the fact that the short shots were not made according to the directions that Sorensen provided.  Docket No. 140 at 10 (citing Sorensen Decl., Docket No. 130-2, ¶¶ 9-10).  Sorensen asked Homeland to:

> Make a series of short shots samples in approximately 5 mm increments of flow length with all parameters being held constant during the production injection molding process as step d, above, including: same plastic material, same injection speed, same injection pressure, and same cooling time. The only correct change in making these short shots is injection time.

Sorensen Decl., ¶ 9. Sorensen specifically complained that the short shots submitted by Homeland did not follow that process, and instead made short shots "using its own, largely undocumented, process." *Id.*, ¶ 10. In granting summary judgment, the Court noted that Sorensen declined to run its own tests to contradict Homeland's short shots, and thus had presented no evidence that the accused products have flow chambers. Docket No. 140 at 10.

Homeland notes, somewhat confusingly, that "to put to rest any doubts that Sorensen may have had concerning how the short shots were made, Homeland's counsel asked Mr. Meyer to confirm that the short shots were made according to the same parameters used to make the accused products," and that Meyer did so, as stated in his declaration. Homeland's Opp'n. to Rule 11 Mot., Docket 188 at 6. As discussed above, the "same parameters" statement appears to be the false portion of the Meyer declaration, so it is not clear why that should be reassuring.

Homeland further argues that:

> The short shots were made according to the same *process* used to make the
> Homeland products . . . . The short shots are, by definition, incomplete or
> abbreviated injections using the normal set up conditions . . . . The parameters . . .
> are truncated for the short shots because the short shots are incomplete moldings,
> but this does not change the process . . . . the parameters are smaller because the
> mold is not completely filled.  But if the process were run to make a complete
> mold, the parameters would be the same.

Homeland's Opp'n. to Rule 11 Mot., Docket No. 188 at 14. That does not make much sense. Homeland is arguing that the process is the same, other than the parameters. But the parameters were exactly what was meant by "process" in the Meyer declaration, which stated that the "'short shots' were made according to the same injection molding process used to make the accused products (*i.e.* using the same parameters of injection pressure, injection speed, and injection time)." Docket No. 120 ¶ 9. The only part of the "process" that is the same in the short shots is that the same mold is used and plastic is injected. But, again, that is not what the Meyer declaration said. Homeland's attempted explanation here is unconvincing.

The Court wishes that Homeland's counsel had been more careful in preparing the Meyer declaration, and more candid, or coherent, in responding to the issue in the context of this motion. However, while the lapse is not praiseworthy, it did not deceive the Court. The Meyer declaration on its face showed that the short shots involved variations to all three parameters. Sorensen clearly understood that and objected to the difference between the way it wanted the short shots performed and the way Homeland performed them. And, the Court understood in granting summary judgment of noninfringement that the parameters were not precisely as Sorensen had prescribed. Docket No. 140 at 10.

Finally, Sorensen also argues that the Court was "hampered in addressing the falsity of Mr. Meyer's testimony" because Homeland allegedly misrepresented that Meyer lived abroad despite now living in New York. Docket No. 193 at 20. Sorensen offers as evidence a screen shot from a web service that provides the following "locations" for a Joseph Meyer, Age 67: Rhinecliff, NY, Port Ewen, NY, Beacon, NY, and Stuart, FL, as well as the fact that Meyer's most recent declaration was executed in New York. *Id.*, Suppl. Kramer Decl., Ex. 1, Docket

-6-

193-3. But Meyer's declaration states that he retired in December 2012, so Sorensen has produced no evidence whatsoever that Homeland's prior representations concerning Meyer's residence were untrue. Docket No. 188-1. And, Sorensen *repeatedly* declined to depose Meyer. Docket No. 188 n.9.

### 2.  The Allegedly Misleading Prosecution History

Sorensen argues that it was somehow misleading for Homeland to have noted that "during prosecution, the Patent Office rejected the claims [of the '460 patent] as being obvious in view of the Allen and Smith patents. Rule 11 Mot. at 12 (quoting Homeland's Mem. In Supp. of Mot. for Summary Judgement of Invalidity, Docket No. 158-2 at 10). Sorensen believes that it was a Rule 11 violation for Homeland to have only included that non-final rejection, without including the PTO's later, final finding that the patent was not obvious in view of Allen and Smith.

That is a bizarre argument. Of course the PTO eventually allowed the patent; if it had not, this case would not exist. The Court fully understands the prosecution history, including the addition of the threshold rate limitation that the applicant used to overcome the rejection over Allen and Smith, and discussed it extensively in the *Markman* Order, Docket No. 113, and in the Order Denying Sorensen's Motion for Reconsideration of *Markman* Ruling re Claim Construction of "Threshold Rate," Docket No. 140. This is now at least the third time Sorensen has raised the issue. Sorensen's argument that this is a Rule 11 violation is frivolous.[2]

### B.  *The Court Denies Sorensen's Motion for Reconsideration or Revision*

Sorensen's Motion to Revise the Court's Order of Summary Judgment of Non-Infringement [Doc. #140] Because it Was Procured Through Fraud, Docket No. 186 ("Mot. to Revise") is based on the same attacks on the Meyer declaration that Sorensen made in its Rule 11 Motion. Sorensen requests that the Court "revise and vacate the Court's order of summary adjudication of non-infringement (Doc. #140) and, at a minimum, allow Sorensen the opportunity to complete discovery and present its case against Homeland for infringement." *Id.* at 2.

For the reasons discussed above, the Court has entirely rejected five out of the six bases on which Sorensen attacks the Meyer declaration.[3]  As to the sixth – the question of whether the short shots were made by "the same process" as the accused products – the Court has explained above how the inaccuracy in the description did not affect the result reached. Further, the Court nowhere relied on any distinction between short shots in which only injection time was varied,

---

[2] The Court also notes that Sorensen's reliance on the fact that Homeland's counsel was sanctioned for a Rule 11 violation *20 years ago* highlights the weakness of its position. Docket No. 182 at 19-20.

[3] Sorensen argued at the hearing that counsel's conception of the dye tests runs afoul of *Sundance, Inc. v. DeMonte Fabricating Ltd.*, 550 F.3d 1356, 1362 (Fed. Cir. 2008). *Sundance* held that it was improper to admit the testimony of a patent attorney who was not a person of skill in the art. In arguing that *Sundance* applies here, Sorensen ignores that counsel did not testify; all the testimony on the dye tests came from Mr. Meyer and Plaintiff's expert, Mr. Tobin.

-7-

and those in which injection time, pressure, and speed were all varied.[4]

Sorensen also argues that it is entitled to discovery on the basis that the Court rejected the Rule 56(d) motion stating, "Had Sorensen stated that it knew, for one reason or another, that the dye or short shot tests were fabricated, and could elicit that fact in discovery, that might present a different scenario [on the Court's Rule 56(d) motion ruling]." Docket No. 186 at 4-5. But a more complete quotation of the Court's opinion is:

> To be clear, while the Court rests largely on Sorensen's lack of diligence in discovery in denying the Rule 56(d) motion, the court could just as well rest on its lack of asserted specific facts that could aid its cause. Had Sorensen stated that it knew, for one reason or another, that the dye or short shot tests were fabricated, and could elicit that fact in discovery, that might present a different scenario. Had Sorensen stated that it could and would promptly run its own tests that would contradict the results of the dye or short shot test, that too might present a different scenario. Instead, after more than a year of opportunities to take discovery and run tests, Sorensen has presented no evidence whatsoever showing that the Accused Products do in fact contain all the claim limitations, and has not even suggested what type of evidence it might present in that regard.

Docket No. 140 at 14-15. Read in context, the Court relied on Sorensen's lack of diligence and failure to assert specific facts as required by Fed. R. Civ. P. 56(d). There is still no evidence that the tests were fabricated, and still no independent testing by Sorensen.

Sorensen is still unable to point to any affirmative evidence of infringement, so there is no basis to reach a different conclusion as to infringement. In granting summary judgment of noninfringement, the Court repeatedly held that Homeland offered evidence, which the Court was "not weighing the credibility of . . . which would be inappropriate on summary judgement motion," and that Sorensen put forward *no* evidence that the Accused Products met the limitations. Docket No. 140 at 10, 12. Once again, Sorensen relies on argument where facts – here, *new* facts – are required.

At the hearing on this motion, Sorensen argued that the reason it did not produce evidence in opposition to summary judgment was that it only had "seven days to respond" to Homeland's motion for summary judgment of noninfringement. In so arguing, Sorensen ignores that it in fact had months – not days – to develop evidence showing genuine issues that could have prevented summary judgment of noninfringement. Homeland first filed its motion on March 21, 2012. Docket No. 76. But the Court took it off calendar, Docket No. 95, and Homeland refiled it on July 26, 2012. Docket No. 118. Further, discovery had been open since

---

[4] Further, Sorensen's argument that the change in injection pressure and speed matter here undercuts Sorensen's entire theory of the '460 patent. Sorensen believes, and asserts, that increasing the thickness at less than a threshold rate controls whether gaseous voids will form in thin-wall injection molding. Docket No. 164 at 18-22 ("The '460 patent makes no reference to the speed at which fluid plastic is injected into a mold cavity."). But by arguing that injection speed and pressure materially affect the behavior of the plastic formation, Sorensen endorses the theory put forth by Homeland's expert, Dr. Tobin, who stated that it is fact those parameters, not the rate of increase in thickness of the thin wall portion, that control void formation. Docket No. 160 at 9-10.

-8-

July 2011. Docket No. 140 at 14. Sorensen also argues at the hearing that it was unfair to expect it to develop expert testimony when it had "just gotten" the Court's claim construction ruling. The Court issued its claim construction order on July 5, 2012. Docket No. 113. Even if Sorensen was somehow justified in not lifting a finger to establish infringement until after the Court's claim construction ruling, which it was not, it still had about a month after that ruling before its opposition to summary judgment was due. Sorensen still provides no adequate excuse for not having come forward with evidence of infringement in response to Homeland's motion for summary judgment of noninfringement.

## C. *The Court Denies Sorensen's Request to Strike*

Sorensen requests – sort of – that the Court strike the declarations of Joseph Trojan, Chen Min, and Joe Meyer submitted by Homeland in opposition to Sorensen's Rule 11 Motion, arguing that they constitute an attempt to inappropriately pack the record for appeal with material the Court did not have before it when ruling on the underlying issues: the same rationale that led the Court to strike portions of Osswald's expert report. Docket No. 194-1; *see Kirshner v. Uniden Corp. of Am.*, 842 F.2d 1074, 1077-78 (9th Cir. 1988) (proper to strike from record on appeal papers that were filed in district court after judgment from which appeal was taken). Sorensen's request is only "sort" of because it actually requests different treatment of the declarations for purposes of each of the pending motions. Regarding the Rule 11 Motion, Sorensen "requests that the Court strictly limit any use of these three declarations as further evidence of falsity of the challenged pleadings, but for no other purpose." Docket No. 194-1 at 2. The Court would indeed only consider the declarations for that purpose. Regarding the Motion to Revise, Sorensen "requests the Court to strike all of the declarations as being after-the-fact evidence submitted on the issue of infringement offered without permission of the Court." *Id.* The Court need not do so, because, as Sorensen states, "the factual setting overlaps between the [Motion to Revise] and the co-pending [Rule 11 Motion], these two motions were not combined because Fed.R.Civ.P. Rule 11(c)(2) requires that they be separate." Docket No. 194 at 3. The Court has only considered them to evaluate the propriety of Homeland's earlier submissions, and not to bolster the Court's prior orders. Further, as Homeland only filed the declarations once, as attachments to Docket No. 188, it is not even clear how the Court could, as Sorensen requests, consider them in one context and "strike" them in another.

Even if the Court could grant the relief Sorensen seeks, it would not do so. The situation here is very different than that presented by Sorensen's submission of the entire Osswald report. In opposing invalidity, Sorensen submitted evidence that was only relevant to noninfringement: an issue the Court had already decided. Docket No. 191. Here, Sorensen moved for Rule 11 sanctions, accusing Homeland's counsel of fraud via the submission of the Meyer declaration. The signed declarations directly address the very basis of Sorensen's motion.

Sorensen also argues that the declarations raise additional complications because Chen Min appears to be a Chinese National working in mainland China. Docket No. 194-1 at 5-7. In particular, Sorensen discusses the difficulty in deposing a Chinese citizen in China, and argues that said difficulty should trigger the application 35 U.S.C. § 295, which provides:

-9-

> In actions alleging infringement of a process patent based on the importation, sale, offer for sale, or use of a product which is made from a process patented in the United States, if the court finds –
>
>> (1) that a substantial likelihood exists that the product was made by the patented process, and
>>
>> (2) that the plaintiff has made a reasonable effort to determine the process actually used in the production of the product and was unable to so determine,
>
> the product shall be presumed to have been so made, and the burden of establishing that the product was not made by the process shall be on the party asserting that it was not so made.

But Sorensen has completely failed to produce evidence that there is "a substantial likelihood" that the accused products are "made from a process patented in the United States." The Court has repeatedly noted Sorensen's failure to produce any such evidence. *See, e.g.,* Docket No. 140 at 15 (Sorensen again has "presented no evidence whatsoever showing that the Accused Products do in fact contain all the claim limitations, and has not even suggested what type of evidence it might present in that regard.").

## IV.  Conclusion

For the above reasons, the Court DENIES Sorensen's Motion for Rule 11 Sanctions and Motion to Revise Court's Order of Summary Judgment of Non-Infringement Because It Was Procured through Fraud.

-10-



US006599460B1

(12) **United States Patent**
Brown et al.

(10) Patent No.: **US 6,599,460 B1**
(45) Date of Patent: **Jul. 29, 2003**

(54) PREVENTION OF VOID-BASED-IRREGULARITY FORMATION IN THIN-WALL, INJECTION-MOLDED PLASTIC PRODUCT

(75) Inventors: **Paul Philip Brown**, San Diego, CA (US); **Jens Ole Sorensen**, Grand Cayman (KY)

(73) Assignee: **Sorensen Research and Development Trust**, San Diego, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 282 days.

(21) Appl. No.: **09/608,923**

(22) Filed: **Jul. 3, 2000**

(51) Int. Cl.⁷ ............................................. B29C 45/00
(52) U.S. Cl. .................. 264/328.12; 249/144; 425/577; 220/671; 220/675
(58) Field of Search .......................... 264/328.1, 328.12; 220/675, 671; 425/577; 249/142, 144

(56)              References Cited

            U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,532,291 A | * 10/1970 | Newman | .......... 242/118.31 |
| 3,679,119 A | 7/1972 | Copping | |
| 3,944,124 A | 3/1976 | Hexel | |
| 4,117,950 A | * 10/1978 | Allen | .......... 220/782 |
| 4,140,828 A | 2/1979 | Copping | |
| 4,467,994 A | 8/1984 | Sorensen | |
| 4,519,557 A | * 5/1985 | Newman | .......... 220/675 |
| 4,622,002 A | 11/1986 | Bormuth | |
| 4,637,141 A | 4/1987 | Sorensen | |
| 4,743,420 A | 5/1988 | Dutt | |
| 4,789,326 A | 12/1988 | Sorensen | |
| 4,807,775 A | 2/1989 | Sorensen | |
| 4,844,405 A | 7/1989 | Sorensen | |
| 4,935,188 A | 6/1990 | Sorensen | |
| 4,959,005 A | 9/1990 | Sorensen | |

| | | | |
|---|---|---|---|
| 4,960,557 A | 10/1990 | Sorensen | |
| 5,008,064 A | 4/1991 | Sorensen | |
| 5,045,268 A | 9/1991 | Sorensen | |
| 5,145,630 A | 9/1992 | Schad | |
| 5,149,482 A | 9/1992 | Sorensen | |
| 5,262,112 A | 11/1993 | Sorensen | |
| 5,839,603 A | * 11/1998 | Smith et al. | .......... 220/380 |
| 5,858,286 A | 1/1999 | Brown et al. | |
| 5,879,613 A | 3/1999 | Brown et al. | |
| 6,003,720 A | * 12/1999 | Morimoto et al. | .......... 220/608 |

            FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 0 362 648 A2 | 4/1990 |
| EP | 0 599 009 A1 | 6/1994 |
| JP | 53-21256 | 2/1978 |
| JP | 54-22481 | 2/1979 |
| JP | 54-148082 | 11/1979 |

* cited by examiner

*Primary Examiner*—Jill L. Heitbrink
(74) *Attorney, Agent, or Firm*—Edward W. Callan

(57)              ABSTRACT

During injection molding of a thin-wall plastic product, such as a drink cup, the formation of void-based irregularities is prevented in a thin-wall portion of the product formed within a zone of a thin-wall cavity section that is located between adjoining flow chambers, in which zone the thickness of the thin-wall cavity section increases in the general direction of flow within the flow chambers adjoining such zone. Such void-based irregularity formation is prevented by dimensioning the mold cavity so that the thickness in such direction at less than a threshold rate. The flow chambers do not extend to a rim portion of the thin-wall cavity section; and the respective inscribed-sphere dimensions of the adjoining flow chambers within a terminal zone of the thin-wall cavity section adjacent a rim portion of the mold cavity are less than the respective inscribed-sphere dimensions of upstream portions of the adjoining flow chambers.

34 Claims, 3 Drawing Sheets





FIG.1



FIG.2



FIG.3



FIG.4

FIG.4A

FIG.5

FIG.6A



FIG.6B



FIG.6C



FIG.7

US 6,599,460 B1

1

# PREVENTION OF VOID-BASED-IRREGULARITY FORMATION IN THIN-WALL, INJECTION-MOLDED PLASTIC PRODUCT

## BACKGROUND AND SUMMARY OF THE INVENTION

The present invention generally pertains to injection molding of thin-wall plastic products and is particularly directed to preventing the formation of void-based irregularities in thin-wall portions of such products.

Some thin-wall portions of some plastic products are injection molded by using a mold cavity that includes flow chambers for directing injected fluid plastic material into thin-wall cavity sections located between the flow chambers to thereby form the thin-wall portions of the product.

For some products, it is desired to increase the thickness of the thin-wall section in the general direction of flow within the flow chambers adjoining said zone. However, when such thickness is so increased, void-based irregularities sometimes occur in a thin-wall portion of the product that is formed by fluid plastic material directed into a zone of the thin-wall cavity section that is located between opposed flow chambers adjoining such zone because the injected fluid plastic material that is directed into such zone may surround one or more gaseous voids within such zone during the formation of the product, as shown in FIG. 1.

FIG. 1 illustrates a sequential flow-front pattern of directed plastic material within a region of a thin-wall cavity section 10 adjacent the downstream extremities of a pair of opposed flow chambers 12. The sequential flow-front pattern was determined by injecting different quantities of fluid plastic material into the flow chambers 12 and recording the extent of the resultant flow of such material directed into the thin-wall cavity section for each injection. It is seen that within a zone of the thin-wall cavity section 10 that is located between the flow chambers 12 the injected fluid plastic material that is directed into the thin-wall cavity section 10 surrounds a gaseous void 14 during the formation of the product. Consequently the thin-wall of the product includes an irregularity in the portion thereof that is formed in the zone of the thin-wall cavity section 12 in which the void 14 was surrounded by the directed fluid plastic material during the formation of the product. Such an irregularity may be manifested as a hole and/or a fragile and/or miscolored wall in such portion of the product. When the product is a container, such as a drink cup, a hole in the wall will enable fluid to leak from the container.

We have discovered that the formation of such void-based irregularities in the thin-wall portion of the product can be prevented within the zone of the thin-wall cavity section that is located between the flow chambers in which the thickness of the thin-wall cavity section increases in the general direction of flow within the flow chambers adjoining said zone by dimensioning the mold cavity so that said thickness increases in said direction at less than a threshold rate. When said thickness increases in said direction at a rate that equals or exceeds the threshold rate, such void-based irregularities usually occur. The threshold rate for a zone is determined empirically for each product, as described below in relation to the detailed description of the preferred embodiments.

The present invention provides a mold for injection-molding a product that includes at least one thin wall, comprising: a plurality of mold parts, which when combined define a mold cavity for forming the product and at least one

2

gate from which fluid plastic material may be injected into the mold cavity; wherein the mold cavity includes at least one thin-wall cavity section and at least two opposed flow chambers that adjoin opposite edges of the thin-wall cavity section for directing injected fluid plastic material from exit positions of the said at least two opposed flow chambers into corresponding entrance positions of the thin-wall cavity section to thereby form at least one thin-wall portion of the product; wherein the at least one thin-wall cavity section includes at least one zone that is located between said at least two opposed flow chambers, wherein within the at least one zone inscribed-sphere dimensions at each entrance position are smaller than inscribed-sphere dimensions at the corresponding exit position of the adjoining flow chamber; and wherein within the at least one zone the thickness of the at least one thin-wall cavity section increases in the general direction of flow within the flow chambers adjoining said zone, with said increase being at less than a threshold rate to thereby prevent injected fluid plastic material so directed into the at least one zone from at any time surrounding any gaseous void within the at least one zone. "Inscribed-sphere dimensions" are those dimensions in which a sphere can be fitted.

The present invention also provides a method of injection-molding a product that includes at least one thin wall, comprising the steps of:

(a) combining a plurality of mold parts to define a mold cavity for forming the product and at least one gate from which fluid plastic material may be injected into the mold cavity, wherein the mold cavity includes at least one thin-wall cavity section and at least two opposed flow chambers that adjoin opposite edges of the thin-wall cavity section for directing injected fluid plastic material from exit positions of the said at least two opposed flow chambers into corresponding entrance positions of the thin-wall cavity section to thereby form at least one thin-wall portion of the product, wherein the at least one thin-wall cavity section includes at least one zone that is located between said at least two opposed flow chambers, and wherein within the at least one zone inscribed-sphere dimensions at each entrance position are smaller than inscribed-sphere dimensions at the corresponding exit position of the adjoining flow chamber; and

(b) injecting fluid plastic material from the gate into the mold cavity to form the product;

wherein step (a) comprises combining mold parts that define a said mold cavity in which within said at least one zone of the at least one thin-wall cavity section the thickness of the at least one thin-wall cavity section increases in the general direction of flow within the flow chambers adjoining said zone, with said increase being at less than a threshold rate to thereby prevent injected fluid plastic material so directed into the at least one zone from at any time surrounding any gaseous void within the at least one zone.

Additional features of the present invention are described with reference to the detailed description of the preferred embodiments.

## BRIEF DESCRIPTION OF THE DRAWING

FIG. 1 illustrates a sequential flow-front pattern of directed plastic material within a region of a thin-wall cavity section in which a void is surrounded by such material during the formation of a thin-wall portion of a product within the thin-wall cavity section.

US 6,599,460 B1

3

FIG. 2 shows exemplary dimensions of a preferred embodiment of a thin-wall cavity section defined by a mold according to the present invention. FIG. 2 is drawn approximately to scale.

FIG. 3 illustrates a sequential flow-front pattern of directed plastic material within the thin-wall cavity section shown in FIG. 2.

FIG. 4 is a perspective view of a drink-cup product injected molded in the mold of the present invention.

FIG. 4A is a perspective view of a portion of the product of FIG. 4 that is formed during an empirical determination of whether the rate of increase of the thickness of a thin-wall cavity section is below the threshold rate at which void-based irregularity formation is consistently prevented.

FIG. 5 is a sectional view of a mold in which the mold parts define a cavity section for molding the drink-cup product shown in FIG. 4.

FIG. 6A is a sectional view illustrating the respective inscribed-sphere dimensions in one embodiment of the mold cavity at an entrance position of a thin-wall cavity section and a corresponding exit position of an adjoining flow chamber, as seen along lines 6—6 in FIG. 2.

FIG. 6B is a sectional view illustrating the respective inscribed-sphere dimensions in another embodiment of the mold cavity at an entrance position of a thin-wall cavity section and a corresponding exit position of an adjoining flow chamber, as seen approximately along lines 6—6 in FIG. 2.

FIG. 6C is a sectional view illustrating the respective inscribed-sphere dimensions in still another embodiment of the mold cavity at an entrance position of a thin-wall cavity section and a corresponding exit position of an adjoining flow chamber, as seen approximately along lines 6—6 in FIG. 2.

FIG. 7 is a sectional view illustrating the respective inscribed-sphere dimensions in an embodiment of the mold cavity at an entrance position of a thin-wall cavity section and a corresponding exit position of an adjoining flow chamber near the downstream extremity of the flow chamber, as seen along lines 7—7 in FIG. 2.

DETAILED DESCRIPTION

Referring to FIG. 2, a preferred embodiment of a mold cavity defined by a mold according to the present invention includes a thin-wall cavity section 20 and a pair of opposing flow chambers 21 adjoining opposite sides of the cavity section 20 for directing injected fluid plastic material from exit positions of the two opposing flow chambers 21 into corresponding entrance positions of the thin-wall cavity section 20 to thereby form a thin-wall portion of an injection molded product. The pair of opposing flow chambers 21 extend from a feeding flow chamber 22 that is coupled to a gate 23 defined by the mold.

An exemplary preferred embodiment of a thin-wall cavity section 20 for forming a thin-wall portion of an injection molded plastic product is dimensioned as shown in FIG. 2. The material used for this exemplary embodiment was polypropylene. The thin-wall cavity section 20 includes an initial zone 24, a first intermediate zone 25, a second intermediate zone 26 and a terminal zone 27. The terminal zone 27 extends to a rim portion 28 of the mold cavity at which a rim of a thin-wall portion of a product is formed. The dividing line between the initial zone 24 and the first intermediate zone 25 is 90.35 mm. from the gate 23. The dividing line between the first intermediate zone 25 and a

4

second intermediate zone 26 is 111.76 mm. from the gate 23. The dividing line between the second intermediate zone 26 and the terminal zone 27 is 122.94 mm. from the gate 23. The initial zone 24, the first intermediate zone 25 and the second intermediate zone 26 are located completely between the pair of opposing flow chambers 21. Neither of the pair of opposing flow chambers 21 extends to the rim portion 28, whereby a substantial portion of the terminal zone 27 is not located between the opposing pair of flow chambers 21. The prevention of formation of void-based irregularities in the terminal zone 27 is enhanced by not extending either of the pair of opposing flow chambers 21 to the rim portion 28.

The formation of void-based irregularities in the terminal zone 27 beyond the downstream extremities of the flow chambers 21 may not be a problem when they occur very close to a rim portion 28.

In the initial zone 24, the thin-wall cavity section 20 has a uniform thickness of 0.15 mm. In the first intermediate zone 25, the thickness of the at least one thin-wall cavity section 20 increases in the general direction of flow within the flow chambers 21 adjoining the first intermediate zone 25 at a rate of 0.0035. In the second intermediate zone 26, the thickness of the at least one thin-wall cavity section 20 increases in the general direction of flow within the flow chambers 21 adjoining the second intermediate zone 26 at a rate of 0.0066. In the terminal zone 27, the thickness of the at least one thin-wall cavity section 20 increases in the general direction of flow within the flow chambers 21 closest to the terminal zone 27 at a rate of 0.0316. Each of the opposing flow chambers 21 adjoining the initial zone 24, the first intermediate zone 25 and the second intermediate zone 26 has a diameter of 0.85 mm. Approaching the downstream extremities of the opposed flow chambers 21, the respective inscribed-sphere dimensions of the flow chambers 21 are less than the respective inscribed-sphere dimensions of upstream portions of the adjoining flow chambers 21. Such decrease in the respective inscribed-sphere dimensions of the flow chamber 21 further enhances prevention of formation of void-based irregularities in the terminal zone 27.

Referring to FIG. 3, which illustrates a sequential flow-front pattern of directed plastic material within the thin-wall cavity section shown in FIG. 2, it is seen that the injected fluid plastic material that is directed into the thin-wall cavity section 20 does not at any time surround any gaseous void within any zone of the thin-wall section 20 that is located between the pair of opposing flow chambers 21 (including zones 24, 25, 26 and the portion of zone 27 that is located between the opposing flow chambers 21).

A drink cup 40, as shown in FIG. 4, having a plurality of thin-wall portions 42 was injected molded by the method of the present invention in a mold 44 according to the present invention, as shown in FIG. 5. The mold 44 includes a plurality of mold parts 45, 46, which when combined define a mold cavity 48 for forming the drink-cup 40 and a gate 50 from which fluid plastic material is injected into the mold cavity 48. The mold cavity 48 includes a plurality of thin-wall cavity sections 20, as shown in FIG. 2, and a plurality of adjoining opposed flow chambers 21 at opposite edges of each thin-wall cavity section 20. The thin-wall portions 42 of the drink cup 40 are formed in the thin-wall cavity sections 20. The drink cup 40 also includes ridges 52, which are formed in the flow chambers 21 of the mold cavity 48. The ridges 52 do not extend to a rim 54 of the cup 40. Each thin-wall cavity section 20 of the mold cavity 48 includes an initial zone 24, a first intermediate zone 25, a second intermediate zone 26 and a terminal zone 27, which

US 6,599,460 B1

5

are located and dimensioned as described above with reference to FIG. 2.

The threshold rate of increase in the thickness of the thin-wall cavity section 20 within each of the first intermediate zone 25, the second intermediate zone 26 and the terminal zone 27 below which void-based irregularity formation between the adjoining flow chambers 21 is prevented within all such zones 25, 26, 27 was determined empirically by injection molding test strips generally corresponding to an individual common thin-wall portion 42 of the drink cup 40, with different quantities of fluid plastic material being injected into a mold cavity, such as shown in FIG. 2, in which the rate of increase in the thickness is varied for each such zone 25, 26, 27 separately, and observing the respective rates of increase of the thickness within each zone 25, 26, 27 at which void-based irregularity formation is or is not prevented.

The dimensions of the mold cavity 48 were initially selected in accordance with such test-strip determinations. Partial test products 56, such as shown in FIG. 4A, were then injected molded with different quantities of fluid plastic material being injected into the mold cavity 48 to determine whether the respective rates of increase of the thickness within each of the first intermediate zone 25, the second intermediate zone 26 and the terminal zone 27 of the thin-wall cavity section 20 that were determined by observing the test strips were such that void-based irregularity formation between the adjoining flow chambers 21 in each of the zones 25, 26, 27 was consistently prevented. When observation of the partial test products 56 reveals that void-based irregularity formation is not consistently prevented, the rate of increase in the thickness is reduced in the zone or zones in which void-based irregularity formation is not consistently prevented; and further test strips and partial test products 56 are injection molded for further observation.

FIGS. 6A, 6B and 6C illustrate the respective inscribed-sphere dimensions at an entrance position of a thin-wall cavity section and a corresponding exit position of an adjoining flow chamber in three alternative embodiments of the mold cavity 48.

In the mold cavity of FIG. 6A, the entrance position 60a of the thin-wall cavity section 20a is of approximately uniform thickness in a direction normal to the direction of flow within the adjoining flow chamber 21a; the cross-section of the flow chamber 21a is circular in the direction normal to the direction of flow within the flow chamber 21a; and here is a sharp transition between the exit position 62a of the flow chamber 21a and the entrance position 60a of the thin-wall cavity section 20a. Injected fluid plastic material is directed from the exit position 62a of the flow chamber 21a into the corresponding entrance position 60a of the thin-wall cavity section 20a; and the inscribed-sphere dimension 64a at the entrance position 60a is smaller than the inscribed-sphere dimension 66a at the corresponding exit position 62a of the adjoining flow chamber 21a.

In the mold cavity of FIG. 6B, the entrance position 60b of the thin-wall cavity section 20b is of approximately uniform thickness in a direction normal to the direction of flow within the adjoining flow chamber 21b; the cross-section of the flow chamber 21b is oval in the direction normal to the direction of flow within the flow chamber 21a; and there is a tapered transition between the exit position 62b of the flow chamber 21b and the entrance position 60b of the thin-wall cavity section 20b. Injected fluid plastic material is directed from the exit position 62b of the flow

6

chamber 21b into the corresponding entrance position 60b of the thin-wall cavity section 20b; and the inscribed-sphere dimension 64b at the entrance position 60b is smaller than the inscribed-sphere dimension 66b at the corresponding exit position 62b of the adjoining flow chamber 21b.

In the mold cavity of FIG. 6C, the thickness of the entrance position 60c of the thin-wall cavity section 20c decreases in a direction away from and normal to the direction of flow within the adjoining flow chamber 21c. Injected fluid plastic material is directed from the exit position 62c of the flow chamber 21c into the corresponding entrance position 60c of the thin-wall cavity section 20c; and the inscribed-sphere dimension 64c at the entrance position 60c is smaller than the inscribed-sphere dimension 66c at the corresponding exit position 62c of the adjoining flow chamber 21c.

FIG. 7 illustrates the respective inscribed-sphere dimensions at an entrance position 60a of the thin-wall cavity section 20a and a corresponding exit position 62a of the adjoining flow chamber 21a near the downstream extremity of the flow chamber 21a in an embodiment of the mold cavity corresponding to that shown in FIG. 6A. The entrance position 60a of the thin-wall cavity section 20a is of approximately uniform thickness in a direction normal to the direction of flow within the adjoining flow chamber 21a; the cross-section of the flow chamber 21a, (which resides within the generally concave surface of the mold cavity 48) is semicircular in the direction normal to the direction of flow within the flow chamber 21a; the flow chamber 21a has a smaller inscribed-sphere dimension than in the upstream portion of the flow chamber 21a shown in FIG. 6A; and there is a sharp transition between the exit position 62a of the flow chamber 21a and the entrance position 60a of the thin-wall cavity section 20a. Injected fluid plastic material is directed from the exit position 62a of the flow chamber 21a into the corresponding entrance position 60a of the thin-wall cavity section 20a; and the inscribed-sphere dimension 64a at the entrance position 60a is smaller than the inscribed-sphere dimension 68a at the corresponding exit position 62a of the adjoining flow chamber 21a.

In additional alternative embodiments (not shown), (a) at least one of the adjoining flow chambers does not extend from the gate either directly or via one or more connected intervening flow chambers; (b) the direction of flow within an elongated flow chamber is not necessarily lengthwise; (c) opposed flow chambers do not necessarily direct fluid plastic material toward a common position between the opposed flow chambers; (d) flow chambers may be curved and/or shaped in any manner; (e) thin-wall cavity sections need not be relatively flat or conical; (f) a thin-wall cavity section may be interposed between at least one flow chamber and the gate; and (g) meld chambers, such as described in U.S. Pat. No. 4,844,405, may be disposed within the thin cavity region between the opposed adjoining flow chambers to further enhance prevention of formation of void-based irregularities in those zones of the thin-wall section 20 that are located between the pair of opposing flow chambers 21.

The advantages specifically stated herein do not necessarily apply to every conceivable embodiment of the present invention. Further, such stated advantages of the present invention are only examples and should not be construed as the only advantages of the present invention.

While the above description contains many specificities, these should not be construed as limitations on the scope of the present invention, but rather as examples of the preferred embodiments described herein. Other variations are possible

US 6,599,460 B1

7

and the scope of the present invention should be determined not by the embodiments described herein but rather by the claims and their legal equivalents.

We claim:

1. A method of injection-molding a product that includes at least one thin wall, comprising the steps of:

(a) combining a plurality of mold parts to define a mold cavity for forming the product and at least one gate from which fluid plastic material may be injected into the mold cavity, wherein the mold cavity includes at least one thin-wall cavity section and at least two opposed flow chambers that adjoin opposite edges of the thin-wall cavity section for directing injected fluid plastic material from exit positions of the said at least two opposed flow chambers into corresponding entrance positions of the at least one thin-wall cavity section to thereby form at least one thin-wall portion of the product, wherein the at least one thin-wall cavity section includes at least one zone that is located between said at least two opposed flow chambers, and wherein within the at least one zone inscribed-sphere dimensions at each entrance position are smaller than inscribed-sphere dimensions at the corresponding exit position of the adjoining flow chamber; and

(b) injecting fluid plastic material from the gate into the mold cavity to form the product;

wherein step (a) comprises combining mold parts that define a said mold cavity in which within said at least one zone of the at least one thin-wall cavity section the thickness of the at least one thin-wall cavity section increases in the general direction of flow within the flow chambers adjoining said zone, with said increase being at less than a threshold rate to thereby prevent injected fluid plastic material so directed into the at least one zone from at any time surrounding any gaseous void within the at least one zone.

2. A method according to claim 1, wherein the mold cavity includes a plurality of said thin-wall cavity sections and a plurality of said adjoining at least two opposed flow chambers at opposite edges of each thin-wall cavity section; and wherein each thin-wall cavity section includes at least one said zone located between the adjoining at least two opposed flow chambers, in which inscribed-sphere dimensions at each entrance position are smaller than inscribed-sphere dimensions at the corresponding exit position of the adjoining flow chamber; and in which the thickness of the thin-wall cavity section increases in the direction of flow within the adjoining flow chambers at less than said threshold rate.

3. A method according to claim 2, wherein the mold cavity defines a hollow product.

4. A method according to claim 3, wherein the mold cavity defines a drink cup.

5. A method according to claim 2, wherein each at least one thin-wall cavity section extends to a rim portion of the mold cavity in which a rim of the product is formed, and wherein none of at least two opposed flow chambers adjoining the at least one thin-wall cavity section extend to the rim portion.

6. A method according to claim 5, wherein within a terminal zone of the at least one thin-wall cavity section adjacent the rim portion of the mold cavity, the respective inscribed-sphere dimension of the adjoining flow chambers are less than the respective inscribed-sphere dimension of upstream portions of the adjoining flow chambers.

7. A method according to claim 2, wherein within a terminal zone of the at least one thin-wall cavity section

8

adjacent a rim portion of the mold cavity in which a rim of the product is formed, the respective inscribed-sphere dimension of the adjoining flow chambers are less than the respective inscribed-sphere dimension of upstream portions of the adjoining flow chambers.

8. A method according to claim 1, wherein within a terminal zone of the at least one thin-wall cavity section adjacent a rim portion of the mold cavity in which a rim of the product is formed, the respective inscribed-sphere dimension of the adjoining flow chambers are less than the respective inscribed-sphere dimension of upstream portions of the adjoining flow chambers.

9. A method according to claim 1, wherein each at least one thin-wall cavity section extends to a rim portion of the mold cavity in which a rim of the product is formed, and wherein none of at least two opposed flow chambers adjoining the at least one thin-wall cavity section extend to the rim portion.

10. A method according to claim 9, wherein within a terminal zone of the at least one thin-wall cavity section adjacent the rim portion of the mold cavity, the respective inscribed-sphere dimension of the adjoining flow chambers are less than the respective inscribed-sphere dimension of upstream portions of the adjoining flow chambers.

11. A method according to claim 9, wherein within a terminal zone of the at least one thin-wall cavity section adjacent the rim portion of the mold cavity, the thickness of the at least one thin-wall cavity section increases in the direction of flow within the closest portions of the adjoining flow chambers at a rate greater than the rate of increase within the at least one zone of the at least one thin-wall cavity section.

12. A method according to claim 11, wherein a portion of the terminal zone is located between the adjoining at least two opposed flow chambers.

13. A method according to claim 11, wherein within an intermediate zone of the at least one thin-wall cavity section that is located between the adjoining at least two opposed flow chambers and between the at least one zone and the terminal zone, the thickness of the thin-wall cavity section increases in the direction of flow within the adjoining at least two opposed flow chambers at a rate less than the threshold rate, greater than the rate of increase within the at least one zone and less than the rate of increase within the terminal zone.

14. A method according to claim 1, wherein within an initial zone of the thin-wall section between the adjoining at least two opposed flow chambers and upstream from the at least one zone, the thickness of the thin-wall section does not change in the direction of flow within the adjoining at least two opposed flow chambers.

15. A method according to claim 1, wherein the flow chambers are elongated in the direction in which injected plastic material is directed within the flow chambers.

16. A method according to claim 1, wherein at each entrance position, the thin-wall cavity section is of uniform thickness in a direction normal to the general direction of flow within the adjoining flow chamber.

17. A method according to claim 1, wherein the thickness of each entrance position of the thin-wall cavity section decreases in a direction away from and normal to the general direction of flow within the adjoining flow chamber.

18. A mold for injection-molding a product that includes at least one thin wall, comprising:

a plurality of mold parts, which when combined define a mold cavity for forming the product and at least one gate from which fluid plastic material may be injected into the mold cavity;

9

wherein the mold cavity includes at least one thin-wall cavity section and at least two opposed flow chambers that adjoin opposite edges of the thin-wall cavity section for directing injected fluid plastic material from exit positions of the said at least two opposed flow chambers into corresponding entrance positions of the thin-wall cavity section to thereby form at least one thin-wall portion of the product;

wherein the at least one thin-wall cavity section includes at least one zone that is located between said at least two opposed flow chambers;

wherein within the at least one zone inscribed-sphere dimensions at each entrance position are smaller than inscribed-sphere dimensions at the corresponding exit position of the adjoining flow chamber; and

wherein within the at least one zone the thickness of the at least one thin-wall cavity section increases in the general direction of flow within the flow chambers adjoining said zone, with said increase being at less than a threshold rate to thereby prevent injected fluid plastic material so directed into the at least one zone from at any time surrounding any gaseous void within the at least one zone.

19. A mold according to claim 1, wherein the mold cavity includes a plurality of said thin-wall cavity sections and a plurality of said adjoining at least two opposed flow chambers at opposite edges of each thin-wall cavity section; and

wherein each thin-wall cavity section includes at least one said zone located between the adjoining at least two opposed flow chambers, in which inscribed-sphere dimensions at each entrance position are smaller than inscribed-sphere dimensions at the corresponding exit position of the adjoining flow chamber; and in which the thickness of the thin-wall cavity section increases in the direction of flow within the adjoining flow chambers at less than said threshold rate.

20. A mold according to claim 19, wherein the mold cavity defines a hollow product.

21. A mold according to claim 20, wherein the mold cavity defines a drink cup.

22. A mold according to claim 19, wherein each at least one thin-wall cavity section extends to a rim portion of the mold cavity in which a rim of the product is formed, and

wherein none of at least two opposed flow chambers adjoining the at least one thin-wall cavity section extend to the rim portion.

23. A mold according to claim 22, wherein within a terminal zone of the at least one thin-wall cavity section adjacent the rim portion of the mold cavity, the respective inscribed-sphere dimension of the adjoining flow chambers are less than the respective inscribed-sphere dimension of upstream portions of the adjoining flow chambers.

24. A mold according to claim 19, wherein within a terminal zone of the at least one thin-wall cavity section adjacent a rim portion of the mold cavity in which a rim of the product is formed, the respective inscribed-sphere dimension of the adjoining flow chambers are less than the respective inscribed-sphere dimension of upstream portions of the adjoining flow chambers.

10

25. A mold according to claim 18, wherein within a terminal zone of the at least one thin-wall cavity section adjacent a rim portion of the mold cavity in which a rim of the product is formed, the respective inscribed-sphere dimension of the adjoining flow chambers are less than the respective inscribed-sphere dimension of upstream portions of the adjoining flow chambers.

26. A mold according to claim 18, wherein each at least one thin-wall cavity section extends to a rim portion of the mold cavity in which a rim of the product is formed, and

wherein none of at least two opposed flow chambers adjoining the at least one thin-wall cavity section extend to the rim portion.

27. A mold according to claim 26, wherein within a terminal zone of the at least one thin-wall cavity section adjacent the rim portion of the mold cavity, the respective inscribed-sphere dimension of the adjoining flow chambers are less than the respective inscribed-sphere dimension of upstream portions of the adjoining flow chambers.

28. A mold according to claim 26, wherein within a terminal zone of the at least one thin-wall cavity section adjacent the rim portion of the mold cavity, the thickness of the at least one thin-wall cavity section increases in the direction of flow within the closest portions of the adjoining flow chambers at a rate greater than the rate of increase within the at least one zone of the at least one thin-wall cavity section.

29. A mold, according to claim 28, wherein a portion of the terminal zone is located between the adjoining at least two opposed flow chambers.

30. A mold according to claim 28, wherein within an intermediate zone of the at least one thin-wall cavity section that is located between the adjoining at least two opposed flow chambers and between the at least one zone and the terminal zone, the thickness of the thin-wall cavity section increases in the direction of flow within the adjoining at least two opposed flow chambers at a rate less than the threshold rate, greater than the rate of increase within the at least one zone and less than the rate of increase within the terminal zone.

31. A mold according to claim 18, wherein within an initial zone of the thin-wall section between the adjoining at least two opposed flow chambers and upstream from the at least one zone, the thickness of the thin-wall section does not change in the direction of flow within the adjoining at least two opposed flow chambers.

32. A mold according to claim 18, wherein the flow chambers are elongated in the direction in which injected plastic material is directed within the flow chambers.

33. A mold according to claim 18, wherein at each entrance position, the thin-wall cavity section is of uniform thickness in a direction normal to the general direction of flow within the adjoining flow-chamber.

34. A mold according to claim 18, wherein the thickness of each entrance position of the thin-wall cavity section decreases in a direction away from and normal to the general direction of flow within the adjoining flow chamber.

* * * * *

**UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT**

# CERTIFICATE OF SERVICE

I certify that I served a copy of the following document(s) on counsel of record on September 16, 2013 by Electronic Means (by email or CM/ECF):

RESPONSIVE AND OPENING BRIEF OF PLAINTIFF/CROSS-APPELLANT HOMELAND HOUSEWARES, LLC

to:

Patricia A. Shackelford
Law Office of Patricia A.
Shackelford
1991 Village Park Way, Ste. 100
Encinitas, CA 92024
patricia.shackelford@pshackelfordlaw.com

Christian Fenton
Law Office of Christian Fenton
954 4th Ave., Ste. 407
San Diego, CA 92101
christian.fenton@gmail.com

September 16, 2013

/s/R. Joseph Trojan
R. Joseph Trojan
TROJAN LAW OFFICES
9250 Wilshire Blvd., Suite 325
Beverly Hills, CA 90212
(310) 777-8399
(310) 777-8348
Email: Trojan@trojanlawoffices.com
Attorneys for Plaintiff-Appellant

## <u>CERTIFICATE OF COMPLIANCE</u>

Counsel for Plaintiff/Counterclaim Defendant/Cross-Appellant Homeland Housewares, LLC ("Homeland") certifies the following:

1.      This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B).  The brief contains 15,974 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6). The brief has been prepared in a proportionally-spaced typeface using Microsoft Word 2000 in a 14-point Times New Roman.

Respectfully submitted,

TROJAN LAW OFFICES
By

September 16, 2013                     /s/R. Joseph Trojan
                                       R. Joseph Trojan
                                       Attorney for Cross-Appellant
                                       Homeland Housewares, LLC